RAJ P. SINGH (SBN 269097)
Email: raj@williamsandsingh.com
DREW D. WILLIAMS (SBN 277143)
Email: drew@williamsandsingh.com
**WILLIAMS & SINGH, LLP**
1122 W. State Street, Suite E
El Centro, CA 92243
Telephone: (760) 994-4992/Facsimile: (760) 589-1006

*Attorneys for Plaintiff*
KEVIN T. KELLY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN T. KELLY,<br><br>                    Plaintiff,<br><br>v.<br><br>CITY OF POWAY, a municipal corporation,<br><br>                    Defendant. | Case Number: \_\_'21CV611  H    JLB\_\_<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALITIES**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.)<br><br>(Endangered Species Act, 16 U.S.C. § 1531 et seq.)<br><br>(Civil Rights Act, 42 U.S.C. § 1983 et seq.)<br><br>*JURY TRIAL REQUESTED* |

///

///

COMPLAINT

Plaintiff Kevin T. Kelly, by and through his counsel, hereby alleges:

## I.    PRELIMINARY STATEMENT

1. This Complaint addresses ongoing violations of the Clean Water Act (CWA), the Endangered Species Act, the San Diego Regional National Pollutant Discharge Elimination System (NPDES) Municipal Separate Storm Sewer Systems (MS4) Permit, Order No. R9-2013-0001, NPDES No. CAS0109266, as amended by Order Nos. R9-2015-0001 and R9-2015-0100 (2013 MS4 Permit), and the Civil Rights Act.

2. This Court has subject matter jurisdiction over the parties and this action because it arises under federal law. The events giving rise to this Complaint and the violations described herein occurred, and continue to occur, within this judicial district.

3. This Complaint arises out of the unlawful pollution of Warren Canyon and Lake Poway caused by Defendant City of Poway and the Poway residents of Warren Canyon upstream of Lake Poway, which is a recreational lake open to the public as well as a drinking water reservoir designed to capture stormwater and non-stormwater by the pull of gravity.

4. The City of Poway has been misleading the natural resource agencies by labeling the main tributary excavated to build Lake Poway – Warren Creek – as an "ephemeral stream" to avoid complete compliance with the strictures of the Clean Water Act and the 2013 MS4 Permit.

5. The City of Poway is owner and operator of Lake Poway and the upstream portion of the City's Municipal Separate Storm Sewer System (MS4) including Warren Crossing,

COMPLAINT

which is a manmade unpaved road that has been built across Warren Creek and leads to the world-famous peak of Mount Woodson and Potato Chip Rock, and Fisherman's Footbridge, which is part of an unpermitted trail located at the mouth of Warren Creek and within the outskirts of Lake Poway.

6. When the City of Poway incorporated as a general law city in San Diego County in December 1980, the former Poway Municipal Water District became part of the City structure, including the earthen dam in Warren Canyon near the base of Mount Woodson. The dam, 160 feet high and 1,060 feet wide, created a 62-acre lake over a United States Geological Survey blue-line seasonal stream called Warren Creek. This reservoir, now known as Lake Poway, serves as a local emergency water supply and is able to store over one billion gallons of water at one time.[1]

7. While most of the water from Lake Poway is usually imported by the San Diego County Water Authority and piped in and out of the reservoir on a regular basis, natural runoff adds a significant amount of water to the reservoir during non-drought years. This natural runoff is mainly funneled into the reservoir from two seasonal streams that merge together, with one coming from the Mount Woodson Cornerstone, the other coming from the Rock Haven Cornerstone. From the merged streams, the reservoir has been

---

[1] Once in Lake Poway, the water from the reservoir is pulled into the Lester J. Bergland Water Treatment Plant via a public water supply intake structure for further purification into drinking water. Also, some of this purified water is pumped back into the reservoir for storage.

COMPLAINT

designed to capture millions of gallons of storm runoff as well as rising groundwaters and natural spring water emanating from both Mount Woodson and Rock Haven.

8.  The San Diego Natural History Museum has an exhibit that states the following: "In a place where water is scarce, wet places are precious. [A]t hidden places in our mountains, water springs from the earth. It follows gravity's pull to the ocean." One such place where water springs from the earth is Kelly Spring, which flows into Lake Poway. The spring is on Plaintiff's property and under the City of Poway's jurisdiction.

9.  Lake Poway is a reservoir built over an intermittent stream known as Warren Creek in Warren Canyon that is under the City of Poway's jurisdiction. Warren Creek is fed by spring water, rising groundwaters, and stormwater on a seasonal basis.

10. Warren Creek is "a tributary of the San Dieguito River hence the Pacific Ocean" according to official documents describing Warren Canyon and the dam built there.

11. Water from Warren Creek flows underneath the dam via a subterranean stream that flows into Sycamore Creek, then into San Dieguito River, and into the Pacific Ocean as surface water on an intermittent seasonal basis.

12. The City of Poway has been using Lake Poway not only for water storage purposes but also for recreational purposes including commercial navigation since the 1970s.

13. In 2017, Warren Creek had consistent stream flow at Kelly Spring on Mount Woodson and into Lake Poway at Boulder Bay everyday between the end of January 2017 to at least the end of April 2017.

14. In 2019, Warren Creek had consistent stream flow at Kelly Spring on Mount

COMPLAINT

Woodson and into Lake Poway at Boulder Bay everyday between February 5, 2019 and at least through July 15, 2019.

15. In 2019, stream flow through Warren Crossing, located at 33.0030 latitude, -117.0057 longitude, was persistent 24 hours a day, 7 days a week from February 5, 2019 through at least June 5, 2019. After June 5, 2019, water flow through Warren Crossing became more intermittent at the surface at this location along Warren Creek and had visible surface water flows at least during the night and morning hours daily there. For those times that visible surface flow was not present, water flowed near the surface and reemerged as a continuous, persistent visible surface stream above the Boulder Bay area of Lake Poway and flowed into the reservoir during that time frame.

16. Warren Creek has had consistent stream flow at Kelly Spring on Mount Woodson and into Lake Poway at Boulder Bay everyday between December 27, 2019 through at least January 20, 2020.

17. Stream flow was consistently present at the surface immediately above and into the Boulder Bay area of Lake Poway during the entire month of January 2020 even though it rained less than an inch in total in the area that month (January/February 2020 has been one of the drier winter periods in California recorded history).

18. During the month of March 2020, base surface flow from groundwater sources again constantly appeared at the surface in Warren Creek including from Kelly Spring on Mount Woodson which flowed downstream into Lake Poway. Warren Creek has had consistent stream flow at Kelly Spring on Mount Woodson and into Lake Poway at

COMPLAINT

Boulder Bay everyday between March 31, 2020 through at least July 31, 2020.

19. On December 27, 2019, stream flow through Warren Canyon at the Boulder Bay area of Lake Poway was approximately 30 gallons a minute; by January 20, 2020, stream flow through Warren Canyon at the Boulder Bay area of Lake Poway dwindled to approximately 5 gallons a minute.

20. On April 1, 2020, a dry-weather day, the flow rate of Kelly Spring near the base of Mount Woodson was approximately 7 gallons per minute; the flow rate at downstream Warren Crossing and into Lake Poway was estimated to be at least 20 gallons per minute.

21. On May 15, 2020, a dry-weather day, the flow rate of Kelly Spring near the base of Mount Woodson was approximately 10 gallons per minute; the flow rate at downstream Warren Crossing and into Lake Poway was estimated to be at least 40 gallons per minute on May 15, 2020.

22. The waters flowing through Warren Canyon at the Boulder Bay area of Lake Poway in the month of January 2020, on April 1, 2020, and on May 15, 2020 were not "ephemeral" flows in direct response to precipitation (stormwater) but were due to a raised groundwater table and from spring water flows.

23. The City of Poway is the owner and operator of the Lake Poway Recreation Area which includes the City-owned MS4 system which receives discharges of stormwater, non-storm spring waters, rising groundwaters, and unpermitted dredged and fill materials placed in the streambed from the City's activities as well from residents of

COMPLAINT

6

Warren Canyon upstream of Lake Poway under the City of Poway's jurisdiction.

24. With this storm and spring water, sediment from unpermitted man-made structures along with other pollutants are transported through Poway's MS4 system in Warren Canyon and into Lake Poway. Unfortunately, over a long period of time and without sustainable management, sediment deposits will gradually displace the volume area that was previously used for water storage until eventually the reservoir becomes filled with sediment. As water storage is lost, the beneficial uses that depend on storage – such as water supply and flood control – also will decline and eventually will be lost.

25. Over the past 40 years, the City of Poway has altered the location and size of the original trails surrounding Lake Poway but has never obtained the proper Clean Water Act permits, *individual* water quality certifications, and/or waste discharge requirements from the San Diego Water Board for the placement, maintenance, and replacement of dredged and fill materials (soil and sediment) beyond the original fill design in the intermittent tributaries above Lake Poway or in Lake Poway itself.

26. There are also about 20 private residences in Warren Canyon within the City of Poway and upstream of Lake Poway, and a number of these private residences also contain unpermitted and unauthorized culvert-with-dirt backfill stream crossings, constructed fords, and other illicit discharges/connections and *mobile* pollutants intentionally placed within Warren Creek since the City of Poway incorporated which have not been effectively prohibited and eliminated by the City of Poway with its law enforcement powers.

COMPLAINT

27. Many of these stream crossings in Warren Creek failed during the winter storms of 2017, including at least one unpermitted and unauthorized culvert crossing owned by the City of Poway and at least a half dozen unpermitted crossings owned by private landowners, which resulted in an unreasonable amount of sedimentation pollution into Lake Poway from mobile pollutants originating from anthropogenic point sources.

28. Portions of the aforementioned stream crossings in Warren Canyon were washed out again during the winter storms of February 2019, with the waste being deposited in the lakebed.

29. Portions of the aforementioned stream crossings in Warren Canyon were washed out again during the spring storms of April 2020, with the waste being deposited in the lakebed.

30. A significant portion of the polluted water discharged into Lake Poway in 2017, 2019, and 2020 was non-storm spring water that flowed during periods of wet weather and dry weather, collecting sedimentation pollution from and through private residences' point sources and the City's point sources further downstream before flowing into the reservoir as waste.

31. After the winter storms of 2017, the City of Poway again conducted unauthorized and unpermitted dredging and filling activities in waters of the United States including constructing culvert-with-dirt-backfill stream crossings that have not been engineered to withstand storm surges of an expected 50-year storm event.

32. The City of Poway is ultimately responsible for all of these discharges into and from

COMPLAINT

8

its MS4 into receiving waters including into Lake Poway, which has been deemed "Waters of the United States" by the United States Environmental Protection Agency (EPA) and the State of California.

33. The MS4 Permit recognizes that "historic and current development makes use of natural drainage patterns and features as conveyances for runoff." 2013 MS4 Permit, Finding 11. Further, "[r]ivers, streams and creeks in developed areas used in this manner are part of the [City's] MS4 regardless of whether they are natural, anthropogenic, or partially modified features." Id.

34. Although semirural in nature, Warren Canyon including the Lake Poway area is a developed area of the City of Poway, with unpaved and paved roads traversing the area including over its watercourses.

35. Warren Creek is both a MS4 and a receiving water according to the 2013 MS4 Permit.

36. Failure to obtain mandatory permits for activities at the sites in question (i.e. roads within USGS blue-lined intermittent/seasonal streams and adjacent wetlands) violates the Clean Water Act's prohibition on unpermitted discharges and unpermitted disturbance of watercourses. These failures are demonstrated by the discharges of polluted stormwater and non-storm water containing pollutants coming through Warren Crossing and into Lake Poway and aggravating a condition of pollution in the reservoir.

37. The City has used a generalized emergency Department of the Army permit to repair its

COMPLAINT

main tributary crossing on April 17-20, 2017; however, the City has not met the generalized emergency permit conditions of this permit; the rebuilding efforts were not fully described in the emergency permit (other structures, dirt fill, concrete, and dredged materials were placed in the historical stream without authorization from the Department of the Army and the San Diego Water Board); the rebuilding efforts occurred during non-emergency storm conditions (winter rains practically ceased by the end of February 2017); and the reconstruction occurred in proximity to the City's public water supply intake within the reservoir (the emergency permit cannot be used in this type of situation).

38. On its first attempt at procuring a federal dredge and fill permit in Warren Canyon since its reservoir was constructed and completed in 1972, the City of Poway obtained in 2017 a Department of the Army Permit for building a road over an "ephemeral" stream and over "non-wetland" waters to construct Warren Crossing. Warren Creek is much more than "ephemeral" as it is an intermittent seasonal stream fed by natural springs and rising groundwaters and contains "wetland" waters as defined by the Department of the Army.

39. The City of Poway never obtained a valid Department of the Army permit in 2017 or in previous years for Warren Crossing, which in reality crosses over an intermittent stream fed seasonally by spring water and over wetland waters protected by the Clean Water Act as it has been interpreted by the federal courts and the natural resource agencies since the 1970s.

40. These 2017 rebuilding efforts in the Lake Poway area took place when Poway's City

COMPLAINT

Council suspended environmental review of its projects after it declared a weather "state of emergency" in a year with a near average amount of rainfall for Mount Woodson (the annual average rainfall is 19 inches; it rained 21 inches during the 2016-2017 rainfall season). After the heavy rains of January and February 2017, it hardly rained at all in March and April 2017. Inexplicably, this "state of emergency" was not lifted until March of 2018 following one of the longest dry spells in San Diego County recorded history. Under this shroud, the City of Poway conducted all of its rebuilding activities in the Lake Poway area and in Waters of the United States and/or state during non-emergency circumstances and during the dry spring, summer, and fall months.

41. The City of Poway's Land Development Engineering Division will not provide permits to private landowners to construct or rebuild culvert-with-earth-fill road crossings over blue-line streams on private property in Warren Canyon because of water quality regulations; yet, in hypocritical fashion and without the proper local permits from the Department of the Army and/or the San Diego Water Board, the City's Public Works Department has recently built culvert-with-earth-fill road crossings in proximity to Lake Poway, a public water supply that impounds storm water and non-storm spring water from the local mountains and that contains a public water supply intake into a drinking water purification plant.

42. Lake Poway impounds Waters of the United States.

43. As there are multiple sources of water flowing through Warren Creek and into Lake Poway – including storm and non-storm spring water from both Mount Woodson and

COMPLAINT

Rock Haven – Lake Poway and Warren Creek are considered Waters of the United States (WOTUS), even under the Trump Administration's Navigable Waters Protection Rule which took effect on June 22, 2020.

44. Lake Poway has met the definition of Waters of the United States (WOTUS) as a navigable-in-fact lake under the rules promulgated by the EPA in 1973 and under the joint rules promulgated by the EPA and the Department of the Army in the 1980s as it was built over an intermittent seasonal stream fed by spring water and a raised groundwater table.

45. Lake Poway is not an enclosed conveyance system or a terminal off-stream reservoir with a lockless dam.

46. Lake Poway is not a dry-canyon ditch as the City of Poway contends.

47. Lake Poway was not constructed in "non-jurisdictional" waters.

48. Lake Poway is flooded on a seasonal basis by "jurisdictional waters."

49. Lake Poway was not created in "dry land." It was created by excavating an intermittent tributary containing wetlands with a direct hydrological connection to the Pacific Ocean.

50. Lake Poway and Warren Canyon have been designated as "Environmentally Sensitive Areas (ESAs)" by the City of Poway.

51. Lake Poway was not built over an ephemeral tributary. It was built over a seasonal intermittent stream that has funneled storm and non-storm spring water to the San Dieguito River and thence the Pacific Ocean.

52. Lake Poway is not a strictly intrastate body of water: It is composed of navigable-in-fact

COMPLAINT

waters that are hydrologically connected and have a significant nexus to the Pacific Ocean which is 17 miles away.

53. The waters of Lake Poway itself have been used in interstate commerce.

54. Foth-CLE Engineering Group, a Wisconsin based company, was paid by the City of Poway, a California municipal corporation, to use its vessel and attached equipment to navigate and survey Lake Poway in 2018.

55. Lake Poway is used by interstate and foreign travelers for recreational or other purposes:

   a. Fish could be taken from the reservoir and sold in interstate commerce;

   b. The City of Poway and its agents are in the commercial business of renting fishing boats to interstate and foreign tourists for use on Lake Poway; and

   c. Hundreds of tourists from countries such as Australia and Japan as well as tourists from other states visit Lake Poway every year and use Warren Crossing on their way to the world-famous attraction of Potato Chip Rock.

56. The reservoir has a high downstream hazard risk of flooding according to the state of California because of the seasonal streams feeding the reservoir. Water flooded over the dam in 1997, which was naturally funneled into the Pacific Ocean below.

57. The area below the dam was almost inundated in 2017. Had it rained another inch during the first week of March 2017, water would have spilled over the dam (Poway was able to successfully prevent flooding over the dam in 2017 by pumping some of the water out of the reservoir during the final days of February 2017).

58. Water also naturally seeps underneath the dam, flows underneath the dam via a

COMPLAINT

subterranean stream, flows out of a required outlet pipe for mandatory releases to satisfy downstream prior water rights, and spills over a spillway during times of flooding. Such waters flow down into the San Dieguito River and thence the Pacific Ocean as surface water.

59. City records show that Poway estimated that 1,000 acre-feet of local water from Warren Creek and rainfall within the lake basin filled Lake Poway in the 1979-1980 season (the entire capacity of Lake Poway is around 3,432 acre-feet).

60. The City of Poway has a license to use a fixed amount of the water from Warren Creek, which is a tributary to the San Dieguito River and thence the Pacific Ocean. The amount cannot exceed 858 acre-feet per season (a number derived from the City's own calculations of water flows from Warren Canyon), and it can only be collected by the reservoir between November 1 of each year to May 31 of the succeeding year. The City of Poway must maintain an outlet pipe of adequate capacity in the dam as near as practicable to the bottom of the natural stream channel in order that water entering the reservoir which is not authorized for appropriation under its license may be released.

61. In 2019, the City of Poway was mandated under its 1987 water rights license agreement with the State Water Resources Control Board to release water from Lake Poway dam to the natural stream below the dam and to the San Dieguito River and hence to the Pacific Ocean everyday between June 1, 2019 to at least August 10, 2019 because there was persistent stream flow in the Boulder Bay area of Lake Poway from Warren Creek during that time period. This evidence shows that Lake Poway is not a terminal reservoir.

COMPLAINT

14

62. In 2020, the City of Poway was mandated under its 1987 water rights license agreement with the State Water Resources Control Board to release water from Lake Poway dam to the natural stream below the dam and to the San Dieguito River and hence to the Pacific Ocean everyday between June 1, 2020 to at least August 3, 2020 because there was persistent stream flow in the Boulder Bay area of Lake Poway from Warren Creek during that time period. This evidence shows that Lake Poway is not a terminal reservoir.

63. The City of Poway failed to release the surface water from Lake Poway to the natural stream below the dam as mandated by its licensing agreement between June 1, 2019 to August 10, 2019 and between June 1, 2020 to August 3, 2020. Poway is only allowed to keep stormwater and non-stormwater flowing in Warren Canyon between November 1 of each year to May 31 of the succeeding year and must release any stormwater, natural spring water, and/or rising groundwater that flow outside that time period.

64. The City of Poway also has a water rights agreement with the City of San Diego, signed in 1968, in which the City of San Diego owns half the water rights of Warren Canyon. The City of Poway must transfer half the local water that it captures via its dam to the City of San Diego annually because the City of San Diego owns Lake Hodges, which is downstream of Lake Poway.

65. Based on data maintained by the U.S. Geological Survey, the historical record shows that well over 100,000 gallons of water a minute can surge through the main tributary in Warren Canyon and into Lake Poway during a 50-year storm event.

COMPLAINT

66. During the last 40 years, the City of Poway has mismanaged its local water supplies by not accurately reporting the amount of natural runoff that flows into Lake Poway during wetter years. This inaccurate and inconsistent reporting is due to the fact that the City of San Diego owns half of the water rights coming from the tributary feeding Lake Poway, and the City of Poway does not want to pay the City of San Diego back for its due share of water annually.

67. Poway's City Engineer did not do his job of overseeing the work of Poway's Public Works Director Mike Obermiller, who did not account for the amount of water that can flow through the main tributary and into Lake Poway and designed a dirt-backfill stream crossing that will not withstand storm surges and the amount of water coming through the main tributary during wetter years.

68. Poway's City Engineer left his job soon after being notified of Plaintiff's intention to file a lawsuit over Poway's Clean Water Act violations.

69. On the same date that the original complaint in 18cv2615 was filed by Plaintiff, Poway's City Manager notified the public of her impending resignation following a six-month notice period.

70. In August 2019, Poway's Public Works Director Mike Obermiller was let go from his position with the City of Poway.

71. By law, the City of Poway should have constructed a concrete water measuring structure (weir) / engineered bridge combination at the location of its current dirt-backfill stream crossing over the main tributary to fulfill its contractual obligations under the 1968 Water

COMPLAINT

Rights Agreement between Poway and the City of San Diego and to meet state and federal water quality requirements.

72. The amount of water coming through the main tributary of Warren Canyon upstream of Lake Poway during a 50-year storm event would not fit within the recently built culvert crossing as it is currently placed and would lead to another blowout.

73. Considerably less water than a 50-year storm event would cause another blowout of the main tributary culvert crossing because the City realigned the stream from its historical placement by placing a culvert at a new location within the stream and leaving the old culvert buried in place without removing this waste.

74. The City placed dirt-fill, concrete, plastic, and dredged materials in the historical part of the stream bed and on top of the abandoned culvert in the summer of 2017, specifically on August 30, 2017 through September 25, 2017, without the appropriate Clean Water Act and San Diego Water Board permits. All of these materials were not described in the CWA Section 404 permit obtained by the City in the spring of 2017. These materials are likely to blow out to the reservoir below in a 50-year storm event.

75. The effluent coming off the City of Poway's rebuilt earthen crossings, the remaining unpermitted point-source waste in various portions of Warren Canyon including at Warren Crossing, as well as the placement of mobile pollutants in Warren Creek by third-party, upstream landowners in Warren Canyon, have and will cause pollution in downstream Lake Poway seasonally during most rainy seasons, which will lessen its storage and flood-control capacity over time.

COMPLAINT

17

76. In 2017, the City of Poway has failed to obtain *individualized* water quality certifications and/or waste discharge requirements from the San Diego Water Board for its rebuilt stream crossings in at least two locations above Lake Poway.

77. In 2017, Lake Poway had a higher average numeric turbidity level than in 2016 and, unlike other years, had a slightly higher average numeric turbidity level than allowed by state law for drinking water, based on measurements taken from the public water supply intake.

78. The higher turbidity levels at the public water supply intake in 2017 were caused by excessive sedimentation from the proximal blown-out stream crossings and the resulting polluted storm and non-storm water that flowed into and diffused through the reservoir.

79. Under the Clean Water Act, the City of Poway is responsible for ensuring that pollution from its point sources do not lead to the loss of the beneficial uses of Lake Poway. However, not only has the City of Poway not obtained the proper Clean Water Act and San Diego Water Board permits for its construction activities in the Lake Poway area, it has also not been adhering to the National Pollutant Discharge Elimination System ("NDPES") permit (the "2013 MS4 Permit") that it has procured for its storm and non-storm water point-source discharges from its main MS4 feeding the reservoir.

80. Under its 2013 MS4 Permit, the City of Poway is responsible for adequately addressing the phosphorous-laden and the nutrient-rich non-storm water and accompanied sediment pollutants which exceeds Poway's non-storm water action levels (NALs) for several constituents that has been discharged into its MS4 and into

COMPLAINT

Lake Poway on a daily basis during the times of the year when there is non-stormwater stream flow through Warren Canyon including in 2017, 2019, and 2020.

81. The 2013 MS4 Permit requires the City of Poway to address these flows by reducing these flows through stream rehabilitation projects that would also reduce the concentration of the pollutants in these flows.

82. Defendant has operated the Lake Poway Recreational Area in violation of the Clean Water Act and its 2013 MS4 Permit by: failing to obtain permits from the United States Army Corps of Engineers ("Army Corps") for dredge and fill activities within the Army Corps' jurisdiction, including its new boat dock over Lake Poway, which was accepted as completed and finalized by Poway's City Council on November 21, 2017; failing to comply with the City of Poway's 2013 MS4 Permit's water pollution control requirements for development projects; failing to obtain water quality certifications and/or waste discharge requirements from the State of California before disturbing Warren Creek, its tributaries, its banks, and onsite federal waters including Lake Poway in 2017.

83. The City of Poway has not done enough to reduce or eliminate past or future storm and non-storm water discharges of pollutants into Lake Poway. As mandated by its 2013 MS4 Permit and its Jurisdictional Runoff Management Program (JRMP) document, it should have removed the polluted sediment buildup in its MS4 and in Lake Poway and implemented effective controls to reduce future pollution.

84. Defendants has also failed to fully enforce the Clean Water Act and the 2013 MS4

COMPLAINT

Permit requirements against the residents of Warren Canyon upstream of Lake Poway to stop the recurring pollution resulting from unpermitted stream crossings on private property over Warren Creek that have been repeatedly washed out into the reservoir over the years including in 2017, 2019, and 2020 due to poor design; failing to monitor septic tanks and water wells in Warren Canyon as required by the 2013 MS4 Permit; and failing to adequately address the spring water containing pollutants that has been discharged into Poway's MS4 as a source of pollutants aggravating a condition of pollution in the receiving waters downstream of Warren Crossing including the reservoir (Lake Poway).

85. As Lake Poway is Waters of the United States, the City of Poway's 2013 MS4 Permit requires it to reduce pollutants in storm water discharges from its MS4 to the maximum extent practicable (MEP).

86. In 2017, a significant amount of non-storm water – i.e. rising groundwaters and natural spring water flowing from both Mount Woodson and Rock Haven that is funneled into Warren Creek – became contaminated with mobile pollutants including sedimentation from failed culvert-with-dirt-backfill crossings owned by the City of Poway as well as several private residences who have unpermitted stream crossings of their own in Warren Canyon that were washed out.

87. The City of Poway's failed culvert crossing at Warren Crossing in 2017 was not previously permitted by the Department of the Army under Section 404 of the Clean Water Act or approved by the San Diego Water Board with an up-to-date water quality

COMPLAINT

certification even though it has been altered and relocated from its original design.

88. The San Diego Water Board requires updated certifications every few years for culvert maintenance involving dredging and filling, which the City of Poway has never obtained for this site.

89. This polluted non-storm water was discharged through a City-owned point source and entered Lake Poway – the receiving body of water of the state and waters of the United States – and aggravated a condition of pollution in the reservoir caused by the accumulation of unpermitted waste being deposited there repeatedly over the last 45 years.

90. The City of Poway's 2013 MS4 Permit requires that non-storm spring water must be properly addressed through the effective implementation of various provisions of the City's 2013 MS4 Permit. Otherwise, the 2013 MS4 Permit and federal law require the City to obtain a separate NPDES permit for the non-storm water discharges containing pollutants.

91. History will repeat itself because the City of Poway and some private landowners in Warren Canyon have replaced unpermitted fill and dredged materials – mobile pollutants – back in the main tributary feeding Lake Poway after the winter storms of 2017.

92. The non-storm spring water flows into Lake Poway from two main sources: Rock Haven Spring, which flows on City-owned land (APN: 278-210-1100) and Kelly Spring, which is located on land that Plaintiff owns (APN: 278-210-1800). As the water from Kelly Spring discharges through damaged wetlands, through several point source dirt road

COMPLAINT

crossings, into the City of Poway's MS4, and into the receiving waters of Lake Poway, the spring water has become and becomes contaminated with sedimentation pollution and other mobile pollutants.

93. Unless a non-storm water discharge is identified as a discharge authorized by a separate NPDES permit, the City's 2013 MS4 Permit requires the City of Poway to reduce or eliminate non-storm water discharges containing pollutants from springs and rising groundwaters into its MS4 where feasible and priorities and resources allow. 2013 MS4 Permit, Provision E.2.a.(7).

94. This reduction of a non-storm water discharge from a spring through wetlands repairs and stream rehabilitation projects is required to be implemented when the non-storm water is a source of pollutants aggravating a condition of pollution in the City's receiving waters of the United States. The policy goal of this requirement is to ensure that the municipality is doing all it can to preserve and save precious local water resources.

95. From 1972 when Poway dam was built to today, over 20,000 tons of sediment have entered Lake Poway from Warren Creek.

96. Much of this polluted sediment waste has been piling up in the Boulder Bay area of Lake Poway and is pushed further and further into the lake after storm surges.

97. Under its 2013 MS4 Permit, MS4 operators like the City of Poway cannot passively receive and discharge pollutants from third parties under its jurisdiction that it fails to control, whether in storm water or non-storm water discharges.

98. The City's discharges and third-party discharges entering the City's MS4 have caused,

COMPLAINT

have contributed to, and have threatened to cause waste blockage pollution in Lake Poway as well as eutrophication of certain portions of the reservoir including at the mouth of Warren Creek and in Hidden Bay in violation of its 2013 MS4 Permit.

99. The anthropogenically caused, point-source sedimentation pollution piling up in Boulder Bay area of Lake Poway contains elevated phosphorous and nutrient levels, causing excessive fertilization (eutrophication threatening to lead to oxygen depletion and aquatic suffocation) and harmful cyanobacterial blooms in the mouth of the seasonal tributary and in Lake Poway.

100. The City of Poway's 2013 MS4 Permit and Poway's JRMP mandate that it remove the polluted sediment from Boulder Bay and unblock and restore the natural flow (sans polluted sediment) of the tributary into Lake Poway.

101. In addition to reducing future storm water pollution, the City of Poway must reduce future non-storm water discharges into its MS4 and into Lake Poway through effective law enforcement of those under its jurisdiction and through effective controls and other best management practices (BMPs) to fulfill its current 2013 MS4 Permit; otherwise, it must ensure that separate NPDES permits are obtained for the polluted non-storm water discharges to its MS4 (from the mountain spring water containing pollutants) and to Lake Poway that will occur and recur on a seasonal basis.

102. The City of Poway must also implement effective controls and BMPs to segregate seasonal flows of spring water from non-point source and point-source pollutants before they are discharged into Warren Creek and into the City's MS4.

COMPLAINT

103.     The non-storm spring water emanating from Mount Woodson is first discharged into the City-owned MS4 starting at APN: 278-290-1000 and continuing on into APN: 278-280-2300, which contains the City-owned point-source culvert and point-source earth-fill crossing over Warren Creek. The non-storm spring water is then discharged through a point source that drains over 1000 acres (a wooden footbridge single conveyance in Warren Creek which straddles APN: 278-280-2300 and APNs: 278-281-0100 and 760-159-0500 (14692 and 14656 Lake Poway Road, Poway, California 92064, Latitude 33.0039, Longitude -117.0069)).

104.     The wooden footbridge and attached abutments (trail crossing) are a point source as defined by the federal regulations that discharges into adjacent wetlands and the surface waters of the Boulder Bay area of Lake Poway. The two pictures below show the wooden footbridge in 2005 and 2009.



105.     Because of the 2017 storms, the wooden footbridge, built circa 2001, has been nearly buried in waste (see picture below taken in 2018).

COMPLAINT



106.   The wooden footbridge has never received the proper permits from the Department of the Army and/or the San Diego Water Board.

107.   The 48-inch culvert at Warren Crossing immediately upstream of Fisherman's Footbridge is also a point source as defined by the federal regulations that discharges into adjacent wetlands of Lake Poway, into the surface waters of the Boulder Bay area of Lake Poway, and further into the reservoir.

108.   Defendant has operated Warren Crossing and Fisherman's Footbridge in violation of the Clean Water Act by: failing to fully enforce the Clean Water Act and the 2013 MS4 Permit requirements against the residents of Warren Canyon upstream of Lake Poway to stop the recurring pollution resulting from unpermitted stream crossings on private property over Warren Creek; and failing to adequately address the phosphorous-laden and the nutrient-rich spring water that has been discharged into Poway's MS4 as a source of pollutants aggravating a condition of pollution in the receiving waters downstream of Warren Crossing including the reservoir.

109.   The City of Poway has failed to report its non-storm water discharges containing

COMPLAINT

pollutants, its lack of best management practices, and the resulting prohibited and uncontrolled pollution into Lake Poway in its Report of Waste Discharge required for its Regional MS4 permit renewal and in other reports such as the Water Quality Improvement Plan Annual Report as required by its current 2013 MS4 Permit.

110.    The City of Poway has identified through the public record the fact that spring water from Rock Haven flows in its MS4 and reaches Lake Poway and that storm water and non-storm water runoff from Warren Creek contributed to the sedimentation pollution into the Boulder Bay portion of Lake Poway in 2017.

111.    The City of Poway has acknowledged in the public record that MS4 pollution has nearly buried its wooden footbridge in Boulder Bay with course and fine sediment in 2017, which only a few years ago was floating above the waters of Lake Poway.

112.    Again in 2019, enough waste sediment entered the Boulder Bay portion of Lake Poway to further extend the beach into the reservoir and to re-bury the area under its wooden footbridge with a fresh load of waste that only a few years ago was floating above water.

113.    Again in 2020, enough waste sediment entered the Boulder Bay portion of Lake Poway to further extend the beach into the reservoir. The area under its wooden footbridge had less waste underneath it after the April 2020 storms (as compared to years 2017-2019) as more of the waste from 2017-2019 was pushed further into the reservoir.

114.    To rectify the degradation of beneficial uses of Lake Poway, the 2013 MS4 Permit requires the City of Poway to reduce pollutants in storm water to the maximum extent

COMPLAINT

practicable and to either prohibit the non-storm water discharges or propose controls to be implemented for the category of non-storm water discharges as part of an updated Water Quality Improvement Plan and then implement those controls to reduce/minimize the non-storm water discharges. 2013 MS4 Permit, Provision E.2.a.(6).

115.    One of the policy goals of the Clean Water Act is to capture stormwater and non-storm water efficiently and effectively after storm surges to lessen the City's reliance on imported water. For the portion of the City of Poway that lies within the San Dieguito watershed, the most effective method of accomplishing this goal is through stream rehabilitation projects at the source of the water. The City of Poway refuses to undertake such projects as mitigation for its harms to the environment and public water supply, which are federally and state mandated.

116.    MS4 Permit violations are violations of the Clean Water Act and its implementing regulations and are grounds for enforcement under the Act, including citizen enforcement actions seeking civil penalties. 2013 MS4 Permit, Standard Permit Provisions I and Attach. B 1.a.; see also 33 U.S.C. § 1365(a); 40 C.F.R. § 122.41(a) (Dec. 21, 2015).

117.    Plaintiff has proposed a feasible way to considerably reduce the non-storm water discharges to the City's MS4 and Lake Poway – i.e. the spring water and rising ground waters containing pollutants that emanate from both Rock Haven and Mount Woodson – through wetland repairs and stream rehabilitation projects on APN: 278-210-1800 in the City of Poway that have been designed by a qualified surface water engineer. The City of

COMPLAINT

Poway refuses to undertake such projects in the two streams on this parcel, which would

fulfill its 2013 MS4 Permit requirement, Provision E.2, by slowing storm water surges,

filtering out pollutants such as iron and phosphorous from surface water, creating new

wetlands, and recharging underground aquifers through increased capture and infiltration

of lowflow spring water discharges.

118.    Moreover, following the destruction of its trail system into waters of the United States

and reconstruction of its new earthen stream crossings, the City of Poway has failed to

adhere to its Habitat Conservation Plan's mitigation requirements by properly accounting

for its developmental impacts to waters of the state and United States through the actual

preservation of additional biological resources including restoration and preservation of

additional stream and wetland acreage of <u>equivalent</u> type and quality at the appropriate

mitigation ratio and within the same watershed.

119.    The City of Poway does not value its wetlands with its current policies and

procedures; rather, "[t]he City is trying to remove the 'water of the U.S.' classification"

for Lake Poway and Warren Canyon so that it does not have to comply with any part of

the Clean Water Act. Foth-CLE Engineering Group, *Geophysical Survey of Lake Poway*,

at 33 n.4 (June 7, 2018).

120.    As Plaintiff is owner of land designated for use as a streams mitigation bank with

high habitat value in the Warren Canyon watershed, the City of Poway's irrational,

arbitrary, and/or capricious actions and policies unsupported by scientific evidence in

falsely designating the main tributary in Warren Canyon as "ephemeral" and in refusing

COMPLAINT

to comply with the 2013 MS4 Permit terms in Warren Canyon violate Plaintiff's

Substantive Due Process Rights protected by the Civil Rights Act, 42 U.S.C. §1983.

121.   On top of all that, the City of Poway has constructed and maintained unauthorized

hiking trails on Plaintiff's private property in the watershed area above Lake Poway.

Through its construction and maintenance activities on Plaintiff's private property and

advertising activities on its website, the City has violated state law, the Endangered

Species Act, and Plaintiff's Fifth Amendment rights as the unpermitted and unauthorized

trails cross a blue-line stream feeding Lake Poway and contain federally protected

endangered plant and animal species along the trails and in the vicinity.

## II.   JURISDICTION

122.   This action involves conduct, injuries, and rights to relief that present federal

questions arising under the Clean Water Act ("CWA"), 33 U.S.C. § 1251 et seq., the

Endangered Species Act, 16 U.S.C. § 1531 et seq., and the Civil Rights Act, 42 U.S.C. §

1983 et seq. Accordingly, this court has jurisdiction over the subject matter of this action

pursuant to 33 U.S.C. § 1365, 28 U.S.C. §§ 1331, 1343, and 2201 (an action for

declaratory/injunctive relief under the Constitution and laws of the U.S.), and 16 U.S.C.

§§ 1538 and 1540(g).

123.    Defendant the City of Poway was served with a notice of Plaintiff's intent to sue for

violations of the CWA and the Endangered Species Act, via certified and registered mail,

COMPLAINT

return receipt requested, on July 27, 2018 and on November 5, 2018.[2] More than sixty days have passed since Defendant received these Notice Letters. Defendant has not remedied these violations that are the subject of the Notice Letters and this Complaint. No regulatory agency has commenced and is diligently prosecuting any action to address the illegal activity that is the subject of this action.

124.    Defendant the City of Poway was also served with a notice of Plaintiff's intent to sue for violations of the CWA, via certified and registered mail, return receipt requested, on May 24, 2019. More than sixty days have passed since Defendant received the Supplemental Notice of Violations Letter (May 24, 2019 NOV). Defendant has not remedied the CWA violations that are the subject of this NOV.

125.    Defendant City of Poway was served with a notice of Plaintiff's intent to sue for violations of the CWA, via certified and registered mail, return receipt requested, on October 1, 2019. More than sixty days have passed since Defendant received this Supplemental Notice of Violations Letter (October 1, 2019 NOV). Defendant has not remedied the CWA violations that are the subject of this NOV.

126.    Defendant City of Poway was served with a notice of Plaintiff's intent to sue for violations of the CWA, via certified and registered mail, return receipt requested, on February 5, 2021. More than sixty days have passed since Defendant received this

---

[2] Plaintiff has also submitted Notice Letters to the required parties via certified mail on the following dates: August 3, 2018; August 6, 2018; August 7, 2018; August 13, 2018; and October 19, 2018.

COMPLAINT

Supplemental Notice of Violations Letter (February 5, 2021 NOV). Defendant has not remedied the CWA violations that are the subject of this NOV.

127.   With the aforementioned NOV letters, Plaintiff has also provided proper notice of Defendant's violations of the Clean Water Act and the Endangered Species Act to the Administrator of the United States Environmental Protection Agency (US EPA); the Administrator of the US EPA Region IX; the Attorney General of the United States; the Executive Director of the California State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, San Diego Region ("San Diego Water Board"); and the Secretary of the Department of the Interior, in full compliance with the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A), the regulations adopted thereunder, 40 CFR § 135.1 et seq., and in full compliance with the Endangered Species Act, 16 U.S.C. § 1540(g)(2)(A)(i).

128.   No regulatory agency has commenced and is diligently prosecuting any action to address the illegal activity that is the subject of this pleading, including the material presented in the July 27, 2018 NOV, the November 5, 2018 NOV, the May 24, 2019 NOV, the October 1, 2019 NOV, and the February 5, 2021 NOV.

129.   Plaintiff has filed suit in 18cv2615, 19cv1803, and in this case before the 120th day since first noticing the federal and state agencies of the City of Poway's regulatory violations in the aforementioned NOV letters.

130.   Plaintiff has mailed copies of the complaints in this case and in 18cv2615 and 19cv1803 to the Attorney General of the United States and to the Environmental

COMPLAINT

31

Protection Agency in accordance with the CWA's notice requirements.

131.    Venue is proper in the Southern District of California pursuant to 28 U.S.C. § 1391(b), 33 U.S.C. § 1365(c)(1), and 16 U.S.C. § 1540(g)(3)(A) because the acts and omissions giving rise to this action – the Clean Water Act and the 2013 MS4 Permit violations and prohibitions described herein, the harm to the public and Plaintiff and their reservoir arising herefrom, and the illegal takings of endangered species on private property within the same watershed referenced above – all occurred and/or are located in San Diego County, California, in the Southern District of California.

132.    The United States District Court for the Southern District of California has jurisdiction to, inter alia, order civil penalties and grant equitable relief, including but not limited to an order to comply with the CWA and Endangered Species Act and applicable permits thereunder. 33 U.S.C. § 1365(a); 16 U.S.C. § 1540(g).

133.    This action is not barred by any prior administrative penalty under Section 309(g) of the Clean Water Act, 33 U.S.C. § 1319(g).

134.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district, and under 33 U.S.C. § 1365(c)(1) because the sources of the violations described in this Complaint are located within the district.

135.    Plaintiff seeks relief from Defendant's violations of the procedural and substantive requirements of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

136.    The United States District Court for the Southern District of California also has

COMPLAINT

supplemental jurisdiction over all other claims that are so related to the claims within such original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution. 28 U.S.C. § 1367.

## III. PARTIES

### A. Plaintiff

137.    Plaintiff is a taxpaying citizen of Poway and owns 43 acres of key watershed land that contain streams and springs in Warren Canyon feeding Lake Poway (APNs 278-210-1800, 278-210-3000, 278-210-2900, 278-210-0300, and 278-210-0400).

138.    Three of these parcels contain streams and wetlands: APN: 278-210-1800, 278-210-3000, and 278-210-2900.

139.    Plaintiff has purchased these five parcels with the goal of establishing a wetlands and streams mitigation bank from which environmental compensation credits can be sold to private developers and municipalities such as Poway.

140.    Plaintiff has submitted his mitigation bank proposal entitled the Mount Woodson-Rock Haven Springs Mitigation Bank to the California Department of Fish and Wildlife and paid a processing fee for its review.

141.    Encouraging such investment in the environment, the EPA and the Department of the Army (DA) have defined a mitigation bank as a wetland, stream, or other aquatic resource area that has been restored, established, enhanced, or (in certain circumstances) preserved for the purpose of providing compensation for unavoidable impacts to aquatic resources permitted under the Clean Water Act or a similar state or local wetland regulation. In

COMPLAINT

addition to providing compensatory credits to third parties for impacts to streams and wetlands, mitigation banks can incorporate storm water crediting mechanisms to implement retention and treatment requirements of NPDES municipal stormwater (MS4) permits. To ensure that development projects do not result in the net loss of streams and wetlands in a locality, the EPA and the DA have mandated that a watershed approach be used for siting mitigation projects required for obtaining DA permits. 33 C.F.R. § 332.3(c)/40 C.F.R. § 230.93(c). And water quality improvement projects mandated by the 2013 MS4 Permit also require a watershed-based approach to repair damaged wetlands and streams upstream of a receiving water containing prohibited and/or uncontrolled point-source discharges.

142.    Because of the rarity of groundwater aquifers and WOTUS in semi-arid San Diego County, the value of Plaintiff's acreage as a mitigation bank is highly dependent on its WOTUS classification, the WOTUS classification of receiving waters in Poway, and the application of the 2013 MS4 Permit to Warren Canyon.

143.    The City of Poway's policies and omissions concerning the watershed feeding Lake Poway and its violations of the Clean Water Act have harmed, and will continue to harm, Plaintiff's economic interests as a mitigation banker within the Warren Canyon watershed without relief from this Court.

144.    The City of Poway's policies and omissions in Warren Canyon have harmed and continue to harm Plaintiff's property interests in Warren Canyon.

145.    Since November 2016, Plaintiff has benefited from the waters of Lake Poway.

COMPLAINT

146.   As a frequent recreational user of the City's reservoir and the surrounding natural environment, he, along with his family, has hiked around, used the boat dock and fishing dock, boated in, and fished in Lake Poway. He has frequently recreated in the Boulder Bay area and near Hidden Bay and other areas of the Lake Poway Recreation Area including Warren Crossing and Fisherman's Footbridge that have and will be affected by the City of Poway's illegal activities in waters of the state and United States. He hopes to continue to recreate in the Lake Poway area with his family in the future without the seasonal intermittent plumes of sedimentation waste and other pollutants gradually filling in Lake Poway and the wetlands surrounding Warren Crossing over time. The waste buildup harms Plaintiff's use and nearshore aesthetic enjoyment, harms wildlife through oxygen-depleting eutrophication and the toxic products that the City uses to combat eutrophication, harms fishing, harms the storage and flood-control capacities of the reservoir, and harms the wetland capacity of Warren Canyon.

147.   He has a passion for protecting wetlands including the wetlands in, adjacent to, and above Lake Poway and enhancing the human use and enjoyment of those natural resources.

148.   It is Plaintiff's position that Lake Poway is Waters of the United States as defined by federal law and that the City of Poway's regional storm water and non-storm water permit (the 2013 MS4 Permit) is enforceable in the sub-watershed area above Lake Poway, even under Justice Scalia's plurality opinion in Rapanos v. United States, 547 U.S. 715 (2006).

COMPLAINT

149.   Through this lawsuit, Plaintiff seeks to have the City of Poway implement a comprehensive load reduction plan in the Lake Poway/Warren Canyon watershed area (a subwatershed of the San Dieguito Watershed) which will include stream rehabilitation and wetland repair projects to remedy the unauthorized waste buildup, the unpermitted dredge and fill activity in Warren Canyon, and the uncontrolled pollutant loads into Lake Poway and waters further downstream.

150.   As owner of the spring (Kelly Spring near the base of Mount Woodson on APN: 278-210-1800) that contributes the largest amount of non-storm spring water from a single source into Lake Poway on a seasonable basis, Plaintiff wants to work with the City of Poway and the San Diego Water Board to find the best solution to reduce and segregate the non-storm water from the City's MS4 through wetland repairs and stream rehabilitation projects that will create new wetlands and recharge the underground aquifers and will improve the water quality of Lake Poway and the San Dieguito watershed in general.

151.   The water from Kelly Spring, which flows into the northern drainage feature on Plaintiff's property, eventually is discharged into the city-owned MS4 at APN: 278-290-1000, the City of Poway's open space resource management area, through a City-owned 48-inch culvert, under a City-owned wooden footbridge conveyance, and into Lake Poway at APN: 278-280-2300. The water from Kelly Spring has become polluted in the past from various unpermitted point-source culvert crossings and constructed fords, wetlands destruction, adjacent wells, and illegal connections and discharges such as

COMPLAINT

failing septic tanks and other pollutants placed into Warren Creek by private landowners and by the City before being discharged downstream as contaminated non-storm water containing pollutants into the City's MS4 and into Lake Poway.

152.   It is the City of Poway's position that Plaintiff is responsible for reducing the pollutant loads from Kelly Spring into Lake Poway; however, the City of Poway is wrong as Plaintiff is not a municipality, is not a Copermittee of the 2013 MS4 Permit, and has not personally or through his agents contributed to the sediment waste pollution in Warren Canyon.

153.   According to the Trump Administration's WOTUS rules, the raised groundwater table and the groundwater from Kelly Spring expressed as surface water that flows into Lake Poway as non-storm water for weeks and/or months of a typical non-drought year are the <u>main</u> reasons why Clean Water Act jurisdiction applies to Warren Creek and downstream Lake Poway, a navigable-in-fact waterbody used for commercial navigation in interstate commerce.

154.   During non-drought years, the spring water from Kelly Spring is also a source of pollutants to receiving waters because of the water's high iron and phosphorous content that frequently exceed the non-storm action levels (NALs) of the 2013 MS4 Permit and because the wetlands surrounding the spring has been altered by tractors, culverts, and vegetation removal without permits over the past 40 years by people other than Plaintiff or his agents, including in 2016 and thereafter, causing greater pollutant loads downstream.

COMPLAINT

155.    During wetter years, the water from Rock Haven Spring that is discharged into the City's property at APN: 278-210-1100 then flows onto APN: 278-210-2400, which contains an unmonitored septic tank near the watercourse, then onto Plaintiff's property at APN: 278-210-1800 at the southern drainage feature on the acreage before being discharged into various point sources on private and public property and into Lake Poway further downstream through the City's MS4 system.

156.    Plaintiff also has been surfing in the Pacific Ocean at various spots along the San Diego County coast since 2007 and has hiked multiple times in areas below Poway dam including on the south side of the San Dieguito River near the point where the storm and non-storm waters from the Warren Canyon area are discharged into the Pacific Ocean (in and around Torrey Pines Extension uplands). He has identified the ecological connection between Torrey Pines Extension and his property on Mount Woodson by identifying that the federally endangered plant Del Mar Manzanita grows in both locations. Plaintiff has also recreated on the north side of the San Dieguito River where it meets the Pacific Ocean. He believes the science that the ecological and aquatic health of the Pacific Ocean at the mouth of the San Dieguito River is highly dependent on the ecological and aquatic health of its hydrologically connected headwaters, including Lake Poway and its upstream subwatershed.

**B. Defendant**

157.    The City of Poway is a California General Law City and municipal corporation, duly organized and existing by virtue of the laws of the State of California and the charter of

COMPLAINT

the City of Poway.

158.   The City of Poway operates a modern water collection, treatment, and distribution system.

159.   The City of Poway owns Lake Poway, which is one source of the City's drinking water supply, and owns portions of the area upstream of Lake Poway including APNs 278-280-2300; APN 278-281-0100; APN: 278-290-1000; and APN: 278-210-1100.

160.   According to City documents, the City's parcel, APN: 278-210-1100, contains flows from locally known Rock Haven Spring, a source of non-storm spring water that flows first through the City of Poway's property and then through Plaintiff's private property (APN: 278-210-1800) before reentering the City's MS4 by Lake Poway on APN: 278-290-1000.

161.   The City's parcels contain point sources that have caused, have threatened to cause, and have served as a conduit for pollution into Lake Poway.

162.   By law, the City of Poway also has enforcement authority over the residents of Warren Canyon and their point sources that are placed within their privately owned portions of Warren Creek within city limits because the creek is interrelated and becomes part of a municipal stormwater conveyance system downstream.

163.   As the operator of the MS4 in Warren Canyon, the City of Poway "cannot passively receive and discharge pollutants from third parties." "By providing free and open access to an MS4 that conveys discharges to the receiving waters of the U.S., the operator essentially accepts responsibility for discharges into the MS4 that it does not prohibit or

COMPLAINT

otherwise control" within its own jurisdiction.  "These discharges may cause or contribute to a condition of pollution or a violation of water quality standards." 2013 MS4 Permit, Finding 12.

164.    Lake Poway is a year-round navigable-in-fact waterbody and is considered waters of the United States for any of the following reasons: because the waters of Lake Poway have been used in interstate commerce; because Lake Poway is flooded by an intermittent jurisdictional stream that contains non-storm water flows; because water from the reservoir has reached and will reach the Pacific Ocean 17 miles away during a 25-year storm event and/or after mandated water releases from an outlet pipe to the same tributary below the dam; because Poway only owns half the water rights in the Warren Canyon watershed (the other half is owned by the City of San Diego downstream); and because water from Warren Canyon flows underneath the Warren Canyon dam via a subterranean stream that reemerges as surface water to the San Dieguito River and into the Pacific Ocean.

165.    On October 22, 2019, the EPA and the Department of the Army published a final rule to repeal the 2015 Clean Water Rule: Definition of "Waters of the United States" ("2015 Rule"), which amended portions of the Code of Federal Regulations, and to restore the regulatory text that existed prior to the 2015 Rule. The final rule became effective on December 23, 2019. As of December 23, 2019, the agencies implemented the pre-2015 Rule regulations informed by applicable agency guidance documents and consistent with Supreme Court decisions and longstanding agency practice.

COMPLAINT

166.   As the City of Poway has been wrongly arguing that the water features in the Lake Poway watershed are "ephemeral" and "low impact" for its own pecuniary gain to avoid complete compliance with the CWA and state law, the City of Poway is devaluing the wetlands and other waters of the United States that Plaintiff owns above Lake Poway and the waters of the United States that the City of Poway owns/operates through its violations of the Clean Water Act in 2017, 2018, 2019, and 2020.

167.   In short, the City of Poway is seeking to sever Clean Water Act jurisdiction over Plaintiff's land/watercourses in the City of Poway and to improperly reduce its regulatory "burden" imposed by state and federal laws through mischaracterization of the water resources in Warren Canyon.

## IV. STATUTORY BACKGROUND

168.   The Clean Water Act (CWA) (33 U.S.C. § 1251 et seq.) of 1972 is the basic federal law that addresses surface water quality control and protection of beneficial uses of water. The objective of the CWA is to restore and maintain the chemical, physical, and biological integrity of the nation's waters through prevention, reduction, and elimination of pollution. The CWA applies to discharges of pollutants into waters of the United States.

169.   Section 301 of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant in waters of the United States by any person except in compliance with a National Pollutant Elimination System (NPDES) permit issued under Section 402 of the

COMPLAINT

CWA, 33 U.S.C. § 1342, or a Department of the Army Permit for dredged or fill material at specified sites issued under Section 404 of the CWA, 33 U.S.C. § 1344.

170.    Section 502(5) of the CWA, 33 U.S.C. § 1362(5), defines "person" to mean an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body.

171.    Section 502(6) of the CWA, 33 U.S.C. § 1362(6), defines "pollutant" to mean dredged soil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological material, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water.

172.    Section 502(12)(A) of the CWA, 33 U.S.C. § 1362(12)(A), defines the term "discharge of pollutants" to mean any addition of any pollutant to navigable waters from any point source.

173.    Section 502(7) of the CWA, 33 U.S.C. § 1362(7), defines "navigable waters" as "the waters of the United States, including territorial seas."

174.    Section 502(14) of the CWA, 33 U.S.C. § 1362(14), defines "point source" to mean any discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel, or other floating craft, from which pollutants are or may be discharged.

COMPLAINT

175.   "The stormwater discharges came from point sources, because they flowed out of artificial 'pipe[s],' 'ditche[es],' and 'channel[s],' 33 U.S.C. § 1362(14)." <u>Decker v. Northwest Environmental Defense Center</u>, 568 U.S. 597, 623 (Scalia, J., concurring in part and dissenting in part).

176.   A point source also includes the dredged and fill materials placed around the culverts inside a MS4 and/or waters of the United States by machines such as back hoes. "[T]he definition of a point source is to be broadly interpreted," and courts have uniformly held that earth-moving equipment, such as dump trucks, bulldozers, excavators, plowing equipment, back hoes, and related heavy machinery, are all point sources. <u>See, e.g.,</u> <u>Peconic Baykeeper, Inc. v. Suffolk County</u>, 600 F.3d 180, 188 (2d Cir. 2010); <u>Concerned Area Residents for the Environment v. Southview Farm</u>, 34 F.3d 114, 118 (2d Cir. 1994); <u>Avoyelles Sportmen's League v. Marsh</u>, 715 F.2d 897, 922 (5th Cir. 1983).

177.   Section 402(p) of the CWA, 33 U.S.C. § 1342(p), requires NPDES permits for certain municipal storm water discharges. EPA promulgated regulations at 40 C.F.R. § 122.26 (December 21, 2015) to implement the storm water permit provisions of Section 402(p).

178.   "Storm Water" is defined as "storm water runoff, snow melt runoff, and surface runoff and drainage." 40 C.F.R. § 122.26(b)(13) (December 21, 2015).

179.   Non-storm water discharge is any discharge into the MS4 or from the MS4 into a receiving water that is not composed entirely of storm water.

COMPLAINT

43

180.   NPDES permits are required for discharges of storm water from a "municipal separate storm sewer system (MS4) [which] means a conveyance or system of conveyances (including <u>roads with drainage systems</u>, municipal streets, catch basins, curbs, gutters, ditches, man-made channels, or storm drains)" owned by a city and designed for conveying storm water. 40 C.F.R. § 122.26(b)(8) (December 21, 2015). An MS4 conveys only untreated storm water. <u>See</u> 40 C.F.R. § 122.26(a)(7) (December 21, 2015).

181.   Generally, the CWA requires point source discharges, including dischargers of storm water associated with maintenance or construction activity, to comply strictly with water quality standards. 33 U.S.C. § 1311(b)(1)(C).

182.   CWA section 402(p) requires the EPA or authorized state to issue NPDES permits for storm water discharges from MS4s to waters of the United States.  CWA section 402(p)(3)(ii) requires that NPDES permits for storm water discharges from MS4s to "require controls to reduce the discharge of pollutants [in storm water] to the maximum extent practicable [MEP], including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or State determines appropriate for the control of such pollutants." 33 U.S.C. § 1342(p).

183.   Section 402(b) of the CWA, 33 U.S.C. § 1342(b) authorizes States with an EPA-approved NPDES program to issue NPDES permits. The State of California, through its State Water Resources Control Board (SWRCB) and Regional Water Boards, is a state

COMPLAINT

approved under section 402(b) of the CWA to administer the NPDES program, including the issuance of storm water and non-storm water permits within California.

184.    Under 40 CFR § 122.26(b)(2) (December 21, 2015), an illicit discharge is defined as "any discharge to a municipal separate storm sewer that is not composed entirely of storm water except discharges pursuant to a NPDES permit (other than the NDPES permit for discharges from the municipal separate storm sewer)." This implementing regulation requires a separate NPDES permit for *uncontrolled* polluted non-storm water discharged into and from a MS4.

185.    As required by Section 402(p)(3)(B)(ii) of the Clean Water Act, cities are required to "effectively prohibit non-storm water discharges into the MS4 and watercourses, except where such discharges" are covered by a separate NPDES permit or fall within one of thirteen categories of flows that are conditionally exempted from the discharge prohibition such as natural flow from springs and rising ground waters. These non-storm water flows may be exempted so long as: (i) they are not a source of pollutants to receiving waters and (ii) they do not violate antidegradation policies.

186.    "[M]unicipalities will not be held responsible for prohibiting some specific components of discharges or flows" through their MS4s, even though "such components may be considered non-storm water discharges, unless such discharges are specifically identified on a case-by-case basis as needing to be addressed." 55 Fed. Reg. 47995 (16 November 1990).

COMPLAINT

187.    "EPA disagrees that [water from springs and rising ground water] will not pose, in every case, significant environmental problems." 55 Fed. Reg. 48037 (16 November 1990).

188.    40 CFR § 122.26(d)(2)(iv)(B)(1) (December 21, 2015) states that the proposed management program required in a MS4 permit shall include: An enforcement program "to prevent illicit discharges to the municipal separate storm sewer system."

189.    The program description shall address the following categories of non-storm water discharges or flows only where such discharges are identified by the municipality as sources of pollutants to waters of the United States: … rising ground waters, . . . springs . . . ." 55 Fed. Reg. 48037 (16 November 1990).

190.    "The CWA prohibits the point source discharge of non-storm water not subject to an NPDES permit through municipal separate storm sewers to waters of the United States." 55 Fed. Reg. 47996 (16 November 1990).

191.    Section 404(a) of the Clean Water Act, 33 U.S.C. § 1344(a), establishes an Army Corps-administered permit program for the discharge of dredged or fill material at specified sites into waters of the United States.

192.    Section 404 requirements are distinct from, and in addition to, the NPDES permit framework in Section 402, 33 U.S.C. § 1342.

193.    Section 404(a) of the CWA, 33 U.S.C. § 1344(a), prohibits the "discharge of a pollutant" into waters of the United States, except in compliance with a permit issued pursuant to the provisions in the Act.

COMPLAINT

194.     The Act broadly defines the term "pollutant" to include dredged spoil, rock, sand, and waste discharged into water. 33 U.S.C. § 1362(6).

195.     The "discharge of fill material" under Section 404 is defined as "the addition of fill material into waters of the United States," including, but not limited to, infrastructure construction fill, causeway or road fills, and "site development fills for recreational, industrial, commercial, residential, or other uses." 33 C.F.R. § 323.2(f) (December 30, 2008).

196.     "Fill material" refers to material that replaces aquatic area with dry land or changing the bottom elevation of a waterbody. 33 C.F.R. § 323.2(e)(1) (December 8, 2008).

197.     "Dredged material" under Section 404 means "material that is excavated or dredged from waters of the United States." 33 C.F.R. § 323.2(c) (December 8, 2015).

198.     Activities in waters of the U.S. that are regulated under the Section 404 program include fills for development, water resource projects, boat docks, and infrastructure development (such as unpaved roads) that are placed in waters of the United States.

199.     The Army Corps of Engineers has authority to issue individual permits or "general permits on a state, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material" (both known as a "Section 404 Permit"). 33 U.S.C. § 1344(e)(1).

200.     Under CWA Section 404(e), the Army Corps of Engineers (USACE) can issue general permits to authorize activities that have minimal individual and cumulative adverse environmental effects. USACE can issue nationwide permits, which is a general

COMPLAINT

permit that authorizes activities across the country, unless revoked by a district or division commander. Nationwide permits authorize a wide variety of activities such as linear transportation projects, residential development, commercial and industrial developments, utility lines, road crossings, bank stabilization activities, wetland and stream restoration activities, and certain maintenance activities.

201. Regional permits are a type of general permit issued by a Division or District Engineer that may require case-by-case reporting and acknowledgement. 33 C.F.R. § 325.5(c)(1) (August 30, 2018).

202. An individual or standard permit is required when a project cannot meet all of the conditions of a general permit and has more than minimal individual or cumulative impacts. These types of projects are evaluated using additional environmental criteria and involve a more comprehensive public interest review. 33 C.F.R. § 325.5(b) (October 25, 2018).

203. Section 401(a)(1) of the Clean Water Act, 33 U.S.C. § 1341(a)(1), requires that any application to the Army Corps for a Section 404 permit must include a "certification from the State in which the discharge originated or will originate . . . that any . . . discharge will comply with [other sections of the Clean Water Act]."

204. Before the Army Corps can issue a Section 404 permit, the state must certify the project is compliant with local Basin Plans and water quality objectives. 33 U.S.C. § 1341(a)(1).

205. This certification from the state is known as a Section 401 Certification.

COMPLAINT

206.   Section 404 permits rely upon, and are required to, incorporate any conditions imposed by a state's water quality certification. 33 U.S.C. § 1341(a)(1).

207.   The Clean Water Act allows for citizen enforcement of the Clean Water Act against a municipality which is alleged to be in violation of an effluent standard or limitation under the Act or with an order issued by the Administrator or State with respect to a standard or limitation under the Act. Civil penalties, declaratory relief, injunctive relief, and litigation costs may be awarded.

208.   All violations of separate Clean Water Act requirements or permit conditions are separately subject to penalty assessment on each and every day such violations continue. For the purposes of Section 402 of the CWA, each day's discharge in excess of an NPDES limitation in either numeric or narrative form or each permit condition not implemented constitutes a separate violation. For purposes of Section 404 of the CWA, a day of violation may either be a day that actual discharge or dredged or fill material takes place, or may also include any day that such dredged or fill material is allowed to remain in waters or wetlands. Civil liability under the CWA is not limited to intentional violations. 33 U.S.C. § 1319; 33 U.S.C. § 1365; 28 U.S.C. § 2201.

209.   A private cause of action is available for citizens under 33 U.S.C. § 1365 to file a civil action against any person "who is alleged to be in violation of … an effluent standard or limitation . . ." Id. at § 1365(a)(1). Section 1365(f) defines "effluent standard or limitation" as "an unlawful act under subsection (a) of section 1311, . . . certification

COMPLAINT

under section 1341, . . . and a permit or condition issued under section 1342 of this title." Id. at § 1365(f).

210.    An unlawful act under 33 U.S.C.  subsection (a) of section 1311 includes failure to obtain a valid permit for dredged and fill materials into navigable waters under 33 U.S.C. § 1344.

211.    The Endangered Species Act, 16 U.S.C. § 1531 et seq., was passed in 1973 to provide a legal mechanism for the conservation of endangered and threatened species and the ecosystems upon which they depend. With limited exceptions, the Endangered Species Act places restrictions on a range of activities involving endangered and threatened animals and plants to help ensure their continued survival. With limited exceptions, the prohibited activities may not be carried out unless authorized by a permit from the U.S. Fish and Wildlife Service. Sections 7 and 9 of the Endangered Species Act allow "incidental" takes of threatened and endangered species, but only in accordance with a permit and a corresponding Habitat Conservation Plan.

212.    It is unlawful to commit, to attempt to commit, to cause to be committed or to solicit another to commit the following: Remove, cut, dig up, damage, or destroy a federally listed endangered plant on private property in violation of any law or regulation of any state including a state criminal trespass law. 16 U.S.C. § 1538(a)(2)(B).

213.    With respect to any endangered species of wildlife, it is unlawful to take any such species within the United States without a permit. 16 U.S.C. § 1538(a)(1)(B).

COMPLAINT

214.   The Endangered Species Act allows for citizen enforcement of the Endangered Species Act to enjoin any person who is alleged to be in violation of any provision of the Act. Injunctive relief and costs of litigation may be ordered by a federal judge. 16 U.S.C. § 1540(g).

215.   The Civil Rights Act, 42 U.S.C. § 1983, protects against the deprivation of a person's substantive due process rights, including property rights, from improper actions and policies of a municipality acting under the color of state law. Injunctive relief and declaratory relief can be ordered for such violations under Section 1983. Attorney's fees and costs are also available under 42 U.S.C. § 1988.

## V. CITY OF POWAY'S MS4 PERMIT REQUIREMENTS

216.   The San Diego Water Board issued to the City of Poway the National Pollutant Discharge Elimination System ("NPDES") Permit and Waste Discharge Requirements, No. R9-2013-0001, as amended by Order No. R9-2015-0001 and R9-2015-0100, NPDES No. CAS0109266 (the "2013 MS4 Permit").

217.   Warren Creek as a creek conveying storm water through point sources in a developed area falls under the definition of a small MS4 interrelated to a large MS4 under the jurisdiction of Poway's 2013 MS4 Permit, Findings, Numbers 1 and 11.  Poway has not been granted a waiver for its Warren Canyon MS4 discharges or the applicability of the 2013 MS4 Permit in Warren Canyon from the San Diego Water Board or the EPA.  See

COMPLAINT

Poway's MS4 map published in its 2015 JRMP as shown below.



218.   Permit Provision A prohibits unauthorized discharges from the City of Poway's properties, facilities, activities, MS4s and other rights of way, including:

   a.   Provision A.1.a provides: "Discharges from MS4s in a manner causing, or threatening to cause, a condition of pollution, contamination, or nuisance in receiving waters of the state are prohibited."

      1.   The term "pollution" means an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects either of the following: the waters for beneficial uses; or facilities which serve those beneficial uses. "Beneficial uses" of the waters of the state that may be protected against quality degradation include, but are not limited to,

COMPLAINT

domestic, municipal, agricultural and industrial supply; power

generation; recreation; aesthetic enjoyment; navigation; and

preservation and enhancement of fish, wildlife, and other aquatic

resources or preserves.

2. The term "receiving waters" includes creeks, streams, rivers, lakes,

wetlands, reservoirs, estuaries, bays, and the ocean.

3. "Discharges" means addition of pollutants to navigable waters from

any point source.

b. Provision A.1.b provides: "Non-storm water discharges into MS4s are to be

effectively prohibited, through the implementation of Provision E.2, unless

such discharges are authorized by a separate NPDES permit."

c. Provision A.1.c further provides: "Discharges from MS4s are subject to all

waste discharge prohibitions in the Basin Plan."

d. Provision A.2.a provides: "Discharges from MS4s must not cause or

contribute to the violation of water quality standards in any receiving waters."

e. Provision A.3 provides: "Pollutants in storm water discharges from MS4s

must be reduced to the MEP."

f. Provision A.4 provides: "Each Copermittee must achieve compliance with

Provisions A.1.a, A.1.c and A.2.a through timely implementation of control

measures."

COMPLAINT

1. Attachment F provides: "[C]ompliance with the Provision A.4 does not shield a Copermittee who may have violated Provision A.1a, A.1.c, or A.2.a from an enforcement action."

2. Attachment F further provides:

    The Ninth Circuit held in <u>Natural Resources Defense Council v. County of Los Angeles</u> (2011) 673 F.3d 880, 886 (revd. on other grounds and remanded by <u>Los Angeles County Flood Control District v. Natural Resources Defense Council</u> (133 S. Ct. 710 (2013))) that engagement in the iterative process does not provide a safe harbor from liability for violations of permit terms prohibiting exceedances of water quality standards. The Ninth Circuit holding is consistent with the position of the State and Regional Water Boards that exceedances of water quality standards in an MS4 permit constitute violations of permit terms subject to enforcement by the Water Boards or through a citizen suit. While the Water Boards have generally directed discharges to achieve compliance by improving control measures through the iterative process, the San Diego Water Board retains the discretion to take other appropriate enforcement and the iterative process does not shield dischargers from citizen suits under the CWA.

    2013 MS4 Permit, Attachment F, at F-45.

3. The requirements of Provision A.4, therefore, are required to be implemented until the water quality standards expressed under Provisions A.1.a, A.1.c, and A.2.a are achieved.

4. "Part of the 'controls' required by the Order is the process described in Provision A.4. Provision A.4 includes the process that is ultimately expected to achieve compliance with the requirement that discharges from the MS4 do not cause or contribute to violations of water quality standards in the receiving waters. The implementation of Provision A.4 is required when the Copermittees or the San Diego Water Board have determined that discharges from the MS4 are causing or contributing to violations of water quality standards in the receiving waters."

COMPLAINT

2013 MS4 Permit, Attachment F, at F-45.

219.   The San Diego Water Board's Basin Plan implements and incorporates by reference both the State and federal antidegradation policies. The Order requires the Copermittees to meet water quality standards through best practicable treatment or control measures. As required by 40 CFR 122.44(a) (December 21, 2015), the Copermittees must comply with "maximum extent practicable" (MEP) technology-based standards set forth in CWA section 402(p) for discharges of pollutants in storm water from the MS4s.

   a.   MS4s regulated to the MEP standard achieve the standard by storm water management plans that implement best management practices in a narrative form, not a numeric form. There are no numeric baseline criteria in the MEP standard. Therefore, water quality standards (WQS) are the only baseline that exists within the MEP standard.

   b.   WQS are the only way to "control [] such pollutants" from municipal storm water because without a concrete standard, there is no measure of control.

220.   NPDES Permit No. CAS0109266, 2013 MS4 Permit, Attachment F describes:

"Although sediment is naturally occurring in the natural environment, the discharge of sediment under unnatural conditions is problematic to receiving waters. Fine sediment in creeks causes high turbidity that interferes with the functionality of native flora and fauna in local creeks. For example, turbidity interferes with both photosynthesis of water-philic plants, as well as successful foraging and reproduction of benthic macroinvertebrates. Sediment can also make it difficult for fish to breathe because it clogs fish gills. Other pollutants such as heavy metals or pesticides can adhere to sediment and are transported to receiving waters during storm events, where they dissolve in the water column and become bioavailable to aquatic organisms. Sediment is recognized as a major stressor to surface waters . . ."

COMPLAINT

2013 MS4 Permit, Attachment F, at F-110-111.

a. Attachment F further describes:

"The San Diego Water Board identified, through investigations and complaints, sediment discharges from unpaved roads as a significant source of water quality problems in the San Diego Region. Inspection activities conducted by the San Diego Water Board since the Third Term Permits have found a lack of source control for many unpaved roads within the jurisdiction of the Copermittees. Unpaved roads are a source of sediment that can be discharged in runoff to receiving waters, especially during storm events. Erosion of unpaved roads occurs when soil particles are loosened and carried away from the roadway base, ditch or road bank by water, wind, traffic, or other transport means. Exposed soils, high runoff velocities and volumes, sandy or silty soil types, and poor compaction increase the potential for erosion. Road construction, culvert installation, and other maintenance activities can disturb the soil and drainage patterns to streams in undeveloped areas, causing excess runoff and thereby erosion and the release of sediment. Poorly designed unpaved roads can act as preferential drainage pathways that carry runoff and sediment into natural streams, impacting water quality. In addition, other public works activities along unpaved roads have the potential to significantly affect sediment discharge and transport within streams and other waterways, which can degrade the beneficial uses of those waterways."

2013 MS4 Permit, Attachment F, at F-116.

b. The EPA also recognizes that discharges from unpaved roads pose a significant potential threat to water quality.

221.   Non-storm water (dry weather) discharges from the MS4 are not considered storm water (wet weather) discharges and therefore not subject to the MEP standard. Non-storm-water discharges must be reduced and effectively prohibited through effective controls especially when the non-storm water is a source of pollutants to the MS4.

COMPLAINT

222.    The Copermittees are required to reduce or eliminate non-storm water discharges such as water from springs and rising ground waters to the MS4, especially when the non-storm spring water is a source of pollutants to receiving waters, to further the San Diego Water Board's policy of enhancing precious local water supplies. 2013 MS4 Permit, Provision E.2.a.(7).

223.    Pure spring water in an unaltered environment discharged into the MS4 is considered a conditionally exempt category of non-stormwater which still must be properly "addressed" under any set of circumstances by each Copermittee under its strict 2013 MS4 Permit. However, spring water that has accumulated excess sedimentation directly from third parties' point sources and/or from a municipality's point sources is considered polluted non-stormwater (anthropogenically caused) and is not subject to the MEP standard but must meet a much more stringent test to effectively address the discharges. Such discharges from the MS4 into receiving waters are to be <u>effectively prohibited</u> and are to be treated as illicit discharges unless effective controls, prohibitions, and remedial actions are put into place to reduce the non-storm water discharges to acceptable levels.

224.    If there are non-storm water discharges that are not required to be addressed as illicit discharges, those discharges must comply, <u>at a minimum</u>, with the discharge prohibitions and receiving water limitations of Provision A. Thus, the non-storm water discharges from the MS4 must be at levels that will not cause or contribute to a condition of pollution, contamination, or nuisance in waters of the state (Provision A.1.a), and must not cause or contribute to a violation of water quality standards in receiving waters

COMPLAINT

(Provision A2.a) to be consistent with the discharge prohibitions and receiving water limitations of Provisions A.1.a and A.2.a. 2013 MS4 Permit, at F-68.

225.   Waste and pollutants which are deposited and accumulate in MS4 drainage structures will be discharged from these structures to waters of the U.S. unless they are removed. These discharges may cause or contribute to, or threaten to cause or contribute to, a condition of pollution in receiving waters. 2013 MS4 Permit, Finding 16.

226.   The 2013 MS4 Permit, C-8, defines "pollutant" as follows: "*Any* agent that may cause or contribute to the degradation of water quality such that a condition of pollution or contamination is created *or* aggravated" (emphasis added).

227.   As described by the EPA, water quality criteria "can be . . . narrative (e.g., a criterion that describes the desired conditions of a water body being 'free from' certain negative conditions)" in form. EPA, WQS Handbook, Chapter 3; see 2013 MS4 Permit, F-16.

228.   Water quality standards as defined in CWA § 303(c) consists of the beneficial uses (e.g., recreational activities such as fishing, municipal drinking water supply, etc.) of a water body and water quality objectives necessary to protect those uses.

229.   A condition of pollution exists when the water quality needed to support designated

COMPLAINT

58

beneficial uses has become unreasonably affected or impaired by waste.[3] 2013 MS4 Permit, C–11–C–12; Cal. Water Code § 13050(l).

230.   Waste broadly "encompasses any substance whose formation was caused by human activity or whose path through the ecosystem is controlled or affected by human agency." Phaler, Water Quality Control in CA, 1 Ecology L.Q. 400, 406 (1971).[4]

231.   The San Diego Water Board Basin Plan prohibits the following "waste" discharges: 1) Discharge of pollutants or dredged or fill material to waters of the United States except as authorized by a NPDES permit or a dredged or fill material permit; 2) Discharge of waste to inland surface waters in a manner causing a condition of pollution; 3) Discharge of waste in a manner causing flow, ponding, or surfacing on lands not owned or under the control of the discharger; 4) The dumping, deposition, or discharge of waste directly into waters of the state or adjacent to such waters in any manner which may permit its being transported into the waters; 5) Discharge of waste into a natural or excavated site below historic water levels; and 6)  Discharge of sand, silt, clay or other

---

[3] Under the Dickey Act, 'pollution' means an impairment of the quality of the waters of the State by . . .waste to a degree which does not create an actual hazard to the public health but which does adversely and unreasonably affect such waters for domestic, industrial, agricultural, navigational, recreational or other beneficial use. Dickey Act, Ch. 1549, § 1, [1949] Cal. Stat. 2782, as amended, ch. 603, § 1, [1957] Cal. Stat. 1815. The updated Porter-Cologne Act does not require that an adverse effect be shown. Cal. Water Code § 13241.

[4] Under the Dickey Act, earth eroded from tractor trails and the deposition of fine-grained particles which affect fish and other aquatic life and reservoir capacity constituted waste discharge. Under the Porter-Cologne Act, it was the legislators' intent to include the prior constructions of waste in the new definition of waste. Cal. State Water Resources Control Board, Study Panel Report, App. A, at 23-24 (1969).

COMPLAINT

earthen materials from any activity, including land grading and construction, in quantities which cause deleterious deposits, turbidity or discoloration in waters of the state or which unreasonably affect or threaten to affect beneficial uses of such waters. 2013 MS4 Permit, Attachment A, at A-1–A-2.

232.    The reasonableness of a waste discharge is question of fact.[5]

233.    Consistent with federal law, unless non-storm water discharges to the MS4 are authorized by a separate NPDES permit, polluted non-storm water discharges are appropriately subject to the effective prohibition requirement and water boards are not limited by the iterative MEP approach to storm water regulation in crafting appropriate regulations for non-storm water discharges.

234.    The federal regulations (40 C.F.R. 122.26(d)(2)(vi)(B)(1) (December 21, 2015)) require the Copermittees to:

> "'implement and enforce an ordinance, order or similar means' to address and prevent polluted non-storm water discharges to their MS4s. Thus, the Co-permittees are required to 'effectively' prohibit polluted non-storm water discharges to their MS4s through enforcing their legal authority established under 'ordinance, order, or similar means' and either remove those discharges to their MS4s, put controls in place approved by the San Diego Water Board to reduce the non-storm water discharges, or else require those discharges to obtain coverage under a separate NPDES permit."

> 2013 MS4 Permit, Attachment F, at F-40.

---

[5] The Ninth Circuit has held that the terms of an NPDES permit, where ambiguous on its face, raises issues of fact. Northwest Environmental Advocates v. City of Portland, 56 F.3d 979, 982 (9th Cir. 1995).

COMPLAINT

235.   Non-storm water discharges from the MS4 are not considered storm water (wet weather) discharges and therefore are not subject to the MEP standard. The Copermittees must effectively prohibit non-storm water discharges into the MS4s, reduce the discharge of pollutants in storm water from the MS4s to the MEP, and ensure that their MS4 discharges do not cause or contribute to violations of water quality standards.

236.   If the Copermittees have effectively prohibited non-storm water discharges and reduced storm water pollutant discharges to the MEP, but their discharges are still causing or contributing to violations of water quality standards, Provision A.4 provides a clear "iterative process" for the Copermittees to follow. Provision A.4 essentially require the Copermittees to implement additional remedial measures such as stream rehabilitation projects and additional BMPs until MS4 discharges no longer cause or contribute to a violation of water quality standards.

237.   The federal NPDES regulations also reference several categories of "non-storm water discharges or flows [which] shall be addressed where such discharges are identified . . . as sources of pollutants to waters of the United States."

238.   Provision E.2.a of the City's 2013 MS4 Permit requires each Copermittee to address all types of non-storm water discharges into its MS4 as illicit discharges, unless the discharge is authorized by a separate NPDES permit or identified as a category of non-storm water discharges or flows that must be <u>addressed</u> pursuant to Provision E.2.a. Only non-NPDES-permitted non-storm water discharges identified as a category of non-storm

COMPLAINT

water discharges under Provisions E.2.a.(1) though E.2.a.(5) <u>AND</u> not identified as a source of pollutants do not have to be addressed as illicit discharges.

239.    Each Copermittee must, where feasible and priorities and resources allow, reduce or eliminate non-storm water discharges listed under Provisions E.2.a.(1)-(4) into its MS4, unless a non-storm water discharge is identified as a discharge authorized by a separate NPDES permit. This provision applies to spring water and rising groundwaters under Provision E.2.a.(3). 2013 MS4 Permit, Provision E.2.a.(7).

240.    Under Provision E.2.a.(6) of the 2013 MS4 Permit, if the Copermittee or the San Diego Water Board identifies any category of non-storm water discharges listed under E.2.a.(1)-(4) as a source of pollutants to receiving waters, the category must be prohibited through ordinance, order, or similar means and addressed as an illicit discharge. Alternatively, the Copermittee may propose controls to be implemented for the category of non-storm water discharges as part of an updated Water Quality Improvement Plan (WQIP) instead of prohibiting the category of non-storm water discharges, and implement the controls if accepted by the San Diego Water Board as part of the updated WQIP. <u>See</u> Poway's JRMP, BMP #11.

241.    Consistent with 40 CFR 122.26(d)(2)(iv)(B) and 122.26(d)(2)(iv)(B)(1) (December 21, 2015), each Copermittee must implement a "program . . . to prevent illicit discharges to the municipal storm sewer system" and "detect . . . illicit discharges and improper disposal into the storm sewer," including "other sources of non-storm water." Provision E.2.b of the 2013 MS4 Permit requires each Copermittee to identify MS4 connections

COMPLAINT

including stream crossings, septic tanks, and other connections and to implement measures to prevent and detect illicit discharges and connections to its MS4 as part of its illicit discharge detection and elimination program on public and private property within its jurisdiction.

242. Provision E.2.c requires each Copermittee to conduct field screening of its MS4 within its jurisdiction to detect non-storm water and illicit discharges to the MS4. 2013 MS4 Permit, F-97.

243. Under Provision E.2.c., the City of Poway must conduct field screening of portions of its MS4 containing non-storm water in accordance with the dry weather monitoring requirements of Provision D.

244. Each Copermittee of the 2013 MS4 Permit is responsible for prioritizing its efforts to eliminate non-storm water and illicit discharges or connections to its MS4 based on field screening and monitoring data including satellite imagery, the non-storm water action levels (NALs) of Provision C to support the detection and elimination of non-storm water and illicit discharges to the MS4, required pursuant to Provision E.2, and illicit discharge investigation records collected from septic tank monitoring and monitoring of unpermitted structures such as stream crossings. Sources of non-storm water and illicit discharges or connections must be eliminated by enforcing the legal authority established by each Copermittee pursuant to Provision E.1 and by reducing non-storm water flows containing pollutants as mandated by Provision E.2.a. and Poway's JRMP.

COMPLAINT

245.    Each Copermittee must implement practices and procedures to prevent and limit infiltration of seepage from sanitary sewers (including private laterals and failing septic systems) to the MS4. 2013 MS4 Permit, Provision E.2.b.(5).

246.    Each Copermittee must <u>prioritize</u> its investigation of discharges of storm and non-storm water into Environmentally Sensitive Areas (ESAs) and seek the source of the discharges. 2013 MS4 Permit, Provision E.2.d.(1).

247.    Provision E.2.d describes the measures that the City must take to investigate and eliminate illicit discharges to the MS4.

248.    Provision E.2.d.(1) requires the City to "prioritize and determine when follow-up investigations will be performed in response to visual observations and/or water quality monitoring data collected during an investigation of a detected non-storm water or illicit discharge to or from the MS4 . . . causing or contributing, or threatening to cause or contribute to impairments in water bodies . . . in environmentally sensitive areas (ESAs)." 2013 MS4 Permit, Provisions E.2.d.(1) and E.2.d.(1)(b).

249.    Provision E.2.d.(1)(d) of the 2013 MS4 Permit requires the Copermittee to prioritize and determine when follow-up investigations will be performed in response to visual observations and/or water quality monitoring data collected during an investigation of a detected non-storm water or illicit discharge to or from the MS4 for pollutants identified as causing or contributing to an exceedance of a NAL.

250.    Each Copermittee must implement procedures to investigate and inspect portions of its MS4 that, based on reports or notifications, field screening, or other appropriate

COMPLAINT

information, indicate a reasonable potential of receiving, containing, or discharging pollutants due to illicit discharges to the MS4, illicit connections, or other sources of non-storm water to the MS4 system. 2013 MS4 Permit, Provision E.2.d.(2).

251.   Provision E.2.a.(7) has been included in the requirements for non-storm water discharges to clarify that any non-storm water discharges to the Copermittee's MS4, even those identified pursuant to Provisions E.2.a.(1) through E.2.a.(4), must be reduced or eliminated, unless a non-storm water discharge is identified as a discharge authorized by a separate NPDES permit. 2013 MS4 Permit, F-96.

252.   Provision E.6 of the 2013 MS4 Permit requires each Copermittee to develop an Enforcement Response Plan (ERP) as part of its jurisdictional runoff management program document. Proper implementation of the ERP is necessary to effectively prohibit non-stormwater discharges to the MS4 and reduce the discharge of pollutants in storm water from the MS4 to the MEP.

253.   The ERP will serve as a reference for the Copermittee and the San Diego Water Board to determine if consistent enforcement actions are being implemented to achieve timely and effective compliance from all public and private entities that are not in compliance with the Copermittee's ordinances, permits, or other requirements.

254.   The ERP must contain clear direction for the Copermittee to take immediate enforcement action, when appropriate and necessary, in their illicit discharge detection and elimination, construction management, and existing development management

COMPLAINT

programs. Violations must be corrected in a timely manner, with escalated enforcement required for non-compliance.

255.    Provision E.7 of the 2013 MS4 Permit requires each Copermittee to implement a public education and participation program as part of its jurisdictional runoff management program, which will contribute toward effectively prohibiting non-storm water discharges to the MS4 and toward the reduction of pollutants in storm water from the MS4 to the MEP.

256.    Each Copermittee must perform dry and wet weather field screening monitoring to determine persistent flows and to identify non-storm water and illicit discharges within its jurisdiction and prioritize the dry weather MS4 discharges that will be investigated and eliminated pursuant to Provision E.2.d.

257.    The MS4 Permit requires that the City "effectively prohibit" non-storm water discharges into the MS4 through the implementation of a Jurisdictional Runoff Management Plan, unless such discharges are authorized by a separate NPDES permit. 2013 MS4 Permit, Provision A.1.b; see also 2013 MS4 Permit, Finding 15.

258.    An "illicit discharge" is "any discharge to a [MS4] that is not composed entirely of storm water and is not covered by an NPDES permit." 2013 MS4 Permit, Attachment F-39; see also 40 C.F.R. § 122.26(b)(2) (Dec. 21, 2015).

259.    The Illicit Discharge Detection and Elimination program must be implemented in accordance with previously adopted strategies (a water quality improvement plan) and include certain detailed requirements to achieve compliance with non-storm water

COMPLAINT

discharge prohibitions and receiving water limitations. 2013 MS4 Permit, Provision E.2., Provision A.4.

260.    The City's Illicit Discharge Program must include specific measures to prevent and detect illicit discharges to the MS4. These measures include:

1. Including and maintaining an accurate and updated geographic informational system ("GIS") map of its MS4 that, among other requirements, identifies all segments of the MS4. 2013 MS4 Permit, Provision E.2.b.(1).

2. Using the City's "personnel and contractors to assist in identifying and reporting illicit discharges and connections during their daily employment activities." 2013 MS4 Permit, Provision E.2.b (2).

3. Conducting field screening, including visual observations, of portions of its MS4 to detect non-stormwater and illicit discharges and connections to the MS4. 2013 MS4 Permit, Provision E.2.c; and

4. Including enumerated measures to investigate and eliminate illicit discharges to the MS4. 2013 MS4 Permit, Provision E.2.d.

261.    The City is required to prioritize an investigation into non-storm water or illicit discharges when, as here, pollutants identified with those discharges are causing or

COMPLAINT

67

contributing to receiving water impairments or impacting environmentally sensitive areas within the City. 2013 MS4 Permit, Provision E.2.d(1)(a-b).

262. When illicit discharges and connections are known to the City, it must use its legal authority to eliminate them. 2013 MS4 Permit, Provision E.2.d (3)(a).

263. In addition to its discharge prohibitions and controls on the City's own activities, the 2013 MS4 Permit requires the City to "establish, maintain, and enforce adequate legal authority within its jurisdiction to control pollutant discharges into and from its MS4 through statute, ordinance, permit, contract, order or similar means." 2013 MS4 Permit, Provision E.1.a; see also 40 C.F.R. § 122.26(d)(2)(vi)(B)(1) (Dec. 21, 2015).

264. As noted above, the MS4 Permit demands that the City maintain adequate legal authority to, at a minimum, "prohibit and eliminate all illicit discharges and illicit connections to the MS4." 2013 MS4 Permit, Provision E.1.a.(1); see also 40 C.F.R. § 122.26(d)(2)(i)(B) (Dec. 21, 2015).

265. The San Diego Water Board and the 2013 MS4 Permit requires permits (waste discharge requirements) for all projects constructed within waters of the state. Not obtaining a required permit can be enforced by the City Attorney.

266. The City's legal authority must also control the discharge of spills, dumping, or disposal of materials and other unpermitted fills and mobile pollutants into its MS4 from the interconnected privately owned storm water conveyance system within its jurisdiction and parts controlled by other entities such as Caltrans. 2013 MS4 Permit, Provision E.1.a.(1-10).

COMPLAINT

267.    The City's authority must require the use of effective controls and best management practices ("BMPs") to prevent or reduce the discharge of pollutants in storm water from its MS4 to the maximum extent practicable. 2013 MS4 Permit, Provision E.1.a.(7).

268.    In addition, the City must have the authority to, at a minimum, ensure compliance with its own regulatory efforts to effectively prohibit non-storm water discharges to its MS4 and either eliminate (or effectively reduce) those discharges to its MS4 or require those non-storm water discharges to its MS4 to have their own separate NPDES permits. 2013 MS4 Permit, Provision E.1.a (9); see also 2013 MS4 Permit, Attachment F at F-40.

269.    The 2013 MS4 Permit requires that the City submit a statement certifying that it has "taken the necessary steps to obtain and maintain full legal authority within its jurisdiction to implement and enforce each of the requirements in the [MS4 Permit]." 2013 MS4 Permit, Provision E.1.b.

270.    The City of Poway has prepared in 2015 its own Jurisdictional Runoff Management Plan (JRMP) document in accordance with its NPDES permit for its MS4.

271.    Under 8.2.2 of Poway's JRMP, the City has agreed to maintain unpaved roads and implement BMPs to prevent the transportation of sediment into the storm water conveyance system.

272.    In its JRMP, the City also stated that it will take action in accordance with its Enforcement Response Plan to eliminate illicit connections and illicit discharges into, from, and through its MS4 that lead to non-storm water pollution in receiving waters.

COMPLAINT

273.   In its JRMP, the City has adopted the storm water and non-storm water action levels (SALs and NALs) of Provision C of the 2013 MS4 Permit.

274.   In its JRMP, the City has adopted BMP #11 to minimize spring water when that water is a source of pollutants to receiving waters.

275.   In its JRMP, the City has adopted the BMPs #1 and #14 to remove waste deposits and eroded soils (abatement) from illegal connections in its MS4 that is causing or threatening to cause a condition of pollution in receiving waters.

276.   Provision F of the 2013 MS4 Permit includes the requirements for the documents and reports that the Copermittees must prepare and provide to the San Diego Water Board, including Water Quality Improvement Plans and Annual Reports, a Jurisdictional Runoff Management Plan, Waste Discharge Reports, and reports of non-storm water discharges as well as illicit discharges and connections.

      a.   The Copermittee must confirm whether or not a program was implemented during the fiscal year to <u>actively</u> detect and eliminate illicit discharges and connections in accordance with the requirements under Provision E.2.

      b.   The City is also required to file a Water Quality Improvement Plan Annual Report and a Waste Discharge Report containing any illicit discharges to receiving waters and any exceedances of numeric or narrative water quality standards.

      c.   Illicit connections and illicit discharges and all known non-storm water discharges must be reported to the San Diego Water Board.

COMPLAINT

277.   According to 2013 MS4 Permit Provision E.3., BMPs are required for all

development projects[6] of each Copermittee. Each Copermittee must prescribe the

following BMP requirements during the planning process for all development projects in

waters of the state regardless of size or type, where local permits are issued (i.e. water

quality certifications/mandatory waste discharge requirements from the San Diego Water

Board, permits from Fish and Wildlife, and permits from the City Council), including

unpaved road repairs and flood management projects within waters of the state:

   a.   Onsite BMPs;

   b.   Structural BMPs;

   c.   Source Control BMPs (prevention of illicit discharges into MS4); and

   d.   Low Impact Development (LID) BMPs, including for maintenance or

        restoration of storage reservoirs and drainage corridors including ephemeral

        and intermittent streams. 2013 MS4 Permit, Provision E.3.a.(3) and Provision

        E.3.a.(3)(a) n.25:

        1.   Development projects proposing to dredge or fill materials in waters of

             the U.S. must obtain a CWA Section 401 Water Quality Certification

             from the San Diego Water Board.

        2.   Projects proposing to dredge or fill waters of the state must obtain waste

             discharge requirements from the San Diego Water Board.

---

[6] Development projects are defined as "[c]onstruction, rehabilitation, redevelopment, or reconstruction of any public or private projects." 2013 MS4 Permit, C-4.

COMPLAINT

278.    Furthermore, Provision E.2.d describes the measures that the City must take to investigate and eliminate illicit discharges to the MS4. Provision E.2.d.(1) requires the City to "prioritize and determine when follow-up investigations will be performed in response to visual observations . . . of a detected non-storm water **or** illicit discharge to or from the MS4 . . . causing or contributing, or threatening to cause or contribute to impairments in water bodies . . . in environmentally sensitive areas (ESAs)." 2013 MS4 Permit, Provisions E.2.d.(1) and E.2.d.(1)(b).

279.    The City is also required to do the same for "[p]ollutants identified as causing or contributing to an exceedance of a NAL." 2013 MS4 Permit, Provision E.2.d.(1)(d); see 2013 MS4 Permit, Provision C.

280.    Under Provision E.2.d.(2), the City is also required to respond to a citizen's reports of non-storm water flows within Warren Canyon and the resulting polluted non-storm water discharges into Lake Poway with its own investigation and must maintain records of the discharges and their sources.

281.    Under Provision E.2.d.(3), those spring water discharges that are in exceedance of NALs must either be addressed through its Enforcement Response Plan as an isolated incident or the category must be prohibited pursuant to Provision E.2.a(6).

282.    Under Provision E.2.c., the City of Poway must conduct field screening of portions of its MS4 containing non-storm water in accordance with the dry weather monitoring requirements of Provision D.

COMPLAINT

283.   Finally, under Provision E.2.d.(4), each Copermittee must submit a summary of all detected non-storm water discharges with each WQIP annual report required by Provision F.

## VI. CWA SECTION 404 DEPARTMENT OF THE ARMY PERMIT & CWA SECTION 401 WATER QUALITY CERTIFICATION

284.   Department of the Army Regional General Permit (RGP) Number 63 for Repair and Protection Activities in Emergency Situations authorizes discharges at <u>specific</u> locations of dredged or fill material into Waters of the United States, including adjacent wetlands, and/or work or structures in and adjacent to navigable waters of the United States for necessary repair and protection measures associated with an emergency situation.

285.   An "emergency situation" is present where there is clear, sudden, unexpected, and imminent threat to life or property demanding immediate action to prevent or mitigate loss of, or damage to, life, health, property, or essential public services (i.e., a situation that could potentially result in an unacceptable hazard to life or significant loss of property if corrective action requiring a permit is not undertaken immediately).

286.   RGP 63 applies to all of San Diego County.

287.   Under RGP 63, discharges of dredged or fill material into Waters of the United States must be avoided or minimized to the maximum extent practicable at the project site. Compensation for unavoidable discharge of fill materials may require appropriate mitigation measures within the same watershed.

COMPLAINT

288.    Under the terms of RGP 63, any work authorized must be the minimum necessary to alleviate the immediate emergency, unless complete reconstruction only results in very minor additional impact to aquatic resources and logistical concerns indicate such reconstruction is as expedient considering the condition of the project site and is limited to in-kind replacement or refurbishment. The RGP may NOT be used to upgrade an existing structure to current standards when that activity would result in additional adverse effects on aquatic resources. Such upgrade projects shall be considered separate activities for which other forms of authorization will be required.

289.    According to the RGP 63 Permit, work not described in permit application documentation but deemed necessary after a field assessment is not authorized unless coordinated with the Regulatory project manager and acknowledged by appropriate means. These coordinated permit modifications must also be described in sufficient detail in the post-project report.

290.    Any projects authorized under RGP 63 must be initiated within 14 days of receiving authorization. If the project start time can be delayed for more than two weeks, the imminent threat of impending loss may have diminished in magnitude, as well as immediacy, and generally would not meet the definition of an "emergency."

291.    California's State Water Resources Control Board issued a conditional Section 401 water quality certification for RGP 63 dated November 25, 2013.

292.    The 401 Certification for RGP 63 is subject to modification or revocation upon administrative or judicial review.

COMPLAINT

293.    The 401 Certification for RGP 63 is limited to emergency situations that meet the California Environmental Quality Act definition of an "emergency."

294.    For actions that do not qualify for enrollment under 401 Certification for RGP 63 because the situation does not meet the definition of "emergency," the discharger must contact either the State Water Board or the applicable Regional Water Board to apply for an individual water quality certification.

295.    Under RGP 63, all necessary BMPs to control erosion and runoff from areas associated with the emergency actions shall be implemented.

296.    Under RGP 63, restoration must include revegetation with native species. The revegetation palette must not contain any plants listed on the California Invasive Plant Council Invasive Plant Inventory.

297.    Under RGP 63, every effort must be made to ensure any material dredged or excavated from Waters of the United States is not likely to be washed back into any Waters of the United States.

298.    Under RGP 63, no discharge of dredged or fill material may occur in the proximity of a public water supply intake except where the discharge is for the repair of the public water supply intake structures or adjacent bank stabilization.

299.    Under RGP 63, discharges must not permanently restrict or impede the passage of normal or expected high flows or cause the relocation of the water except within the existing river plain unless the primary purpose of the fill is to impound waters.

COMPLAINT

300.    Under RGP 63, any structure or fill authorized shall be maintained, unless it is later determined that the structure is further contributing to other adverse conditions to public property. In such situations, corrective measures will be taken to rectify these adverse conditions, including removal and/or redesign of the original emergency corrective action, or appropriate mitigation as determined through coordination with the permittee and the appropriate Federal and State agencies.

## VII. CITY OF POWAY'S HABITAT CONSERVATION PLAN REQUIRED BY THE ENDANGERED SPECIES ACT.

301.    Preparation and implementation of the citywide Poway Subarea Habitat Conservation Plan/Natural Community Conservation Plan (HCP) is necessary to allow for the incidental take of listed species by public projects and private projects which rely upon the City's incidental take/management authorization permit (ITP). This subarea HCP fulfills requirements pursuant to Section 10(a) of the federal Endangered Species Act, 16 U.S.C. § 1539.

302.    Poway's HCP plays a number of legal roles as an environmental planning document, and the implementing agreement for the HCP, properly signed by the City of Poway and the wildlife agencies, assures that the HCP will be fully implemented.

303.    Collectively, the laws and planning efforts require protection and management of sufficient, interconnected habitat areas to support listed species – or "target" species that serve as indicators of ecosystem health – in exchange for allowing limited "take" of the species or its habitat.

COMPLAINT

304.    Section 1.0 of the HCP points out that incidental take may occur during otherwise lawful endeavors, such as development allowed under the community's adopted General Plan.

305.    The issuance of an ITP authorizes "take" by any entity under "direct control of the permittee." 50 CFR 13.25(d) (January 8, 2014).

306.    The Poway Subarea HCP serves as a multispecies HCP as called for under Section 10(a)(1)(B) of the federal Endangered Species Act. Listed species covered under the plan include: Encinitas Baccharis (*Baccharis vanessae*), Southwestern willow flycatcher (*Empidonax traillii*), California gnatcatcher (*Polioptila californica californica*), and the Least Bell's vireo (*Vireo bellii pusillus*).

307.    Section 7.4 states: "Impacts to vegetation communities and wildlife habitats in the City of Poway shall require compensating mitigation, restoration, or revegetation, or a combination thereof. Compensating mitigation can consist of 1) outright purchase or dedication of lands inside the Mitigation Area as biological open space or 2) payment of in-lieu fees into a mitigation bank administered by the City of Poway or a land trust acting as an agent of the City of Poway."

308.    Section 7.4 states: "The compensation strategy applies to planned public and private development projects within the City or within other jurisdictions that choose to mitigate within Poway."

COMPLAINT

309.   Section 7.4 further states: "The specific mitigation strategy for a project will be based on the results of a biological resource survey technical report prepared by a qualified biologist."

310.   Section 7.4.3: The following mitigation ratios shall apply to all projects resulting in removal of natural vegetation or wildlife habitat within the City of Poway and that are subject to the HCP, whether inside or outside of the Mitigation Area.

  a.   Any unavoidable impacts to wetland habitat will be mitigated by replacement or enhancement at a minimum ratio of 3:1 for woodland types and 2:1 for shrub-dominated types. Mitigation ratios for disturbed wetlands will generally be mitigated in-kind at no less than 1:1 ratio as determined on a case-by-case basis.

  b.   Impacts to oak-dominated habitats shall require mitigation by in-kind habitat creation, restoration, or enhancement. Impacts shall require a minimum of a 3:1 replacement ratio.

  c.   Direct impacts to coastal sage scrub or mixed coastal sage scrub/chaparral shall be compensated at a minimum 2:1 ratio.

///

///

///

///

COMPLAINT

## VIII. FACTUAL ALLEGATIONS

## A. Stormwater and Non-storm Water Discharges Causing and Threatening to Cause a Condition of Pollution in Warren Canyon and Lake Poway.

311.    The City of Poway is a municipality of the State of California and, therefore, a "person" as defined by Section 502(5) of the CWA, 33 U.S.C. 1362(5).

312.    The City of Poway is primarily responsible for the design, construction, management, and maintenance of the trails surrounding Lake Poway, including the dirt roads, stream crossings, and maintenance facilities in the vicinity. These operations include roads with drainage systems, catch basins, ditches, man-made channels, and storm drains.

313.    The City of Poway owns (or partly leases) Lake Poway and the surrounding areas including the following parcels: APNs: 278-280-2300; APN: 278-290-1000; APN: 278-281-0100; APN: 7601590500; and APN: 278-210-1100.

314.    The City of Poway maintains trails above Lake Poway that are on City-owned/controlled land as well Plaintiff's privately owned land, including APN: 278-210-2900 and 278-210-3000.

315.    The trails cross waters of the United States and/or State of California, including on City-owned land and on Plaintiff's privately owned land (APN: 278-210-3000 and APN: 278-210-2900).

316.    Trail construction and maintenance involve dredging and filling activities in waters of the United States and/or state.

COMPLAINT

317.   The City of Poway owns and operates a MS4 and its components, including on APNs: 278-280-2300; APN: 278-290-1000; APN: 278-281-0100; APN: 7601590500; and APN: 278-210-1100.

318.   The City of Poway's access road and trails cross its MS4 system in several locations above Lake Poway.

319.   The City of Poway's MS4 system encompasses streams and creeks from Poway's city limits off of State Highway 67 and all the way downstream into Lake Poway. The subwatershed area feeding Lake Poway is small (around 1200 acres) and only extends to Mount Woodson and Rock Haven and the eastern city limits of Poway.

320.   The MS4 owned by the City of Poway includes portions of Warren Creek and the City-owned culverts and a wooden footbridge in Warren Creek and its tributaries.

321.   Poway's MS4 also includes the cross-drainage culverts along the City's unpaved roads above Lake Poway, which drain into Lake Poway.

322.   Poway's MS4 also includes the outlet pipe below Poway dam from which water not appropriated under the City's water license agreement is be released to the watercourse downstream from Lake Poway.

323.   Poway's MS4 also includes the spillway adjacent to Lake Poway's dam and Lake Poway itself.

324.   Poway's MS4 also includes a wooden footbridge over Warren Creek that is by definition a point source where storm and non-storm water directly discharges into the

COMPLAINT

surface waters of Lake Poway (Boulder Bay) and its adjacent wetlands through a single conveyance draining more than 1000 acres.

325.    As a city's MS4 includes, by definition, its roads and associated drainage structures, Poway's MS4 includes Warren Crossing, located approximately at 33.0030 Latitude, -117.0057 Longitude, and Fisherman's Footbridge, located approximately at 33.0039 Latitude, -117.0070 Longitude.

326.    Poway's MS4 is a collection of point sources that discharge into the navigable waters of the United States. See NRDC v. CNTY. of Los Angeles, 725 F.3d 1194, 1198 n.6 (9th Cir. 2013).

327.     "[S]tream crossings for roads may involve point source discharges of dredged or fill material." See 40 C.F.R. § 122.27(b)(1) (August 30, 2018).

328.    The Army Corps and the EPA has asserted jurisdiction over portions of Warren Creek and all of Lake Poway as Waters of the United States.

329.    Lake Poway is considered a receiving body of water of the state and "waters of the United States." It is a navigable body of water in the traditional sense of the term as used in the CWA of 1972, its implementing regulations since 1973, and case law.

330.    Lake Poway and Warren Creek are within the San Dieguito watershed.

331.    The City of Poway conducts and/or controls construction activities, including clearing, grading, and excavating, and other land disturbance activities at various locations around Lake Poway and other locations within the San Dieguito watershed. ("Construction activities").

COMPLAINT

332.    The City of Poway conducts maintenance activities, including road maintenance (such as slope stabilization, vegetation control, and drain inlet cleaning) and road surveillance, throughout the City of Poway. The City of Poway also owns and/or operates maintenance facilities, including vehicle maintenance facilities, sand storage facilities, material and equipment storage facilities in the City of Poway. The City of Poway maintains the dirt roads and trails in and around Lake Poway, including clearing them of debris and runoff damage after storms, dredging around MS4 culverts, and regularly trimming tree and plant growth along its trails. ("Maintenance activities.")

333.    The City of Poway has several volunteers under the authority and direction of Bob Hahn, Poway's Parks Maintenance Supervisor, who help maintain the City's trails, including those on Plaintiff's privately owned land (APN: 278-210-2900 and 278-210-3000) above Lake Poway.

334.    The City of Poway also has had staff under the direction of Mike Obermiller, P.E., and the City Engineer, Steve Crosby, P.E., who both have overseen construction and maintenance activities of the City's trails and access roads above Lake Poway.

335.    The City of Poway's discharges consist of stormwater and non-storm water flows coming from its operations and properties, including its Construction Activities, Maintenance Activities, and Maintenance Facilities.

336.    Mobile components of the City of Poway's point-source earthen culvert crossings have been discharged as effluent into its downstream MS4 and into Lake Poway, a navigable receiving water of the state and of the United States.

COMPLAINT

337.    The City of Poway's discharges of pollutants into stormwater and non-stormwater have caused and have threatened to cause pollution in waters of the United States. Pollutant sources from the City of Poway's operations include motor vehicles, road maintenance, construction site runoff, maintenance facility runoff, dumping, spills, landscape care, vegetation removal, dredging and filling activities upstream of Lake Poway, sediment runoff coming from dirt crossings placed in streams above Lake Poway, and road reconstruction activities in and near tributaries and other receiving waters, including Lake Poway. Pollutant categories include metals, synthetic organics, sediment, nutrients, debris, oxygen demanding substances (decaying vegetation, animal waste, and other organic matter), fertilizers such as phosphorous, and other pollutants which may cause harm to aquatic species in the receiving waters.

338.    Losing the flood control capacity of Lake Poway will inevitably lead to water pollution into the Pacific Ocean 17 miles away.

339.    In the City of Poway, anthropogenic sources of pollutants—namely unpermitted discharges of dredged and fill materials placed around culverts and other conveyances such as constructed fords by the City and by private third parties in Warren Canyon – have become mobilized and discharged into the mouth and other portions of Warren Creek and into downstream Lake Poway as an unreasonable amount of waste from and through Poway's point sources in violation of its 2013 MS4 Permit. The approximate location of the unpermitted point sources that were partially or fully washed out as a

COMPLAINT

result of the February 2017 and February 2019 winter storms and April 2020 spring storms in Warren Canyon are as follows:

a. 33.001298, -117.003004 (APN: 278-290-1100);

b.  32.998925, -116.998575 (APN: 278-300-5000);

c.  32.998802, -116.997127 (APN: 278-300-5900);

d.  33.001296, -117.003004 (APN: 278-290-0600);

e.  32.9990, -116.9961 (APN: 278-200-1900);

f.  32.9992, -116.9934 and 32.9993, -116.9927 (APN: 278-200-0700);

g.  32.998671, -116.981069 (APN: 278-200-0200);

h.  32.998204, -116.977989 (APN: 278-210-1500);

i.  32.9980, -116.9761 (APN: 278-210-1800);

j.  32.9990, -116.9756 (APN: 278-210-1800);

k.  32.998103, -116.976631 (APN: 278-210-1600);

l.  32.9992, -117.0003 (APN: 278-300-6000); and

m. 33.0030, -117.0057 (APN: 278-280-2300).

340.   Septic tanks and wells are located in proximity to several of the aforementioned point sources in Warren Canyon. At least one these septic tanks was failing in 2019-2020 and contributed some of the nutrient and bacterial pollutants at Warren Crossing and into Lake Poway.

341.   The following parcels have unpermitted rebuilt crossings constructed after the winter 2017 storms: APNs: 278-200-0700; 278-200-1900; 278-280-2300; 278-290-1100; 278-

COMPLAINT

84

300-5900; 278-290-0600; 278-210-1500; 278-300-6000; 278-200-0200; 278-300-5000; 278-280-2300; and APN: 278-210-1600.

342.   These unpermitted discharges have caused and are causing and are threatening to cause a condition of pollution in Lake Poway. The man-made conveyances in Warren Canyon were mostly washed out on (or around) February 27-28, 2017; again on (or around) February 14-16, 2019; and again on (or around) April 5-10, 2020. However, residual waste has continued to be washed down into Lake Poway before and after those dates, including on February 28, 2019, March 11, 2019, November 28, 2019, December 26, 2019, March 12, 2020, and May 15, 2020.

343.   The pollution is ongoing because the waste remains in the mouth and other portions of the creek and has become further and further discharged into the reservoir with each passing year and each large storm event and because waste – i.e. unauthorized discharges such as unpermitted dredged and fill and earth eroded from tractors – has been subsequently added to Warren Creek by the City and by other Poway residents of Warren Canyon after the winter storms of 2017 and 2019 without the proper permits/authorizations from the San Diego Water Board.

344.   Lake Poway is being affected by waste to the extent that the reservoir is regularly losing its storage capacity, as dramatically shown after February 27-28, 2017, February 14-16, 2019, and April 5-10, 2020 storms (see May 24, 2019 NOV, Exhibit 2; February 5, 2021 NOV, Exhibit 12), and recreational activities such as fishing are being impaired because of deleterious deposits removing fishing spots and causing

COMPLAINT

turbidity, eutrophication, and coloration of the waters from iron, nitrogen, and phosphorous-rich water and sediment. The effects of these discharges are the overabundance of harmful cyanobacteria and other algal blooms occurring in Lake Poway affecting nearshore aesthetic enjoyment and aquatic health, the closure of certain portions of Lake Poway including at Hidden Bay due to swamp-like conditions, the use of toxic copper-based algaecides, and the forced reduction of the water levels and the storage capacity of Lake Poway due in part to the waste blockage.

345.    The discharges from Poway's MS4 into Lake Poway have demonstrated exceedances of the non-storm water action levels (NALs) for indicator bacteria such as fecal coliform and/or Enterococci sp., harming REC-1 beneficial uses such as fishing on a frequent basis in 2019 and 2020.

346.    While Provision B.3.c of the 2013 MS4 Permit provides an option that allows a Copermittee to utilize the watershed-based water quality improvement plan to be deemed in compliance with the prohibitions and limitations of Provisions A.1.a and A.1.c, Poway has not submitted an updated WQIP that follows the rigorous requirements of Provision B.3.c with respect to the types of pollutants that are being addressed in this lawsuit and cannot prove that it has been deemed in compliance with Provisions A of the 2013 MS4 Permit with regard to Warren Canyon and Lake Poway in particular or the San Dieguito (SDR) Watershed in general.

347.    As Poway has not used the "Prohibitions and Limitations Compliance Option" as outlined in Provision B.3.c.(1) and (2) with respect to its stormwater and non-

COMPLAINT

stormwater discharges of polluted sediment and spring water flows containing pollutants such as phosphorous, iron, indicator bacteria, and nitrogen that are aggravating a condition of pollution in receiving waters in the SDR watershed (no numeric goals were set for any of these constituents and there was no public participation process addressing the "option"), Poway is liable under Provision A and must implement Provisions A.4 and E.2 and properly address the flows containing pollutants from Kelly Spring and Rock Haven Spring together with the unpermitted waste deposits from washed-out stream crossings into its MS4 and into its receiving waters.

348.   The original 2013 MS4 Permit did not include a "Prohibitions and Limitations Compliance Option" as a way to be deemed in compliance with the discharge prohibitions of Provision A. The optional "Prohibitions and Limitations Compliance Option" as described in Provision B.3.c.(1) and (2) was added to the 2013 MS4 Permit by R9-2015-0100, which became effective on January 7, 2016. Poway's current non-optional Water Quality Improvement Plan was presented to the San Diego Water Board in September of 2015 which was before the existence of the "Prohibitions and Limitations Compliance Option" and its rigorous requirements including public participation as required by Provision B.3.c.(1)(b)(ii).

349.   Poway's current non-optional WQIP cannot satisfy Provision B.3.c. as a matter of law, and Poway must undergo the rigorous process described in Provision B.3.c. in the future if it desires to utilize the "Prohibitions and Limitations Compliance Option"

COMPLAINT

and benefit from the safe-harbor provision.

350.    The bottom line is that Poway is not shielded from liability for the portion of the 20,000 tons of sediment that is "waste" that has been built up in the Boulder Bay area of Lake Poway over the years from illegal, unauthorized activity in Warren Canyon caused by the City and by third parties under Poway's jurisdiction in violation of the 2013 MS4 Permit.

351.    The City must dredge out the unauthorized waste pollution in the Boulder Bay of Lake Poway that has accumulated from the unpermitted dredged and fill materials placed around culverts and other wetland destructive activity for roads and trails that resulted in mobile waste in 2017, 2019, and 2020.

352.    At a minimum, the City must remove the unnatural sediment deposits that have occurred and recurred in Lake Poway over the past 5 years to the present.

353.    In its JRMP, the City of Poway has adopted the BMPs #1 and #14 and has committed to remove waste deposits and eroded soils (abatement) from illegal connections in and/or into its MS4 that are causing or threatening to cause a condition of pollution in receiving waters. However, the City of Poway continues to refuse to remove these waste deposits throughout Warren Canyon including at Warren Crossing and at the mouth of Warren Creek at the Boulder Bay area of Lake Poway where most of the waste has been deposited.

354.    Spring water discharges of nutrient rich waters into the City of Poway's MS4 in Warren Canyon that exceed NALs and aggravate a condition of pollution in receiving

COMPLAINT

waters must be addressed according to the 2013 MS4 Permit and Poway's JRMP. Such discharges must be minimized through stream and wetlands rehabilitation projects.

355.    Poway's 2013 MS4 Permit requires that the non-storm spring water that flows into its MS4 and from its MS4 to Lake Poway must be properly addressed through the effective enforcement and implementation of various provisions of the City's 2013 MS4 Permit, particularly the discharge prohibitions and receiving water limitations of Provisions A.1.a., A.1.b., A.1.c., and A.2.a, the adaption of monitoring and assessment program and updates to the water quality improvement plan described in Provision B.5., and the illicit discharge detection and elimination requirements of Provision E.2.

356.    The City of Poway has identified in the public record that spring water flows in its MS4 and reaches Lake Poway, and Poway's JRMP has identified the following pollutants coming from its MS4 in Warren Canyon: Indicator Bacteria, Color, Manganese, Mercury, Nitrogen, pH, Phosphorous, Viruses, Turbidity, and Nutrients.

357.    The non-storm spring water discharges of pollutants into Lake Poway have recurred seasonally because waste from washed-out unpermitted culvert crossings, constructed fords, and other wetland destruction activity remains in the creek/MS4 and because non-storm spring water assimilates pollutants from various unpermitted (and illicit) point-sources in Warren Canyon, leading to the non-storm water discharge of sediment and other pollutants into Lake Poway through a City-owned point source.

358.    Discharges of non-storm spring water directly from Rock Haven (Rock Haven Spring), and from Mount Woodson (Kelly Spring, located at 32.9998 Latitude, -

COMPLAINT

116.9749 Longitude) into the City of Poway's MS4 and into Lake Poway are also themselves sources of soluble phosphorous, nitrogen, and iron pollutants aggravating a condition of pollution in Lake Poway.

359.   Because Warren Canyon and Lake Poway are City-designated Environmentally Sensitive Areas and because these areas are being fed with non-storm water discharges containing pollutants exceeding non-storm water action levels (NALs) on a regular basis during the winter and spring months of non-drought years as shown in the exhibits attached to the May 24, 2019, October 1, 2019, and February 5, 2021 NOVs, the City of Poway must address these flows as a priority concern as required by Provisions B.5 and E.2.d and must use the resources that it most definitely has to reduce these flows as required by Provision E.2.a.(7) as well as the City of Poway's JRMP (BMP #11).

360.   The City of Poway, though inadvertently identifying that non-storm water containing pollutants comes from Warren Canyon into its MS4, has not minimized the polluted spring water before it flows into its MS4 by undertaking feasible projects such as constructing water-trapping weirs and repairing wetlands damaged by humans upstream of the lake.

361.   If Poway chooses not to address the non-storm spring waters that are contributing pollutants to Lake Poway as required by the 2013 MS4 Permit, the City must then obtain a separate NPDES permit for the discharges according to federal law and the 2013 MS4 Permit as the discharges violate antidegradation policies.

362.   Under its 2013 MS4 Permit and its terms, the City of Poway is responsible for

COMPLAINT

90

adequately addressing the exceedances of phosphorous and the nutrient-rich non-storm water that is being discharged into its MS4 and into Lake Poway on a daily basis during the times of the year when there is stream flow through Warren Canyon.

363.    Over the last 50 years, including as recently as 2016, the residents of Warren Canyon have altered the wetland ecosystem surrounding Kelly Spring through the use of tractors, resulting in the loss of its pollutant-retention (including its phosphorous-retention) capacity.

364.    Other wetland systems in Warren Canyon including on the City-owned property surrounding Warren Crossing, located at approximately 33.0030 Latitude, -117.0057 Longitude, have lost pollutant-retention capacity due to anthropogenic activity.

365.    A condition of pollution has been occurring and recurring in Warren Creek and in Lake Poway over the years, which was recently highlighted in 2017 when a massive winter storm resulted in the destruction of approximately ten man-made unpermitted conveyances (e.g., dirt backfilled culverts and/or constructed fords) throughout Warren Canyon in the City of Poway, with the unpermitted waste being deposited through its MS4 in downstream portions of Warren Creek including at Lake Poway at Boulder Bay.

366.    In previous iterations of the MS4 permits for the San Diego region, certain discharges or flows of non-storm water were "simply listed and referred to as categories of non-storm water discharges 'not prohibited' unless identified as a source of pollutants." 2013 MS4 Permit, F-89. However, the federal NPDES regulations "do not specifically state that such discharges are 'not prohibited' or 'exempt' or in any way authorized." Id.

COMPLAINT

367.    In the updated 2013 MS4 Permit, all non-storm water discharges must, at a minimum, comply with the discharge prohibitions and receiving water limitations of Provision A.1.a and A.2.a. 2013 MS4 Permit, F-68. In 2017, 2019, and 2020, Poway's non-storm water discharges into Lake Poway did not comply with Provisions A.1.a, A.2.a, and A.1.c.

368.    For spring water discharges, the non-storm water action levels (NALs) of Provision C.1 are to be used to determine if the spring water is a source of pollutants aggravating a condition of pollution in receiving waters.[7]  Exceedances of the NALs would then provide an indication of the relative severity of a pollutant in non-storm water discharges from the MS4 contributing to potential or observed receiving water quality impacts. 2013 MS4 Permit, F-68. In 2017, 2019, and 2020, Poway's spring water discharges exceeded the NALs for total phosphorous, total nitrogen, and iron on multiple occasions.

369.    In addition to meeting Provisions A.1.a and A.2.a, the City must fulfill Provision A.1.b which requires that non-storm water discharges be effectively prohibited through the implementation of Provision E.2. 2013 MS4 Permit, at 17. In 2017, 2019, and 2020, Poway has not properly addressed the spring water flows through its MS4 in Warren Canyon in accordance with the 2013 MS4 Permit.

370.    Provision E.2.a of the City's 2013 MS4 Permit requires each Copermittee to address all types of non-storm water discharges into its MS4 as illicit discharges, unless the

---

[7] The NALs of Provision C.1 are incorporated into the City of Poway's JRMP.

COMPLAINT

discharge is authorized by a separate NPDES permit or identified as a category of non-storm water discharges or flows that must be addressed pursuant to the requirements of Provision E.2.a.(1)-(7). Poway must address the non-storm water flows containing pollutants in Warren Canyon in 2017, 2019, and 2020 as illicit discharges because of Poway's and third parties' illicit connections in Warren Canyon and other anthropogenic activity in this watershed, but it refuses to do so.

371.    For spring water flows under Provision E.2.a.(3), only non-storm spring water discharges not identified under a separate NPDES permit and not identified as a source of pollutants do not have to be addressed as illicit discharges. 2013 MS4 Permit, F-89. Poway's non-storm spring water flows in 2017, 2019, and 2020 in Warren Canyon have been a source of pollutants to receiving waters aggravating a condition of pollution in those waters and are not the subject of another NPDES permit.

372.    Under Provision E.2.a.(6), if the Copermittee or the San Diego Water Board identifies any category of non-storm water discharges such as spring water as a source of pollutants to receiving waters, the category must be prohibited through ordinance, order, or similar means and addressed as an illicit discharge. Alternatively under Provision E.2.a.(6), the City of Poway may propose controls to be implemented for the category of non-storm water discharges as part of an updated WQIP instead of prohibiting the category of non-storm water discharges, and implement the controls if accepted by the

COMPLAINT

San Diego Water Board as part of an updated WQIP.[8] Poway has not proposed and implemented controls to address the spring water discharges containing pollutants in Warren Canyon.

373.    In addition to the conditions of Provision E.2.a.(6), "Provision E.2.a.(7) has been included in the requirements for non-storm water discharges to clarify that any non-storm water discharges to the Copermittee's MS4, even those identified pursuant to Provision E.2.a.(1) through E.2.a.(4) [i.e. spring water], must be reduced or eliminated, unless a non-storm water discharge is identified as a discharge authorized by a separate NPDES permit." 2013 MS4 Permit, F- 96. The mandate of Provision E.2.a.(7) for the reduction or elimination of spring water discharges into the MS4 is expected to be completed "where feasible and priorities and resources allow" unless the City obtains a separate NPDES permit for the discharges.[9] Poway has refused to prioritize the Lake Poway watershed and undertake feasible measures to reduce pollutant loads from sediment waste discharges and spring water containing pollutants in its MS4 through wetland repairs and stream rehabilitation projects.

---

[8] Rehabilitating streams and repairing wetlands are the types of "controls" contemplated by the 2013 MS4 Permit to reduce flows to the MS4 and retain pollutants in those flows. Rehabilitating streams and repairing wetlands would be part of a comprehensive load reduction plan to address water quality impacts as required by the 2013 MS4 Permit.

[9] Again, rehabilitating streams and repairing (re-establishing) wetlands are the types of controls contemplated by the 2013 MS4 Permit to "reduce" flows and retain pollutants in those flows before they reach the City's MS4.

COMPLAINT

374.   Furthermore, Provision E.2.d describes the measures that the City must take to investigate and eliminate illicit discharges to the MS4. Provision E.2.d.(1) requires the City to "prioritize and determine when follow-up investigations will be performed in response to visual observations . . . of a detected non-storm water **or** illicit discharge to or from the MS4 . . . causing or contributing, or threatening to cause or contribute to impairments in water bodies . . . in environmentally sensitive areas (ESAs)." 2013 MS4 Permit, Provisions E.2.d.(1) and E.2.d.(1)(b). Poway has not responded to Plaintiff's May 24, 2019, October 1, 2019, and February 5, 2021 NOVs documenting non-storm water and illicit discharges in Warren Canyon and Lake Poway, city-designated ESAs.

375.   The City is also required to do the same for "[p]ollutants identified as causing or contributing to an exceedance of a NAL" in receiving waters. 2013 MS4 Permit, Provision E.2.d.(1)(d); see 2013 MS4 Permit, Provision C. Poway has not adequately responded to the information presented in Plaintiff's May 24, 2019, October 1, 2019, and February 5, 2021 NOVs documenting non-storm water containing pollutants identified as causing or contributing to an exceedance of a NAL in Warren Canyon.

376.   Under Provisions E.2.d.(2), the City is also required to respond to a citizen's reports of non-storm water flows within Warren Canyon and the resulting polluted non-storm water discharges into Lake Poway with its own investigation and must maintain records of the discharges and their sources and the methods used to control them. The City has failed to do so.

COMPLAINT

377.   Under Provision E.2.d.(3), those spring water discharges that are in exceedance of NALs must either be addressed through its Enforcement Response Plan or the category must be addressed according to Provision E.2.a.(6). The City has failed to address these discharges under any provision of the 2013 MS4 Permit in an appropriate fashion.

378.   Under Provision E.2.c., the City of Poway must conduct field screening of portions of its MS4 containing non-storm water in accordance with the dry weather monitoring requirements of Provision D. The City has failed to do so.

379.   Finally, under Provision E.2.d.(4), each Copermittee must submit a summary of all detected non-storm water discharges with each WQIP annual report required by Provision F. Poway has failed to fulfill this requirement in 2017, 2018, 2019, and 2020 with regard to the discharges in the Lake Poway area.

380.   The pollutants present in the spring water from Kelly Spring and from Rock Haven Spring, including the assimilated sediment pollutants from unpermitted culvert crossings/fords and unpermitted wetlands damage in Warren Canyon from tractors (anthropogenically influenced sources), have been added to Lake Poway through a MS4 point source (including through Warren Crossing and through Fisherman's Footbridge located at 33.0039 Latitude, -117.007 Longitude) and have aggravated a condition of eutrophication pollution and waste blockage pollution in the reservoir.

381.   Even if no one from the City has never explicitly identified the spring water as a source of pollutants through its MS4 in Warren Canyon, the 2013 MS4 Permit still requires the City to reduce or eliminate non-storm water discharges such as water from

COMPLAINT

springs to the MS4, where feasible and when priorities and resources allow,[10] unless the City obtains a separate NPDES permit for the non-storm water discharges. 2013 MS4 Permit, Provision E.2.a.(7).

382.    In other words, there is no requirement in Provision E.2.a.(7) of the 2013 MS4 Permit that the City or the San Diego Water Board specifically identify the spring water as "a source of pollutants to receiving waters;" if a citizen can prove that the City has failed to implement the various requirements of Provision E.2.d of its 2013 MS4 Permit that would have uncovered the pollutants in the spring water or has failed to respond to valid reports of non-storm water containing pollutants through its MS4, he can in turn seek the enforcement of Provision E.2.a.(7) through a citizen enforcement action.[11]

383.    The spring water with assimilated pollutants can feasibly be reduced before it enters the City's MS4 through wetland repair projects in Warren Canyon; the City of Poway has the resources to put the plans into place, including from the over $9 million dollars that the City is slated to receive under the Section 603 of the American Rescue Plan Act of 2021 which can be used for City water projects; and the non-storm water discharges

---

[10] The Ninth Circuit has held that the terms of an NPDES permit, where ambiguous on its face, raises issues of fact. Northwest Environmental Advocates v. City of Portland, 56 F.3d 979, 982 (9th Cir. 1995).

[11] See, e.g., Brown v. Superior Court, 37 Cal.3d 477, 484 (1984) ("A construction rendering statutory language surplusage 'is to be avoided.'"); People v. Sylvester, 58 Cal. App. 4th 1493, 1496 (1997) ("[E]ach word and phrase in the statute should be interpreted to 'give meaning to every word and phrase in the statute.'").

COMPLAINT

into Lake Poway must be addressed as a "priority" as that term is defined in the 2013 MS4 Permit, including Provisions E.2.d.

384.   Even though the City of Poway has not yet included the discharges from Warren Canyon into Lake Poway as an area of priority concern in its current WQIP, Poway would have identified the persistent dry weather flows in Warren Canyon – the non-storm spring water discharges – as a "source of pollutants to receiving waters" and as a priority had it been adhering to the requirements of Provision E.2.d and other sections of the 2013 MS4 Permit.

385.   As Poway has not used the "Prohibitions and Limitations Compliance Option" as outlined in Provision B.3.c.(1) and (2) with respect to its stormwater and non-stormwater discharges of polluted sediment and spring water flows containing pollutants such as phosphorous, iron, and nitrogen that are aggravating a condition of pollution in receiving waters in the SDR watershed by submitting an optional updated WQIP that fulfills the specific requirements of Provision B.3.c., Poway must implement Provisions A.4 and E.2 and properly address the discharges from Kelly Spring and rising groundwaters into its MS4. See Alaska Community Action on Toxics v. Aurora Energy Services LLC, 765 F.3d 1169 (9th Cir. 2014) (NPDES permit did not shield defendants from liability for non-stormwater discharges of coal into bay).

386.   In contrast, the San Juan Watershed Management Area Plan approved on June 18, 2018 by the San Diego Water Board does specifically utilize and describe the "Prohibitions and Limitations Compliance Option" of Provision B.3.c, and this process

COMPLAINT

has been documented and approved by the San Diego Water Board in its acceptance letter. The San Diego Water Board issued a press release noting that the San Juan Watershed Management Area Plan WQIP was the <u>first</u> WQIP submitted to the San Diego Water Board to utilize the Compliance Option, Provision B.3.c., of the amended 2013 MS4 Permit.

387.  Furthermore, Provisions E.2.d and B.5 also requires the City to address the reports in the May 24, 2019 NOV, October 1, 2019, and February 5, 2021 NOVs and attached exhibits with updated water quality improvement plans and strategies specific to the Warren Canyon subwatershed. The City has failed to do so in an accurate and thorough fashion for years 2017, 2018, 2019, and 2020.

388.  Certified hydrogeologist John Peterson (California Certified Hydrogeologist #90 and current President of Peterson Environmental), who was employed by the County of San Diego for over 20 years as its groundwater expert and CEQA regulatory manager, has conducted water quantity and water quality monitoring of Kelly Spring and Rock Haven Spring using EPA protocols to establish that Warren Creek is a seasonal, intermittent stream fed by persistent elevated groundwater flows and to identify any pollutants from these water sources that are transported to receiving waters of the United States.

389.  John Peterson conducted 24-hour dry weather monitoring of the spring water flows on April 13-14, 2019 to capture the varying flow rates from the springs and to obtain flow-weighted composite samples for water quality monitoring pursuant to the strictures of Provision D.2 of the 2013 MS4 Permit.

COMPLAINT

390.    John Peterson also conducted dry weather monitoring of the non-storm water flows into Lake Poway on June 4, 2019.

391.    John Peterson also conducted dry weather monitoring of the non-storm water flows into Lake Poway on May 15, 2020.

392.    The results have demonstrated that the water from Kelly Spring (N-Kelly) contains iron and phosphorous pollutants that exceed the NALs established in the City of Poway's JRMP, the 2013 MS4 Permit, and the San Diego Basin Plan, on April 13-14, 2019 and on June 4, 2019.

393.    The results also demonstrated that the water from Rock Haven Spring (S-Rock) contains total nitrogen and total phosphorous pollutants that exceed the NALs established by the City of Poway's JRMP, 2013 MS4 Permit, and the San Diego Basin Plan, on April 13-14, 2019.

394.    The results also demonstrated that the water from Kelly Spring (N-Kelly) and Rock Haven Spring (S-Rock) both contain iron levels that exceeds the NAL established by the City of Poway's JRMP, the 2013 MS4 Permit, and the San Diego Basin Plan, on May 15, 2020.

395.    24-hour water quality monitoring was also conducted in the receiving waters of the United States at Warren Crossing (the City of Poway's MS4) in the damaged wetland waters that are directly connected to Lake Poway on April 14-15, 2019 according to the strictures of Provision D.1 of the 2013 MS4 Permit.

COMPLAINT

396.    The analysis of the flow-weighted composite sample at Warren Crossing has showed that the pollutants from Rock Haven Spring and from Kelly Spring reach the receiving waters of the United States at Lake Poway as exceedances of phosphorous NALs are exhibited there as well on April 14-15, 2019.

397.    The overall ratio of total nitrogen to total phosphorous (TN : TP) in the discharges is much lower than permitted, allowing harmful cyanobacteria to flourish and a condition of eutrophication to persist in Lake Poway, including on April 14-15, 2019 and in the spring of 2019. (See picture below taken on May 4, 2019.)



398.    Man-caused wetlands destruction in Warren Canyon including in the area surrounding Kelly Spring has resulted in increased pollutant loads downstream and into the reservoir.

399.    Dry-weather water quality monitoring conducted on March 18, 2019, March 21, 2019, March 28, 2019, April 2, 2019, April 10, 2019, May 4-5, 2019 (dry weather monitoring during the official dry season), May 30-31, 2019 (dry weather monitoring during the official dry season), June 4, 2019 (dry weather monitoring during the official

COMPLAINT

dry season), and May 15, 2020 (dry weather monitoring during the dry season) also confirm that phosphorous exceeding the NAL from Kelly Spring flow through Warren Crossing and Fisherman's Footbridge and enter Lake Poway on a persistent basis during the winter and spring months when stream waters flow through Warren Canyon during typical non-drought years.

400.   Furthermore, the results from the toxicity tests confirm that the nutrient-rich spring waters contribute to the overabundance of algae as compared to the controls in the studies (both the algal controls and the algal samples from Warren Canyon were supplied with nutrients during the experiments; the additional nutrients present in the spring water samples taken on April 15, 2019 and May 5, 2019 from Warren Canyon resulted in the algal samples performing better than the controls).

401.   Although the subwatershed containing Rock Haven Spring is approximately the same size as the subwatershed area containing Kelly Spring, water flow from Rock Haven Spring occurred over a shorter period of time during the 2019 season, from February 14, 2019 to May 31, 2019, as compared to Kelly Spring. Water from Kelly Spring started flowing on February 5, 2019 and continued to flow through at least July 15, 2019 and into Lake Poway during that time frame.

402.   Water from Kelly Spring flowed into Lake Poway between December 27, 2019 through January 31, 2020 and between March 31, 2020 and July 31, 2020.

403.   More than 90% of the time when the stream flow through Warren Crossing consisted of dry-weather, non-storm spring water between the months of mid-March,

COMPLAINT

April, May and mid-June 2019, the permitted MS4 contribution of phosphorous into Warren Creek and into Lake Poway (0.1 mg/L maximum daily action level (MDAL) non-storm water action level (NAL)) has been exceeded, oftentimes at levels double the amount allowable under the City's MS4 Permit, Poway's Jurisdictional Runoff Management Plan (JRMP), and the San Diego's Basin Plan.

404.   From February 16, 2019 to March 28, 2019, the permitted MS4 contribution of iron into Warren Crossing and into Lake Poway from non-storm water discharges (0.3 mg/L maximum daily action level non-storm action level (NAL)) was exceeded more than 50% of the time.

405.   The level of turbidity exceeded the storm water action level (SAL) on February 14 and 15, 2019 at the mouth of Warren Creek at Fisherman's Footbridge.

406.   The level of turbidity exceeded the storm water action level (SAL) on February 27 and 28, 2017 at the mouth of Warren Creek at Fisherman's Footbridge.

407.   The level of turbidity exceeded the storm water action level (SAL) on April 5-10, 2020 at the mouth of Warren Creek at Fisherman's Footbridge.

408.   Total Nitrogen levels of discharges from Warren Crossing into Lake Poway exceeded the NAL as adopted in Poway's JRMP periodically and on at least two occasions between February 5, 2019 and June 5, 2019.

409.   Exceeding a NAL as established in the Basin Plan, the 2013 MS4 Permit, and Poway's JRMP is evidence that non-storm water has been anthropogenically influenced.

COMPLAINT

410.    One of the main sources of soluble phosphorous into the City of Poway's MS4 is from Kelly Spring, located at 32.9998 Latitude, -116.9749 Longitude, which is under the City of Poway's jurisdiction and on Plaintiff's property. Total Phosphorus levels from discharges from Kelly Spring exceeded the NAL more than 90% of the time between March 18, 2019 and June 5, 2019.

411.    On March 18, 2019, exceedances of the NALs for iron and phosphorous occurred downstream of Warren Crossing.

412.    On March 28, 2019, exceedances of the NAL for phosphorous occurred at Fisherman's Footbridge.

413.    On April 14-15, 2019, exceedances of the NALs for total phosphorous and total nitrogen occurred downstream of Warren Crossing.

414.    On May 4-5, 2019, exceedances of the NALs for total phosphorous and for Enterococcus occurred downstream of Warren Crossing.

415.    On May 30-31, 2019, exceedances of the NALs for phosphorous and for Enterococcus occurred downstream of Warren Crossing.

416.    On June 4, 2019, exceedances of the NALs for phosphorous and for Enterococcus occurred downstream of Warren Crossing.

417.    On May 15, 2020, exceedances of the NALs for iron, phosphorous, and Enterococcus occurred at Warren Crossing.

418.    Water flows from Kelly Spring during 2019 and 2020 were tinted yellow on a consistent basis; water flows from Rock Haven Spring in 2019 were clearer in color

COMPLAINT

on a consistent basis; and water flows at Warren Crossing in 2019 and 2020, which includes the combined flows from Kelly Spring and Rock Haven Spring, were tinted yellow in color on a consistent basis (though not as yellow as the waters from Kelly Spring due to dilution as the downstream waters at Warren Crossing were from multiple sources).

419.   The location of Rock Haven Spring is part of the public record as it is located in Caltrans' right of way within the City of Poway. The 2013 MS4 Permit mandates that the City of Poway is still liable for discharges from Rock Haven Spring through its MS4. Provision E.2.b.(6). (Caltrans's MS4 Permit is much less stringent than the City of Poway's 2013 MS4 Permit.)

420.   By June 13, 2019, volume flows from Kelly Spring dropped below 5 gallons per minute and the reduced volume flows resulted in discharges below the NAL for total phosphorous due to biological uptake.

421.   Increased nutrient concentrations – such as nitrogen and phosphorous – in natural water systems, has impacted water quality and clarity and contributed to algal blooms that impact native vegetation and interfere with the springs' ecosystems and Lake Poway's ecosystem. Increases in nutrients in Poway's ecosystems and water resources result from a variety of activities, including illegal earth moving activities over the creek, unpermitted dirt-backfilled culverts and/or constructed fords at approximately a dozen locations upstream of Lake Poway, wetlands vegetation removal in the area

COMPLAINT

surrounding Kelly Spring and in the area surrounding Warren Crossing, nearby wells, and failing septic tanks in Warren Canyon.

422.    Biological uptake of pollutants such as nitrogen and phosphorous from the spring water and rising groundwater in Warren Canyon has been reduced by wetland destruction at specific locations in Warren Canyon, including at Warren Crossing and on APN: 278-210-1800, the parcel containing Kelly Spring.

423.    Excessive bacterial and nutrient levels of the spring water discharges as measured at Warren Crossing through the months of February, March, April, May, and June 2019 and in May 2020 which exceeded NALs listed in Poway's JRMP indicated that nearby wells and leaking septic tanks in Warren Canyon have contributed to some of the pollution in Lake Poway.

424.    On April 15, 2019, the single sample result registered exceedances of the Enterococcus limit (500/100 mL) NAL downstream of Warren Crossing.

425.    On May 5, 2019, the single sample result registered exceedances of the Enterococcus limit (240/100 mL) NAL downstream of Warren Crossing.

426.    On May 5, 2019, the single sample result registered exceedances of the fecal coliform limit (1600/100 mL) NAL downstream of Warren Crossing.

427.    On May 31, 2019, the single sample result registered exceedances of the Enterococcus limit (130/100 mL) NAL downstream of Warren Crossing.

COMPLAINT

428.   On June 4, 2019, during the dry season, the single sample result registered exceedances of the Enterococcus limit (240/100 mL) NAL downstream of Warren Crossing.

429.   On May 15, 2020, during the dry season, the single sample result registered exceedances of the Enterococcus limit (170/100 mL) NAL at Warren Crossing.

430.   Exceedances of NALs on various dates in the spring of 2019 and 2020 in Warren Canyon demonstrate that the various exceedances are not one-time, isolated occurrences; rather, exceedances of NALs will recur on a seasonal basis during the winter and spring months of non-drought years in Warren Canyon. Thus, the City of Poway must address the exceedances of the NALs for various constituents through implementing 2013 MS4 Permit, Provision E.2.a.(6) and Poway's JRMP, BMP #11, but Defendant has failed to do so and will continue to fail to do so without an order from this Court. See Provision E.2.d.(3)(c) of the 2013 MS4 Permit.

431.   To partially remedy the situation and to the improve the water quality of downstream waters including at Warren Crossing and at Lake Poway, surface water expert Tory Walker, P.E. has proposed the wetlands repair projects as described in the February 5, 2021 NOV, Exhibit 19, to address the spring water flows through Warren Canyon by reducing those flows and retaining more of the phosphorous and other pollutants in those flows within engineered wetlands before they enter the City's MS4 at Warren Crossing and into Lake Poway.

COMPLAINT

432.    The City has failed to monitor receiving waters in Warren Canyon as required by Provision D.1 in 2017, 2019, and 2020.

433.    The City has failed to identify and map out the public and private outfalls and other portions of the MS4 including private stream crossings and septic tanks above Lake Poway as required under Provisions D and E.[12]

434.    The City has failed to monitor the non-storm water discharges into Lake Poway as required by Provisions D.2.a.(2) and D.2.b. in 2017, 2019, and 2020.

435.    The City has failed to fulfill the illicit discharge detection, elimination, and reporting requirements of Provision E.2 and Provision F with regard to the washed-out stream crossings and the non-storm water that is a source of pollutants aggravating a condition of pollution in Lake Poway in 2017, 2018, 2019, and/or 2020.

436.    The City has failed to identify all portions of its MS4 in its current WQIP and/or in its current JRMP including the cross-draining culverts along unpaved roads,[13] culverts located in WOTUS,[14] the location of Kelly Spring and Rock Haven Spring, and Fisherman's Footbridge located in the mouth of Warren Creek at Lake Poway in 2017, 2018, 2019, and/or 2020.

---

[12] Private and public outfalls in Warren Canyon can be found at the following locations: 32.998, -116.9768; 32.998, -116.978; 32.9987, -116.9806; 33.0012, -117.0029; and 33.0030, -117.0057.

[13] Cross-draining culverts can be found along the hiking trails above Lake Poway including at the following locations: 33.003, -117.008; 33.004, -117.009; and 33.0047, -117.0110.

[14] MS4 culverts placed in WOTUS include the following locations: 33.0030, -117.0057 and 33.0062, -117.0052.

COMPLAINT

437.    The City has failed to identify the location and the health of septic tanks throughout Warren Canyon within City limits in 2017, 2018, 2019, and 2020.

438.    The City has not properly updated its WQIP since September 2015.

439.    Poway's discharges (including the discharges of third parties within and under its jurisdiction) that are causing a condition of pollution in Lake Poway are inherently in violation of the waste discharge prohibitions incorporated in the San Diego Water Board's Basin Plan in violation of Provision A.1.c. These MS4 discharges have contributed to a violation of water quality standards, including those in the Basin Plan. 2013 Permit, Provision A.2.a.; Id. at A.2.a.(1).

440.    Poway's unpermitted discharges have caused and are causing a condition of pollution in Lake Poway. Several man-made conveyances in Warren Canyon that serve as roads were mostly washed out on (or around) February 26-27, 2017, again on (or around) February 14-16, 2019, and again on (or around) April 5-10, 2020, but residual washout also occurred after those dates.

441.    City-owned parcels containing the City's point sources that discharge pollutants into Lake Poway include the following: APN: 278-290-1000; APN 278-280-2300; APN 278-281-0100; and APN: 278-210-1100.

442.    The City of Poway also contains at least two significant springs (Rock Haven Spring and Kelly Spring) that discharge into manmade point sources and eventually into the City's MS4 in an anthropogenically influenced state because of unpermitted fill materials and mobile pollutants placed in Warren Creek due to the actions of private property

COMPLAINT

owners as well as City staff. The discharges of mobile pollutants are picked up by the flowing spring waters, which also contain their own sources of pollutants, before being discharged into Lake Poway.

443.    The functional capacity of the wetlands in Warren Canyon have been reduced by anthropogenic activity in Warren Canyon.

444.    The City of Poway must comply with the discharge prohibitions in its 2013 MS4 Permit, Provision A.1.a at a minimum because the polluted water contained a large amount of non-storm spring water that is traceable to Rock Haven Spring and to the seasonal springs on Mount Woodson including Kelly Spring.

445.    In the winter and spring of 2017, the seasonal springs on Mount Woodson continually fed Lake Poway from February 26, 2017 through at least April 20, 2017.

446.    In the winter, spring, and summer of 2019, Kelly Spring continually fed Lake Poway from February 5, 2019 to at least July 15, 2019.

447.    In 2019-2020, Kelly Spring continually fed Lake Poway from at least December 27, 2019 to at least January 20, 2020 and resumed feeding Lake Poway with surfaced water flows on a consistent basis from March 31, 2020 through at least July 31, 2020.

448.    As a result of its control of land areas that are generating polluted stormwater and non-stormwater, the City of Poway has caused and contributed to, and is causing, contributing to, and threatening to cause, pollution in the wetlands of Warren Canyon and in Lake Poway, which are all considered waters of the United States.

COMPLAINT

449.   Between February 26, 2017 and April 17, 2017, each day that the City of Poway has caused, contributed to, threatened to cause, or failed to mitigate polluted stormwater and non-storm water flows through its MS4 is a separate and distinct violation of the 2013 MS4 Permit and 33 U.S.C. §§ 1311(a) and 1342(p).

450.   Between February 5, 2019 and June 5, 2019, each day that the City of Poway has caused, contributed to, threatened to cause, or failed to knowingly mitigate polluted stormwater and non-storm water flows through its MS4 is a separate and distinct violation of the 2013 MS4 Permit and 33 U.S.C. §§ 1311(a) and 1342(p).

451.   Between April 5, 2020 and June 15, 2020, each day that the City of Poway has caused, contributed to, threatened to cause, or failed to knowingly mitigate polluted stormwater and non-storm water flows through its MS4 is a separate and distinct violation of the 2013 MS4 Permit and 33 U.S.C. §§ 1311(a) and 1342(p).

452.   The violations of the 2013 MS4 Permit's discharge prohibitions continue to this day because the polluted sediment has not been removed, which has lessened the reservoir's storage capacity. The polluted sediment containing phosphorous and nitrates waste is also threatening to cause eutrophication in and near the Boulder Bay area of Lake Poway in the future.

453.   During major rain events including during the winter and springs months of 2017, 2019, and 2020, stormwater water flows freely over exposed materials of the stream crossings and sediment buildup, becoming contaminated with bacteria, color, manganese, mercury, nitrogen, pH, phosphorus, viruses, turbidity, and/or nutrients at

COMPLAINT

levels above applicable water quality standards for several of these constituents. The polluted water then flows untreated and unfiltered into Lake Poway.

454.   For weeks and months in a typical non-drought year, non-storm spring water flows freely over exposed materials of the stream crossings and sediment buildup, becoming contaminated with bacteria, color, manganese, mercury, nitrogen, pH, phosphorus, viruses, turbidity, and/or nutrients at levels above applicable water quality standards for several of these constituents. The contaminated non-storm water then flows untreated into the City's MS4 and into Lake Poway.

455.   Minimizing non-storm water flows through wetland repair projects would lessen the amount of pollutants in the non-storm water through biological uptake.

456.   The Basin Plan states that "waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses." The beneficial uses of Lake Poway are being lost by the City of Poway's actions and inactions.

457.   The Regional Board's Basin Plan establishes a number of water quality standards for inland surface waters and coastal waters in the San Dieguito River watershed, all incorporated by reference into the 2013 MS4 Permit. The MS4 Permits prohibit discharges that cause or contribute to exceedances of these water quality standards.

458.   The City has caused and contributed to and failed to prevent, and continues to cause and contribute to and fail to prevent, exceedances of water quality standards in Warren Canyon and in Lake Poway.

459.   As a result of its control of land areas that generate polluted storm water and non-

COMPLAINT

storm water, the City has caused and contributed to, and is causing and contributing to, exceedances of water quality standards in Warren Canyon and in Lake Poway.

460.    These violations are ongoing and continuous because the City's Warren Crossing has not been embedded low enough into the streambed and engineered to withstand storm surges and will eventually blow out into Lake Poway and its adjacent wetlands during the next series of 50-year winter storm events.

461.    The City has not put into place best management practices and effective controls that will reduce pollutants in storm water discharges and non-storm water discharges from its MS4 above Lake Poway to the maximum extent practicable.

462.    In 2017, 2018, 2019, and 2020, the City has not properly addressed the non-storm water discharges from its MS4 above Lake Poway which are aggravating a condition of pollution in Lake Poway.

463.    These violations are ongoing and continuous because the City of Poway has not fully enforced the law against private property owners in Warren Canyon who have their own unpermitted discharges of dredge and fill materials in Warren Creek, including maintained, tractor-disturbed crossings in 2017, 2018, 2019, and/or 2020.

464.    The City of Poway will continue to violate the Clean Water Act in the future unless and until the City is instructed by a federal district judge that the Clean Water Act is applicable to Lake Poway and its watershed area.

465.    The City of Poway will continue to violate the Clean Water Act in the future unless and until the City is instructed by a federal district judge to dredge the Boulder Bay area

COMPLAINT

of Lake Poway, to remove the waste pollution deposited there, and to restore the stream and wetlands there.

466.    The City of Poway will continue to violate the Clean Water Act in the future unless and until the City is instructed by a federal district judge to dredge the Warren Crossing area, to remove the waste pollution deposited there, and to restore and re-establish the wetlands there.

467.    The City of Poway will continue to violate the Clean Water Act in the future unless and until the City is instructed by a federal district judge to commence enforcement actions under the Clean Water Act against those in Warren Canyon who have maintained illegal stream crossings over Warren Creek without obtaining the proper permits and authorizations from the San Diego Water Board and without meeting the requirements listed in the 2013 MS4 Permit, Provision E.3.a. for development projects.

468.    Unless the City of Poway desists in its violations of the 2013 MS4 Permit and Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p), Plaintiff will suffer irreparable harm.

469.    From February 26, 2017 to the present, each day that the City has caused, contributed to, or failed to prohibit exceedances of water quality standards by allowing unpermitted waste to remain and accumulate in Warren Canyon and Lake Poway is a separate and distinct violation of the applicable 2013 MS4 Permit and 33 U.S.C. §§ 1311(a) and 1342(p).

COMPLAINT

470.    These violations are ongoing and continuous. In light of the City's history of violations and the nature of the violations, the City will continue to violate these requirements in the future unless and until enjoined from doing so.

471.    By committing the acts and omissions alleged above, Defendant City is subject to an assessment of civil penalties for each violation of 33 U.S.C. § 1311(a).  See 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4 (February 6, 2019).

472.    An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Defendant must be subject to an injunction ordering them to cease activities in violation of the Clean Water Act and to conduct activities in accordance with its 2013 MS4 Permit.

473.    Allowing the commission of the acts and omissions alleged above to continue will irreparably harm Plaintiff.

474.     The beneficial uses of the streams in Warren Canyon and in Lake Poway itself include municipal and domestic supply, agricultural supply, industrial service supply, industrial process supply, wildlife habitat, cold freshwater habitat, preservation of biological habitats of special significance, and non-contact water recreation. See State Water Resources Control Board, Beneficial Use Designation under the Porter-Cologne Water Quality Control Act.

475.    The City of Poway's Jurisdictional Runoff Management Plan has identified the following pollutants coming from its MS4 in Warren Canyon: Indicator Bacteria, Color, Manganese, Mercury, Nitrogen, pH, Phosphorus, Viruses, Turbidity, and Nutrients.

COMPLAINT

476.    The City of Poway's discharges consist of storm water and non-storm water flows, including flows that are contaminated with waste from point-sources and non-point sources before being discharged to the City-owned MS4 and City-owned receiving waters.

477.    The non-storm spring water are considered "discharges" for purposes of the City's 2013 MS4 Permit when the discharges first enter "into" the City-owned MS4.

478.    The non-storm water spring water and rising groundwaters are also considered discharges when those flows pass through a dirt-backfill culvert or other type of point source road crossing running perpendicular to the watercourse.

479.    There are two prominent sets of springs in the watershed area that feeds Lake Poway: Kelly Spring located near the base of Mount Woodson emanating from Plaintiff's private property at APN: 278-210-1800 in the City of Poway and Rock Haven Spring located near Highway 67 in the City of Poway that flows through land owned by the City of Poway (APN: 278-210-1100).

480.    The picture below, taken in 1968 after a forest fire, depicts the spring water that flows from Mount Woodson on Plaintiff's property at APN: 278-210-1800.

COMPLAINT

481.   Both the spring water discharges from Mount Woodson and from Rock Haven flow

into a merged Warren Creek that eventually are deposited downstream through point-

source road crossings (Warren Crossing as well as a wooden footbridge single

conveyance) on City-owned parcels (APNs: 278-280-2300 and APN: 278-281-0100)

and directly into Lake Poway, the receiving waters.  The photograph below depicts

Plaintiff's parcel APN: 278-210-1800 in yellow; the City's parcel APN: 278-210-1100

which contains Rock Haven Spring discharges is in pink; Lake Poway is colored blue;

and Warren Creek as well as the stream coming off of Mount Woodson on Plaintiff's

parcel are outlined in blue.

COMPLAINT

117





482.   The spring water discharges from Rock Haven regularly become contaminated with pollutants from Highway 67 before being deposited into the City-owned MS4, then onto Plaintiff's property at APN: 278-210-1800, and then pick up more pollutants at various locations on private property in Warren Canyon before eventually emptying into City-owned property and into Lake Poway.

483.   The spring water discharges from both Rock Haven and Mount Woodson also become polluted with contaminants from various illicit connections and unpermitted discharges and mobile pollutants at various locations on private property in Warren Canyon before eventually emptying into City-owned property and its MS4 and into downstream Lake Poway by the pull of gravity.

COMPLAINT

484.   The City of Poway's MS4 Permit and JRMP require it to minimize spring water flows containing pollutants[15] into its MS4 through rehabilitating damaged streams and re-establishing wetlands[16] to address and reduce the non-storm water discharge flows that are a source of pollutants aggravating a condition of pollution in Warren Creek and in Lake Poway, both receiving waters of the United States.

485.   A condition of pollution has been recurring in Warren Creek and in Lake Poway over the years, which was recently highlighted in 2017 when a massive winter storm resulted in the destruction of approximately ten man-made conveyances (e.g., dirt backfilled culverts and/or fords) throughout Warren Canyon in the City of Poway, with the unpermitted waste added by the City and by third parties upstream with their point sources being deposited in downstream portions of Warren Creek including into Lake Poway at Boulder Bay.

486.   Neither the residents of Warren Canyon nor the City of Poway obtained the proper CWA permits for the man-made conveyances (point-source stream crossings) built over Warren Creek that were blown out by the massive amount of storm water runoff that

---

[15] The 2013 MS4 Permit, C-8, defines "pollutant" as follows: "<u>Any</u> agent that may cause or contribute to the degradation of water quality such that a condition of pollution or contamination is created or aggravated." Caltrans's MS4 permit has a more limited definition of "pollutant."

[16] According to the San Diego Water Board, re-establishment means the manipulation of the physical, chemical, and/or biological characteristics of a site with the goal of returning natural/historic functions to a former aquatic resource. Re-establishment results in rebuilding a former aquatic resource and results in a gain in aquatic resource area and functions.

COMPLAINT

occurred in 2017, in 2019, and in 2020.

487.   Some residents of Warren Canyon rebuilt these manmade conveyances after the winter storms of 2017 without the proper CWA permits and water quality certifications from the San Diego Water Board.[17]

488.   Even the City of Poway failed to obtain the proper CWA permits and water quality certifications for its rebuilding activities in Warren Creek and Lake Poway in 2017, including its Warren Crossing project located at 33.0030 Latitude, -117.0057 Longitude and its boat dock replacement project located at 33.0069 Latitude, -117.0123 Longitude within the navigable portion of its receiving waters.

489.   The condition of pollution occurring and recurring in Warren Canyon has caused and threatened to cause the loss of water storage capacity of Lake Poway, a reservoir.

490.   The condition of pollution occurring and recurring in Lake Poway has also caused and threatened to cause eutrophication in fishable Lake Poway from the nutrient-rich sediment and nutrient-rich non-storm water flows coming from the City's MS4, threatening to accelerate swamp-like conditions and degrading the water quality in Lake Poway.

491.   The City of Poway has tried to combat eutrophication in Lake Poway by adding

---

[17] Obtaining CWA permits is not merely a procedural requirement; properly engineered structures that could withstand a 100-year storm – i.e. something other than dirt-backfilled culvert systems – would have been built throughout Warren Canyon if Warren Canyon residents and the City of Poway obtained <u>valid</u> permits approved by Department of the Army and/or the San Diego Water Board.

COMPLAINT

algaecides such as copper sulfate, a toxic compound. City staff adds up to 300 pounds of this toxic compound to Lake Poway in a typical year.

492.     Lake Poway is within the San Dieguito River (SDR) Watershed Management Area (WMA) which encompasses a total of 346 square miles extending from San Dieguito Lagoon in the west to Volcan Mountain in the east.

493.     Small creeks drain downstream into the San Dieguito River, then into the San Dieguito Lagoon, and finally into the Pacific Ocean.

494.     In comparison, the subwatershed area that feeds Lake Poway itself, which has been deemed "waters of the United States" (WOTUS) by the Environmental Protection Agency (EPA) and the State of California, is quite small, encompassing only 1200 acres or less than 2 square miles of the entire SDR watershed.

495.     Lake Poway is mainly fed by two headwater intermittent streams draining Mount Woodson and Rock Haven, natural mountain springs that feed these intermittent streams, and a series of separate smaller tributaries that drain other portions of the surrounding mountainsides directly into the reservoir.

496.     At the Boulder Bay area of Lake Poway, the main fourth-order intermittent stream feeding the reservoir is known as Warren Creek; collectively, all surrounding drainage into Lake Poway, including Warren Creek, is known as Warren Canyon.

497.     The City of Poway has at least two National Pollutant Discharge Elimination System (NPDES) permits for discharges into Lake Poway, including the 2013 municipal separate storm sewer systems (MS4) Permit – the 2013 MS4 Permit – for point-source

COMPLAINT

discharges from Warren Creek and Warren Canyon into Lake Poway issued by the San Diego Water Board.

498.   The City of Poway also has a NPDES permit for copper-based algaecides injections used to combat eutrophication within Lake Poway issued by the State Water Board.

499.   The City's 2013 MS4 Permit also covers discharges from Warren Canyon into areas below Poway dam including the San Dieguito River hence the Pacific Ocean. Some of the phosphorous-laden/nutrient-rich water from Warren Canyon flows via a subterranean stream under Poway dam and via an outlet valve and reaches the San Dieguito River as surface water containing these pollutants. As with Warren Canyon, the downstream San Dieguito River has demonstrated exceedances of NALs for phosphorous and nitrogen in 2017, 2019, and 2020.

500.   Fulfilling certain requirements of the 2013 MS4 Permit, the City of Poway has an approved Jurisdictional Runoff Management Plan (JRMP) specific to the City of Poway and, along with five other municipalities within the SDR WMA, an approved non-optional Water Quality Improvement Plan (WQIP) submitted in September 2015.

501.   Poway has discharged and continues to discharge unreasonable amounts of sedimentation pollution waste (and other assimilated pollutants in storm water and non-storm water) from its MS4 in a manner that is causing, or threatening to cause, a condition of pollution – i.e. the loss of municipal storage capacity, harm to recreational activities such as fishing, and harm to aquatic species through threatened eutrophication – in Lake Poway, a receiving water of the state and WOTUS, in violation of its 2013

COMPLAINT

MS4 Permit, Provision A.1.a.

502.   NPDES MS4 Permits are contracts, and they are to be interpreted as contracts. <u>Nat. Res. Def. Council v. County of L.A.</u>, 725 F.3d 1194, 1204-05 (9th Cir. 2013).

503.   "The plain language of CWA § 505 authorizes citizens to enforce *all* permit conditions" in such contracts. <u>Nw. Envtl. Advocates v. City of Portland</u>, 56 F.3d 979, 986 (9th Cir. 1995) (emphasis in original).

504.   The Ninth Circuit has held that Congress authorized enforcement of state water-quality standards in MS4 permits, "lest municipalities be immunized on the technicality that not all water standards can be expressed as effluent limitations."[18] <u>Nat. Res. Def. Council v. County of L.A.</u>, 673 F.3d 880, 886 (9th Cir. 2011) (rev'd on other grounds and remanded by 133 S. Ct. 710 (2013)).

505.   "Only by enforcing the water-quality standards themselves" in an MS4 Permit ensures that the "gross amount of pollution discharged" from "uncontrollable storm events" will be addressed by a municipality with improved water quality improvement strategies, even a city that may be in general compliance with technology based effluent limitations as outlined in an approved JRMP.[19] <u>See</u> <u>Natural Resources</u>, 673 F.3d at 886.

---

[18] Ninth Circuit case law "emphasizes that NPDES permit enforcement is not scattershot – each permit term is simply enforced as written." L.A., 673 F.3d at 886.

[19] <u>See</u> <u>Sierra Club v. Union Oil</u>, 813 F.2d 1480, 1491 (9th Cir. 1987) ("It is unclear whether the court intended to excuse these violations under the upset defense or under a de minimus theory. In either event, the district court erred. The Clean Water Act and the regulations promulgated under it make no provision for 'rare' violations.")

COMPLAINT

The gross amount of waste sediment that sits in the mouth of Warren Creek at Lake Poway must be addressed by the City of Poway.

506.    The CWA "does not distinguish between those who add [pollutants] and those who convey what is added by others – the Act is indifferent to the originator of water pollution." Natural Resources, 673 F.3d at 886. The City of Poway is liable for the third-party discharges of unpermitted washed-out stream crossings in Warren Canyon under the City's jurisdiction that it failed to prohibit through effective law enforcement that has ended up in Lake Poway in 2017, 2019, and 2020.

507.    By virtue of collecting and channeling stormwater and non-storm water through municipality-owned culverts and other conveyances, a city assumes responsibility under the CWA for receiving such pollutants from others through its point sources.[20] See Committee to Save v. East Bay Muni. Util. Dist., 13 F.3d 305 (9th Cir. 1993).

508.    As described by the EPA, water quality criteria "can be . . . narrative (e.g., a criterion that describes the desired conditions of a water body being 'free from' certain negative conditions)" in form. EPA, WQS Handbook, Chapter 3; see 2013 MS4 Permit, F-16.

---

[20] The City of Poway is ultimately responsible for regulating the activity of its citizens in Warren Canyon; according to the CWA, the implementing permits, and case law, Poway cannot continue to turn a blind eye to the illegal activity occurring there. At the same time, Poway is liable for all discharges, including third-party discharges, coming through its MS4 and into its receiving waters. "In summary, the Ninth Circuit and Tenth Circuit have held that a party can be held liable for illegal discharges under the CWA if it conveyed the discharge . . ., even if the party did not generate or add the pollutant to the discharge." California Sportfishing Protection Alliance v. Shiloh Group, LLC, 268 F. Supp. 3d 1029, 1046 (N.D. Cal. 2017).

COMPLAINT

124

Poway's discharges have violated the 2013 MS4 Permit's water quality standards in 2017, 2019, and 2020, including on February 27-28, 2017, February 14-16, 2019, and April 5-10, 2020.

509.   Water quality standards as defined in CWA § 303(c) consists of the beneficial uses (e.g., recreational activities such as fishing, municipal drinking water supply, etc.) of a water body and water quality objectives necessary to protect those uses.

510.   A condition of pollution exists when the water quality needed to support designated beneficial uses has become unreasonably affected or impaired by waste.[21] 2013 MS4 Permit, C-11–C-12; Cal. Water Code § 13050(l).

511.   Naturally, the storm and non-storm spring waters from Mount Woodson and Rock Haven are discharged into the Pacific Ocean. The picture below was taken from Plaintiff's property APN: 278-210-1800, the location of Kelly Spring. The Pacific Ocean can be seen in the distance.

---

[21] Under the Dickey Act, 'pollution' means an impairment of the quality of the waters of the State by . . .waste to a degree which does not create an actual hazard to the public health but which does adversely and unreasonably affect such waters for domestic, industrial, agricultural, navigational, recreational or other beneficial use. Dickey Act, Ch. 1549, § 1, [1949] Cal. Stat. 2782, as amended, ch. 603, § 1, [1957] Cal. Stat. 1815. The updated Porter-Cologne Act does not require that an adverse effect be shown. Cal. Water Code § 13241.

COMPLAINT



512.   The Poway dam, finished in 1972, has impounded most of these waters.

513.   The City of Poway's unauthorized point-source earthen culvert crossings have discharged pollutants as effluent into its MS4 and into Lake Poway, a navigable water of the state and the United States.

514.   The illicit discharges into Lake Poway include non-storm spring waters which become polluted from the illicit connections/discharges in and from the privately owned storm water conveyance system – the many unauthorized culverts with dirt-backfill stream crossings installed within Warren Creek in Warren Canyon on private property – that eventually get discharged into the City-owned portion of Warren Creek (its MS4 at Warren Crossing) and into Lake Poway.

515.   The City of Poway's discharges of pollutants into storm water and non-storm water have caused and have threatened to cause pollution in waters of the United States

COMPLAINT

through the eutrophication of Lake Poway and through the waste blockage and loss of storage/flood capacity of Lake Poway.

516.   Poway's discharges between February 27, 2017 and April 17, 2017, between February 14, 2019 and June 5, 2019, and between April 5, 2020 and June 15, 2020 have degraded waters in the Warren Canyon Watershed protected by the water quality standards.

517.   Before 2017, the City of Poway has failed to obtain any valid Clean Water Act and/or San Diego Water Board permit for the construction and/or maintenance/replacement of its culvert crossings or its footbridge over the last 45 years in Warren Canyon.

518.   On February 26-27, 2017, the largest portions of these culvert crossings were washed out when the heaviest rains produced destructive flows that damaged or destroyed at least two City-owned crossings over Warren Creek and its tributaries upstream of Lake Poway and at least a half dozen privately owned stream crossings.

519.   The photograph below, taken on March 16, 2017 and during dry weather (it hadn't rained in Poway in over two weeks), depicts the City's hiking trails above Lake Poway. Two red pins point to the approximate location of the culvert crossings within streams that were damaged or destroyed. The red pin on the right depicts the main tributary crossing within Warren Creek located at Lat. 33.003° N; 117.0054° W in Section 32, Township 13 S, Range 1W, in the eastern portion of the city of Poway.

COMPLAINT

127

1
2
3
4
5
6
7
8
9
10
11
12



13   520.    With the addition of pollution from the City's point sources as well as polluted
14
15   discharges from private third parties, the non-storm water flowing through the City's
16   MS4 and into Lake Poway was composed of highly concentrated amounts of sediment,
17   debris, waste, herbicides, pesticides, metals, asbestos, fertilizers, phosphorous, nutrients,
18   viruses, and other illicit substances before the water hit the major conveyance at
19
20   Fisherman's Footbridge and into the Boulder Bay area of Lake Poway.
21   521.    The polluted storm water and non-storm water containing pollutants was discharged
22
23   into Lake Poway on a daily basis from January 20, 2017 to at least April 17, 2017.
24   522.    The effluent also buried adjacent wetland habitat in the area above Boulder Bay.
25   523.    The photograph below, taken on March 16, 2017 <u>during dry weather</u> (it hadn't rained
26
27   in Poway in over two weeks), depicts the long-running plume of pollutants migrating
28   from Warren Creek and into Lake Poway, the receiving body of water. Some of the

COMPLAINT

excess sediment now sits at the bottom of the reservoir. This picture depicts polluted non-storm spring water flowing into Lake Poway on March 16, 2017, carrying the City's damaged point-source dirt stream crossings as well as third-party illicit discharges into the reservoir bottom.



524.   Having known that polluted storm water and non-storm water discharges have caused and have threatened to cause a condition of pollution in Lake Poway in 2017, the City of Poway should have instituted abatement procedures and developed, implemented, and installed effective controls to reduce future sedimentation and other types of pollution into Lake Poway in the future to comply with its MS4 permit.

525.   Having known that polluted storm water and non-storm water discharges have caused and threatened to cause a condition of pollution in Lake Poway in 2017, the City of

COMPLAINT

Poway should have also removed the polluted sediment piled up in the Boulder Bay area of Lake Poway to reduce further pollution into the lake and unblock the clogged flow of the main tributary.

526.    Instead, the City of Poway placed more unpermitted dredged dirt and fill materials into Warren Creek and its tributaries above Lake Poway.

527.    The City's current "BMPs," if any, would not control future storm water pollution to the maximum extent practicable.

528.    The City's current "BMPs" would not effectively reduce or effectively prohibit non-storm water discharges into Lake Poway in the future.

529.    The City of Poway is required to go above and beyond the MEP standard and is required by federal law and its 2013 MS4 Permit to effectively prohibit future non-storm water plumes into Lake Poway by removing its own illicit connections and discharges, remove mobile pollutants intentionally installed in Warren Creek, install effective controls to reduce non-storm water discharges, and enforce the Clean Water Act regulations and state water quality requirements as to private landowners who have installed unpermitted and illegal culvert-with-dirt-backfill crossings, constructed fords, and other sources of mobile pollutants from anthropogenic sources into Warren Creek within the City of Poway's jurisdiction.

530.    The City of Poway must effectively segregate non-storm water discharges into its MS4 because they are aggravating a condition of pollution in Lake Poway.

COMPLAINT

531.    The City of Poway's only way around the strict standard to "effectively prohibit" polluted non-storm water discharges into Lake Poway is to require the procurement of separate NPDES permits for the non-storm water discharges from Rock Haven on City-owned property and for the non-storm water flows that originates from Plaintiff's property but are passively discharged into the City's MS4 conveyance system at APN: 278-290-1000.

532.    The City of Poway has also violated NPDES Permit No. CAS0109266, Provision A.1.c: "Discharges from MS4s are subject to all waste discharge prohibitions in the Basin Plan" for the reasons given above on February 26-28, 2017; on February 13-16, 2019, and on April 5-10, 2020. Unpermitted stream crossings in Warren Canyon that have become mobilized by storm surges and entered into the City's MS4 further downstream are by definition waste discharges prohibited by the 2013 MS4 Permit, Provision A.1.c. The City of Poway is liable for these discharges from the City's MS4 and must remove the accumulation of waste at Warren Crossing and at the mouth of Warren Creek in Lake Poway resulting from unpermitted washed-out crossings owned by the City as well as unpermitted washed-out crossings owned by third parties within its jurisdiction and under its control.

533.    The City of Poway has also violated NPDES Permit No. CAS0109266, Provision A.2.a: "Discharges from MS4s must not cause or contribute to the violation of water quality standards in any receiving waters" for the reasons given above on each and every day between February 27, 2017 and April 20, 2017; between February 14, 2019 and

COMPLAINT

June 5, 2019; and between April 5, 2020 and June 15, 2020. "The receiving water limitations included in this Order consist of all applicable numeric or narrative water quality objects or criteria, for receiving waters as contained in the Basin Plan … or in federal regulations." Narrative water quality standards include protecting particular designated uses such as for recreation, public water supply, and for aquatic habitat (Lake Poway serves all of these purposes). When pollutants cannot be precisely measured, narrative criteria are used to express a parameter in a qualitative form.

   a. The term "pollution" means an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects either of the following: the waters for beneficial uses; or facilities which serve those beneficial uses.

   b. "Beneficial uses" of the waters of the state that may be protected against quality degradation include, but are not limited to, domestic, municipal, agricultural and industrial supply; power generation; recreation; aesthetic enjoyment; navigation; and preservation and enhancement of fish, wildlife, and other aquatic resources or preserves.

534.   The discharges into Lake Poway in 2017, 2019, and 2020 have caused and threatened to cause eutrophication and the partial loss of its storage and flood-control capacities, have affected habitat for fish, and have harmed Plaintiff's aesthetic enjoyment of Warren Canyon including the receiving waters of Lake Poway, Boulder Bay, and Hidden Bay.

535.   With the addition of persistent non-storm water that are a source of pollutants aggravating a condition of pollution in receiving waters between February 26, 2017 and

COMPLAINT

132

April 20, 2017; between February 14, 2019 and June 5, 2019; and between April 5, 2020 and June 15, 2020, the City of Poway has violated the water quality standards mandated by the 2013 MS4 Permit in the Warren Canyon area on all of those dates.

536.    The City of Poway has violated Provisions A.1.a, A.1.c and A.2.a of its NPDES Permit because its discharges of pollutants from its point sources and third-party point sources caused and threatened to cause a condition of pollution in the wetlands of Warren Canyon and in Lake Poway that has resulted in the partial loss of the beneficial uses of these aquatic resources.

537.    The reservoir has lost some of its water storage capacity in 2017, 2019, and 2020 because of Poway's pollution from its point sources – i.e. the disintegrated earthen stream crossings and other mobile pollutants flowing in storm and non-storm water through its MS4 that were not permitted under the CWA and/or in violation of a permit under the CWA.

538.    Sediment-laden runoff and flows in 2017, 2019, and 2020 have decreased the navigational capacity of Lake Poway and have reduced the flood control capacity of Warren Canyon that affect areas below Poway dam including the Pacific Ocean.

539.    Some of the beneficial uses of the wetlands immediately above Boulder Bay adjacent to the entrance into Lake Poway as well as within Boulder Bay have been lost because of increased sedimentation that is changing the nature of the wetlands and because of the effects of eutrophication.

COMPLAINT

a.  Sediment-laden runoff and flows result in increased turbidity and decreased oxygen in a stream and the receiving reservoir, which in turn result in loss of in-stream habitat for fish and other aquatic species.

b.   Sediment-laden runoff and flows kill fish directly, destroy spawning beds, and suffocate fish eggs and bottom dwelling organisms.

c.  Sediment-laden runoff and flows increase difficulty in filtering drinking water, resulting in higher treatment costs.

d.  Sediment-laden runoff blocks light and reduces growth of beneficial aquatic grasses.

540.    While exiting the stream crossings, the rush of storm water and concurrent and subsequent non-storm spring water traveling through the City of Poway's MS4 during winter and spring months of 2017 mobilized the stream crossings one piece of sediment aggregated over time until the polluted storm water traveled toward Lake Poway and most of the dredge and fill materials from the crossings were deposited either in the wetlands above Boulder Bay or in the lake bottom. The City of Poway is liable under the CWA because (1) the City "discharged [unpermitted] pollutants from a point source, (2) the pollutants are fairly traceable from the point source to a navigable water such that the discharge is the functional equivalent of a discharge into the navigable water, and (3) the pollutant levels reaching navigable water are more than de minimis." Hawai'i Wildlife Fund v. County of Maui, 886 F.3d 737, 749 (9th Cir. 2018).

COMPLAINT

134

a. From 1972 to 2018, over 20,000 tons of sediment have entered the Boulder Bay area of Lake Poway.

b. In 2017, several of those tons of sediment filled in Boulder Bay to the point that half of its wooden footbridge at the inlet (which used to be over water) was buried with waste sediment.

c. According to Poway's Public Works Director, the buildup of sediment has blocked the natural flow of the tributary to the surface waters of Lake Poway.

541.   The City of Poway has also violated NPDES Permit No. CAS0109266, Provision A.1.b: "Non-storm water discharges into MS4s are to be effectively prohibited, through implementation of Provision E.2, unless such discharges are authorized by a separate NPDES permit." The City of Poway has not properly applied the requirements of Provision E.2 to the non-storm spring water discharges into its MS4 and into Lake Poway, and the City of Poway does not have a separate NPDES permit for the non-storm water discharges from Rock Haven Spring or a separate NPDES permit authorizing the Mount Woodson spring water discharges containing pollutants into its MS4 and into receiving waters. Pollutant-containing non-storm spring water discharges into Lake Poway have been and will be a future problem because of the recurring, seasonal nature of the springs (i.e. with surface water flows typically 3 months of the year in non-drought years), because of the waste blockage in Warren Canyon that hasn't been removed, and because of the man-caused damage to the pollutant-retaining wetlands surrounding Kelly Spring, at Warren Crossing, and other areas of Warren Canyon.

COMPLAINT

542.    The City of Poway has also violated its 2013 MS4 Permit effluent limitations, Provision A.3, which require the City to reduce pollutants in storm water from the MS4 to the maximum extent practicable. The City has not even done the bare minimum to reduce future storm water pollution as the City has not installed the proper BMPs (which are required by its JRMP and BMP Manuel) in its MS4 above Lake Poway during rebuilding efforts in 2017, has not unblocked the natural flow of its main tributary into Lake Poway and re-engineered the stream with natural rock at a low enough elevation to aid filtration, and has not engineered Warren Crossing to reduce pollutants in storm water to the MEP.

543.    On February 1, 2018, the City of Poway entered into a contract with Foth-CLE Engineering Inc., a Wisconsin company, to perform a bathymetric survey of Lake Poway in order to characterize the thickness of the terrestrial sediment that has deposited in the reservoir from its MS4 system following the Winter Storm Events of 2017. The City of Poway has stated in the public record that the need for this survey "became apparent" after the winter storms of 2017. City staff acknowledged that the course sediment pollution has buried most of its wooden bridge that only a few years ago was suspended over the waters of Lake Poway and that sediment buildup has blocked the natural flow of the tributary. To supply City engineers with options for the removal of terrestrial sediment from Boulder Bay and other identified areas of Lake Poway, CLE compiled a dredge report. The stated goal of the project was to assess the siltation and

COMPLAINT

storage capacity of Lake Poway and to evaluate the removal of silt from Boulder Bay and adjacent areas.

    a. The report found that over 20,000 tons of course sediment has accumulated in Boulder Bay since 1972.

    b. The maps complied by CLE show that the course sediment has built up over the years (i.e. shoaling) along the route of the historical stream (Warren Creek) within Lake Poway all the way to its spillway.

    c. The report also noted that the City of Poway is trying to remove the Waters of the United States designation for Lake Poway so that it would not have to abide by the Clean Water Act and the permits associated with the Act (i.e. Department of the Army Permits and the 2013 MS4 Permit). Foth-CLE Engineering Group, *Geophysical Survey of Lake Poway*, at 33 n.4, June 7, 2018.

544.   A permittee violates the CWA when it violates any term of its NPDES permit. See Russian River Watershed Prot. Comm. V. City of Santa Rosa, 142 F.3d 1136, 1138 (9th Cir. 1998); see also 40 C.F.R. § 122.41(a) ("Any permit noncompliance constitutes a violation of the Clean Water Act and is grounds for [an] enforcement action"); Nw. Envtl. Advocates v. City of Portland, 56 F.3d 979, 986 (9th Cir. 1995) (noting that "[t]he plain language of [the CWA citizen suit provision] authorizes citizens to enforce all permit conditions").

COMPLAINT

545.    The City of Poway has failed to fulfill Provision A.4 of its NPDES permit, which provides: "Each Copermittee must achieve compliance with A.1.a, A.1.c, and A.2.a through timely implementation of control measures. . . . Upon a determination by either the Copermittees or the San Diego Water Board that discharges from the MS4 are causing or contributing to a new exceedance of an applicable water quality standard not addressed by the Water Quality Improvement Plan, the Copermittees must submit the following updates to the Water Quality Improvement Plan . . .: Water quality improvement strategies (i.e. BMPs, retrofitting projects, stream and/or habitat rehabilitation projects, adjustments to jurisdictional runoff management programs, etc.) that will be implemented to reduce or eliminate any pollutants or conditions that are causing or contributing to the exceedance of water quality standards." Poway has not done so with regard to the storm and non-storm water discharges into Lake Poway in 2017, 2019, and 2020.

546.    "[C]ompliance with the Provision A.4 does not shield a Copermittee who may have violated Provision A.1.a, A.1.c or A.2.a from an enforcement action" including "a citizen suit." 2013 MS4 Permit, F-45. The engagement in the iterative process does not provide a safe harbor from liability for violations of permit terms prohibiting exceedances of water quality standards. The NPDES permit is designed to allow the iterative process to continue as many times as necessary to fulfill strict water quality standards.

547.    The City of Poway is required to go above and beyond the iterative approach as it is required to effectively prohibit non-storm water pollution in its receiving waters through

COMPLAINT

effective controls that reduce the amount of lowflow spring water into its MS4 and into Lake Poway. The City of Poway has not done enough to improve water quality in the Warren Canyon watershed and to effectively control polluted non-storm water discharges into Lake Poway that will occur on a seasonal basis.

**B. Poway has not been maintaining its cross-drainage culverts in the Lake Poway Recreation Area.**

548.    The City of Poway has at least four cross-drainage culverts along the unpaved road immediately above Lake Poway.

549.    Cross-draining culverts can be found along the hiking trails above Lake Poway including at the following locations: 33.003, -117.008; 33.004, -117.009; 33.0047, -117.0110; and 33.0046, -117.0100.

550.    These cross-drain culverts discharge into Lake Poway, especially during large storm events.

551.    These cross-drain culverts are considered a part of the City of Poway's MS4 because they are pipes that drain into waters of the state and Waters of the United States, i.e. Lake Poway and thence the Pacific Ocean.

552.    The City of Poway has not engaged in best management practices with regard to maintaining these cross-drain culverts. The pictures below, taken in the summer of 2018, show that the culverts are half-buried in dirt, leaves, and other debris, making the culverts ineffective in properly draining the unpaved road.

COMPLAINT







COMPLAINT

1
2
3
4
5
6
7
8
9
10



11    553.   The inhibited culverts caused an unreasonable amount of pollutants to drain off its

12    dirt roads rather than through the cross-draining culverts. The pollutants entered Lake

13    Poway on February 26-28, 2017  and on February 14-16, 2019 and will occur again on a

14    seasonal basis after large storm events.

15

16    554.   Due to the City of Poway's lack of maintenance of these cross-drain culverts from

17    2017 to the present, the City of Poway has violated its Jurisdictional Runoff

18    Management Plan and its 2013 MS4 permit, Provision A.3, which mandates that

19    pollutants in storm water discharges from MS4s must be reduced to the MEP.

20

21    **C. Poway's failure to obtain proper dredge and fill permits in the Lake Poway**
22    **area.**
23

24    1. Warren Crossing
25

26    555.   On January 24, 2017, the Poway City Council adopted Resolution No. 17-004 which

27    declared an emergency within the City of Poway and suspended environmental review
28

COMPLAINT

141

and the notice and bidding requirements in connection with emergency repairs due to significant winter storms that occurred on January 20 and February 26-28 of 2017.

556.  On April 17, 2017, the City of Poway started a project in Warren Creek, a blue-line stream as depicted on a USGS topographic map that flows into Lake Poway, which has been designated as "Waters of the United States" by the state of California and by the EPA.

557.  The City described the Warren Crossing project in its Army Corps of Engineers' Regional General Permit 63 as follows: "Place 48" tall x 72" wide x 20' long oval corrugated metal pipe (CMP) into 0.007 acre of non-wetland waters of the U.S. No excavation, pushing, shoving or contouring of the soil occurred while placing the pipe." After placement of the CMP, staff hand placed rocks and boulders with the assistance of a backhoe and backfilled/compacted the remaining area with soil and class II base material."

    a.  The City described the purpose of the activity as follows: "Provide vehicular access around the lake for the maintenance of trash receptacles, trails, and other related assets, and the pumping of spoiled porta pots to eliminate the potential for human waste in proximity of drinking water. Provide emergency access for the City of Poway Fire Department in response to reports of traumatic injury, dehydration, acute medical emergencies such as heart attacks and strokes. Many of these emergencies require a rapid delivery of

COMPLAINT

paramedic services and transport to a hospital for continued patient care. The activity was the minimum necessary to alleviate the immediate emergency."

b. The City described the following erosion and sediment control measures implemented: "Straw wattles and booms were placed downstream. Staff performed all work from the adjacent access control road, and no upstream and downstream material in the tributary was pushed, shoved, or contoured."

c. The City described the following pollution prevention measured implemented: "Spill containment materials were onsite; no equipment or vehicle fueling, lubrication, or maintenance were performed onsite; no equipment was placed in the tributary."

d. In rebuilding the new culvert crossing within the flowing waters of the creek, the City abandoned the old culvert and left it buried underneath waste within the historical part of the stream, which is within the high-water mark of Warren Creek.

558.   To the Army Corp of Engineers and to the San Diego Water Board, the City incorrectly labeled Warren Creek as "an ephemeral tributary to Lake Poway" and incorrectly denoted the work as done within "non-wetland" waters.

COMPLAINT

143

559.   Warren Creek at Warren Crossing is not ephemeral[22] but a seasonal intermittent creek fed by seasonal springs and rising groundwaters with flowing water at least three months out of the year in non-drought years.

560.   The area in and around Warren Creek at Warren Crossing contains wetlands as defined by the Army Corps.

561.   The City finished the project within Warren Creek on April 20, 2017.

562.   Although the City of Poway described the project as occurring under "emergency" conditions, "emergency" conditions (as defined by state and federal law) ended by the beginning of March 2017 when the winter rains ended in the City of Poway. In fact, in

---

[22] *Ephemeral*, originally a medical term with the specific meaning "lasting only one day," as a fever or sickness, comes from the Greek and Latin word *hemera*, meaning "day." Merriam-Webster Dictionary defines an "ephemeral stream" as one that "flows only briefly during and following a period of rainfall *in the immediate locality* (emphasis added)." Similarly, the EPA and the DA have proposed the following definition: "The term 'ephemeral' in the proposal means surface water flowing or pooling only in direct response to precipitation, such as rain or snow fall." 84 Fed. Reg. 4173 (February 14, 2019). Importantly, the EPA and the DA make two clarifications to demarcate an ephemeral stream from one that is something more: 1) "The agencies intend to distinguish flow resulting from snow fall from sustained flow resulting from melting snowpack in these definitions;" and 2) The agencies intend to distinguish ephemeral flows from "[c]ontinuous surface flow during certain times of the year" when "the groundwater table intersects the channel and groundwater provides continuous baseflow for weeks or months at a time even when it is not raining or has not very recently rained." Id. With these distinctions, the EPA and the DA define "intermittent" as "surface water flowing continuously during certain times of a typical year, not merely in direct response to precipitation, but when the groundwater table is elevated, for example, or when snowpack melts." Id. And this distinction between an ephemeral tributary to receiving waters and an intermittent tributary to such waters is a critically important one: those features that lack "intermittent flow regimes to satisfy the tributary definition under this proposal . . . would not be jurisdictional" waters. Id.

COMPLAINT

hardly rained at all in March and April 2017 in the City of Poway following the heavy rains of January and February 2017.

563.    Thus, the City of Poway violated the timing and situational requirements of its RGP 63 general permit because the threat of stormy weather had ended by March 1, 2017. The pictures below were taken on April 17, 2017, the day that construction of the Warren Creek Crossing began.



564.    The pictures above show the natural spring water that emanated from Mount Woodson before being drained into Lake Poway. It hardly rained at all in Poway in March or April 2017, including around the time that the above photographs were taken, and yet spring water still flowed in Warren Creek on April 17-20, 2017 during the time that the City of Poway discharged dredged and fill material to Warren Creek and Lake Poway immediately downstream.

565.    The City of Poway submitted the pictures above and the pictures below to the Department of the Army and to the San Diego Water Board in its "Final Report for

COMPLAINT

Regional General Permit 63 for Repair and Protection activities in Emergency Situations (RGP 63)."



566.    However, the City of Poway completed unauthorized work in addition to this rebuilt culvert crossing pictured above and violated the RGP 63 condition that the work authorized be fully described in the permit application and that the minimum necessary be done to alleviate the immediate emergency. The City of Poway failed to disclose to the federal and state authorities the device placed adjacent to the new culvert on a concrete platform within the location of the historical stream and the pipe dredged into the ground and attached to the new culvert. The pictures below were taken in April 2018 at this same location.

COMPLAINT







567.   The placement of conduit and the concrete platform for the above inlet flow meter

installed between August 30, 2017 and September 25, 2017 involved dredging within

Warren Creek for the placement of the conduit attached to the culvert and filling more

COMPLAINT

dirt and other materials into Warren Creek for the platform, which consists of concrete poured on top of the abandoned old culvert. (See picture below.)



568.    The RGP 63 permit states that work not described in the permit application documentation but deemed necessary after a field assessment is not authorized unless acknowledged by appropriate means. Permit modifications must also be described in sufficient detail in the post-project report. The City of Poway failed to mention or gain authorization for dredging and filling work that was done between August 30, 2017 and September 25, 2017 at Warren Crossing within WOTUS, its location within the historical stream, the dredging and filling activities involved in their placement on top of the abandoned culvert adjacent to the new culvert, and the resulting effects on downstream wetlands for their placement, in its post-project report.

569.    The dredging and filling activities conducted between August 30, 2017 and September 25, 2017 have additional adverse effects on aquatic resources including wetlands in the immediate vicinity.  The City of Poway has not engaged in a mitigation

COMPLAINT

project to compensate for these effects as required by its Habitat Conservation Plan and/or Clean Water Act permits.

570.   The dredging and filling work done in WOTUS at Warren Crossing between August 30, 2017 and September 25, 2017 mostly remain in WOTUS to this day and constitute ongoing permitless violations of the CWA.

571.   Although the City of Poway obtained a generalized Section 401 Water Quality Certification by submitting its Final Report to the State Water Board, the certification that the City received violated the RGP 63 condition that situations that do not meet the definition of "emergency" require the municipality to seek out a subsequent individual water quality certification from the San Diego Water Board. Also, the emergency water quality certification failed to mention and to gain approval for the inlet flow meter and its placement within Warren Creek which involved additional dredging and filling activities within the historical stream and wetlands.

572.   The City of Poway never obtained an individual water quality certification (and/or waste discharge requirements) for either its road crossing or its device/pipe and the concrete platform that are all located within Warren Creek. An individualized Section 401 certification would have addressed the local basin plan and water quality standards as they pertain to this project and would have required the City to do much more to mitigate future environmental effects. (Waste discharge requirements would have done the same.)

COMPLAINT

573.   The culvert crossing, along with the inlet flow meter platform, are not and/or do not contain effective BMPs and do not fulfill the City's NPDES requirement to control storm water pollution to the maximum extent practicable (MEP).

574.   Only a fully engineered bridge capable of withstanding a 50-year storm and the restoration of the drainage corridor downstream into Lake Poway would fulfill the MEP standard and the related requirements listed in the 2013 MS4 Permit, Provision E.3.a.

575.   The City of Poway failed to engage in all necessary BMPs including LID BMPs inline directly into the drinking water reservoir to control future erosion and runoff from areas associated with the aforementioned actions in violation of its CWA permits and/or San Diego Water Board permits.

576.    The City of Poway never documented why additional BMPs required of all development projects (as that term is defined in the Permit) were not needed at the Warren Crossing project.

577.   The City tried to justify its emergency permit by arguing that there were porta potties in the vicinity that needed to be emptied. It is not a best management practice to have porta potties in their current location close to Warren Creek at a location that is difficult to reach after storms and close to the Lake in general. The City of Poway could have locked the porta potties, especially the ones located near to Warren Creek, instead of leaving them open for hikers to use after the February 26-27, 2017 storm.

578.   The City of Poway could have closed the trail at Warren Creek indefinitely until the proper repairs were done (the City does not have a problem closing its trails during heat

COMPLAINT

waves or during viral pandemics and enforcing the closure.) Also, there are other ways to get to the top of Mount Woodson (using the aforementioned Warren Creek crossing is not necessary but only a more convenient way to get to the top of the mountain.) The public water supply should take precedence over recreational activities.

579.    The City of Poway has not adhered to the requirements of RGP 63 because no discharge of dredge or fill material may occur in the proximity of a public water supply intake. The City of Poway cannot use RGP 63 or any other general permit to repair its trail crossings above Lake Poway because the crossings occur in proximity of a public water supply intake.

    a.   In 2017, Lake Poway had a higher numeric turbidity level than in 2016 and, unlike previous years, a higher level than allowed by state law for drinking water (0.314 NTUs).

    b.   These higher levels were caused by the failed culvert crossings within the City's MS4 as the pollution made its way to the City's public water supply intake area through diffusion.

    c.   The City must apply for an individualized permit to undertake any access road repair projects above Lake Poway because this generalized permit condition (or any of the other general permits that could have been potentially been used) can never be satisfied.

580.    The City of Poway did not adhere to the RGP 63 permit condition mandating that the structure not impede the normal or expected high flows or cause the relocation of the

COMPLAINT

water. A future heavy storm would destroy the earthen crossing in its "new" location and mobilize the dredged and fill material as effluent into the wetlands and reservoir below.

581.   The City of Poway is likely to repair/replace this stream crossing and the buried conduit and platform without future Department of the Army authorization and without the proper permits from the San Diego Water Board.

   a.   The City of Poway has no intention of removing the conduit or the concrete platform still buried within the historical wetland area within and adjacent to the stream.

   b.   Although the City removed some of the items that it installed within Warren Creek (i.e. the inlet flow meter and some of the exposed conduit) in 2018 in response to this lawsuit, there are structures that it installed within Warren Creek including the buried conduit and concrete platform that have not been removed from the road area within the historical stream and its high water mark since this lawsuit was filed.

   c.   The City has wrongly taken the position that Warren Creek is an ephemeral stream and/or that Lake Poway was constructed in a "dry canyon" that is not subject to the Clean Water Act or the 2013 MS4 Permit.

582.   The City of Poway did not have a CWA Section 404 permit to build Warren Crossing on April 17-20, 2017 in intermittent waters, which were flowing those very days into Lake Poway. Unauthorized discharges of pollutants into WOTUS (i.e. Lake Poway) occurred on April 17-20, 2017 by the City of Poway.

COMPLAINT

583.   Now that the City is aware that it misled the San Diego Water Board by incorrectly describing its project as occurring in an "ephemeral" stream within "non-wetland waters," it must apply for an individualized water certification with the correct information: Warren Creek is an intermittent stream fed by large amounts of storm water runoff as well as elevated groundwater/spring water flows and contains wetlands in the area where the City's work was done in 2017. This correct information would result in more stringent Section 401 Water Certification Requirements/Waste Discharge Requirements from the San Diego Water Board.

584.   As Warren Creek at the location of the Warren Crossing is a seasonal stream with adjacent wetlands that continuously follow the creek down the short way into Lake Poway, Department of the Army jurisdiction exists for this Warren Creek Crossing.

585.   This Warren Creek crossing and inlet flow meter device fall within the scope of the EPA's pre-2015 regulations and guidelines on Department of the Army jurisdiction because the stream is intermittent and connected to a navigable lake used in interstate commerce and the Pacific Ocean.

586.   This Warren Crossing and the remnants of the inlet flow meter structure also fall within the scope of the Trump Administration's Navigable Waters Protection Rule effective on June 22, 2020 as the creek meets the definition of a jurisdictional stream, i.e. an intermittent stream that flows into a navigable water used in interstate commerce.

587.   Even if the Warren Creek Crossing is judged to be outside of the jurisdiction of the Department of the Army, these MS4 structures within Warren Creek should be treated as

COMPLAINT

an illicit connection/discharge in violation of the Basin Plan rules because the City of Poway failed to obtain valid waste discharge requirements (water quality certification for work in waters of the state) from the San Diego Water Board for the <u>entire</u> project and failed to abide by the 2013 MS4 Permit and its mandated requirements that effective BMPs be installed at this location.

588.   Waste discharge requirements would have ensured that the proper BMPs be installed and that any construction fulfill the City's MS4 Permit requirements as listed in Provision E.3, which are required for all development projects, including those constructed by City staff, in <u>all</u> areas of the City of Poway.

589.   The Warren Crossing project was not a "maintenance" project.

590.   Failure to obtain state water quality certification and/or waste discharge requirements is enforceable via a citizen's suit under the CWA because the City's 2013 MS4 Permit and implementing documents federalizes these requirements and their associated mandates requiring the installation of effective BMPs that adhere to the MEP standard to manage storm and non-storm water. 2013 MS4 Permit, Provision E.3.a.(3)(a) n.25.

591.   The City of Poway should have restored the natural drainage corridor by re-engineering the main stream into Lake Poway, which is still currently blocked with polluted sediment that is causing waste blockage and eutrophication, as part of its development projects that the City undertook in the Lake Poway area in 2017 to fulfill its JRMP requirements.

COMPLAINT

592.    Even if Lake Poway were not deemed to be Waters of the United States, Warren Creek is still part of the City's MS4, and as such, the City would be required to obtain waste discharge requirements before construction began which would have required the City to implement its 2013 MS4 Permit requirements including fulfilling Low Impact development BMP requirements and/or onsite BMPs at this site and in the vicinity, which the City failed to do to fulfill the MEP standard. <u>See</u> 2013 MS4 Permit, Provision E.3.a.

2. <u>Ephemeral tributary crossing constructed by Piperin Corp.</u>

593.    On July 17, 2017, the City of Poway entered into a contract for the Lake Poway Trail Slope Repair project with the Piperin Corporation, and the construction work was completed on August 15, 2017.

594.    This project was constructed under the January 24, 2017 Proclamation of Local Emergency, which was the City's justification for waiving environmental review and the formal bidding procedures normally associated with this type of project.

595.    After the heavy rains in January and February of 2017, City staff discovered cracks in the soil slope adjacent to the Lake Poway access road. The City utilized its on-call geotechnical consultant to perform a limited geotechnical evaluation of the dirt road surrounding Lake Poway. The limited geotechnical evaluation specifically focused on an area where a large crack had formed parallel to the road. During the investigation, it was discovered that the tension crack had formed due to surficial instability of the slope at this location.

COMPLAINT

596.   The project repaired the slope by replacing a section of clogged storm drain pipe and reconstructing the slope by benching the exposed slope face into competent material, and rebuilding the slope with compacted fill. The final cost of the project was $38,976.70. The picture below depicts work done by the Piperin Corporation.



597.   The Piperin Crossing project was done within an ephemeral tributary to Warren Creek that flows into Lake Poway. This ephemeral tributary is considered waters of the state, and as such, the City of Poway is required to obtain waste discharge requirements from the San Diego Water Board per the 2013 MS4 Permit, Provision E.3.a.(3) n.25.

598.   The location of the project is 14556 Lake Poway Road at Latitude 33.0046, Longitude -117.0100.

COMPLAINT

599.   The Piperin Crossing project was not executed in "emergency" conditions as the work was done in the dry summer months. The City of Poway abused its emergency powers by suspending environmental review and state bidding laws to repair this earthen stream crossing above Lake Poway.

600.   Under state law, the Piperin Corporation would be required to pay the City back for the payment made to them for its work as the work was done in violation of state bidding laws.

601.   The City of Poway and the Piperin Corporation failed to procure a valid permit from the San Diego Water Board for any of the storm drain/crossing repairs within the tributaries feeding Lake Poway.

602.   Although the City of Poway budgeted money for permits/water quality certification for the Piperin Crossing Project, the City of Poway did not follow through in procuring these required authorizations from the San Diego Water Board.

603.   The City of Poway is likely to repair this crossing without a water quality certification and/or waste discharge requirements from the San Diego Water Board in the future.

604.   The City of Poway failed to implement Best Management Practices and Effective Controls for future storm water pollution as required by the City's NPDES permit, including the restoration of natural drainage corridors in the area immediately downstream of the Piperin Crossing project, because all of the work done by the Piperin Corporation is considered a "development project" constructed within an ephemeral stream. The City of Poway failed to obtain waste discharge requirements issued by the

COMPLAINT

San Diego Water Board for the Piperin Project which would have required BMPs and effective controls.

605.    Even if the Piperin Crossing is deemed outside the jurisdiction of the Department of the Army because it is merely an ephemeral tributary not covered under the Trump Administration's WOTUS rules, it would fall under the City's NPDES permit, which federally obligates the City to obtain Waste Discharge Requirements from the San Diego Water Board, which would have required that best management practices and other effective controls such as the use of bioengineering and other control structures be used to prevent future pollution into Lake Poway. These waste discharge requirements would have fulfilled the City's obligations under its 2013 MS4 Permit, Provisions E.3.a. and A.3.a, which are enforceable permit terms in a CWA citizen's suit.

606.    If the City had obtained proper permits and had undergone the normal environmental review process, it would have showed that steps were taken to avoid impacts to wetlands, streams and other aquatic resources; that potential impacts were minimized; and that compensation will be provided for all remaining unavoidable impacts. These impacts have harmed sensitive habitat for endangered and threatened species.

607.    To fulfill its NPDES permit, the City of Poway should have installed control BMPs/low impact development BMPs that will minimize the generation of pollutants at the location of the Piperin Project and to the area immediately downstream (i.e. Lake Poway). A properly permitted project under the 2013 MS4 Permit would have involved maintenance and restoration of drainage corridors directly inline into the public water

COMPLAINT

supply reservoir (Lake Poway). The proper BMPs were not fully installed within the culvert and all the way into the lake at the site of the Piperin Project.

608.    Since 2017, the Piperin Crossing project, located at Latitude 33.0046, Longitude -117.0100, has not been enhanced with additional BMPs to reduce pollutants in storm water from the City's MS4 during the 2018, 2019, and 2020 seasons to the maximum extent practicable (e.g. by placing filtering rocks and cloth filters within and over the culvert to minimize drainage into the reservoir).

609.    The City has not documented the reasons why the BMPs specified in Provision E.3.a of the 2013 MS4 Permit were not needed for Piperin Crossing even though these BMPs are required for all development projects within city limits.

610.    The Piperin Crossing remains in service to this day and constitutes an ongoing violation of the 2013 MS4 Permit and the CWA.

          3. Lake Poway boat dock replacement project of 2017

611.    The City has failed to obtain the proper CWA permits and failed to adhere to various requirements of its 2013 MS4 Permit when it undertook a development project constructed in the waters of Lake Poway: the 2017 boat dock replacement project commenced in the winter of 2017 and finished in the fall of 2017.

612.    The new boat dock was constructed adjacent to the existing dock which remained in service until the new dock was completed. The City Council accepted the new boat dock as completed on November 21, 2017. (See May 24, 2019 NOV, Exhibit 9.)

613.    The City of Poway failed to adhere to various requirements of its 2013 MS4 Permit

COMPLAINT

and failed to obtain valid authorizations from the Department of the Army (DA) and the San Diego Water Board when it undertook a development project constructed by Bellingham Marine Industries, Inc. within Lake Poway. (See May 24, 2019 NOV, Exhibit 9.) The City failed to obtain a valid CWA § 404 permit as well as a valid water quality certification under CWA § 401 for the boat dock because the City has incorrectly labeled Warren Creek, which drains directly into Lake Poway, as an ephemeral tributary, when in fact it is an intermittent jurisdictional stream, thus making Lake Poway "Waters of the United States" under longstanding EPA policy.

614.    The City has never obtained a Department of the Army Permit or Water Quality Certification from the San Diego Water Board for its boat dock in Lake Poway that has been rebuilt several times over the last 40 years.

615.    The City, in violation of Provision E.3.a.(3) n.25 of the 2013 MS4 Permit and CWA §§ 401[23] and 404,[24] has failed to obtain any authorization whatsoever for the boat dock and associated anchorage installed within jurisdictional waters. Poway is in violation of the Clean Water Act for failing to obtain the proper permits, including the appropriate amount of compensatory mitigation, for its boat dock and all other structures that were built/replaced in the Lake Poway area in 2017.[25] (Cf. May 24, 2019 NOV, Exhibit 10.)

616.    The City of Poway is liable for statutory penalties up to the statutory maximum each

---

[23] 33 U.S.C. § 1341.
[24] 33 U.S.C. § 1344.
[25] Poway never has obtained any CWA permits for its boat dock in the past 50 years.

COMPLAINT

and every day from November 21, 2017 when Poway's City Council finalized the project up through the present day because the boat dock remains in use and is unpermitted and illegal under CWA law.

617. Based upon Plaintiff's investigation to date, Plaintiff alleges that Defendant is responsible for more than 1,500 individual violations of the Clean Water Act for the work done without valid Section 404 permits in 2017 at Warren Crossing and at the boat dock in Lake Poway.

618. Defendant's acts and omissions have harmed, and continue to harm, Kevin T. Kelly, who is in the process of establishing a mitigation bank in Warren Canyon that will positively affect the water quality of Warren Crossing and Lake Poway, because Poway has not been adhering to the Clean Water Act and its requirements to obtain compensatory mitigation credits required for after-the-fact Department of the Army and San Diego Water Board permits.

619. Poway's policy of removing Clean Water Act jurisdiction for all of Warren Canyon continues to harm Plaintiff's economic and recreational interests in Warren Canyon.

**D. The City of Poway has constructed and maintained an unauthorized hiking trail on Plaintiff's parcels, APN: 278-210-2900 and 278-210-3000, in violation of state trespassing/takings laws and in violation of the Endangered Species Act.**

620. The City of Poway is a municipality of the State of California and, therefore, a "person" as defined by Section 3 of the Endangered Species Act, 16 U.S. § 1532(13).

COMPLAINT

621.    Plaintiff's four other parcels (APN: 278-210-0300, 278-210-0400, 278-210-2900, and 278-210-3000 described in two separate deeds) are also located adjacent to the City of Poway's parcel APN: 278-210-1100.

622.    The property line of Plaintiff's parcels reaches to Poway's northern and northeastern city limit. These four parcels, like the City's parcel, are in Warren Canyon and contain a portion of Warren Creek, the blue-line stream draining Rock Haven.

623.    The picture below depicts four of Plaintiff's parcels that are zoned rural residential (Plaintiff's downstream parcel containing Kelly Spring is not pictured below). The well-maintained hiking trails as shown cross over a portion of Warren Creek.



Map Provided by the City of Poway

624.    The City of Poway regularly clears the stream and upland areas of wooded vegetation in violation of state trespassing laws and without a permit from the San Diego Water Board and/or the California Department of Fish and Wildlife, which is needed to clear

COMPLAINT

and alter a stream bed for a trail. The City of Poway has been doing so since the trails were blazed by public agents in 2007 (previous owners of these four parcels did <u>not</u> blaze these trails on Plaintiff's property).

625.   In the picture above, the X marks in lime green are the approximate locations of the endangered species, including Del Mar Manzanita, that the City of Poway has cut or destroyed or encouraged others to damage in the process of constructing, maintaining, and advertising its trails on Plaintiff's parcels.

626.   Neither Plaintiff nor previous property owners of these four parcels constructed or maintained these trails on APN: 278-210-3000 and APN: 278-210-2900.

627.   Under Cal. Penal Code § 602, it is unlawful to cut down, destroy, or injure any kind of wood growing upon the lands of another. Poway and its agents have willfully cut down and injured wood on Plaintiff's parcels, APN: 278-210-2900 and APN: 278-210-3000.

628.   Poway and its agents have violated California Penal Code Section 384a(2) by its trail maintenance activities on Plaintiff's parcels. Poway has willfully and/or negligently cut plant material on APN: 278-210-2900 and APN: 278-210-3000 without written permission from the owners.

629.   Trail construction and maintenance involve cutting wood and living plants, including state and federally protected threatened and endangered species such as Encinitas Baccharis (*Baccharis vanessae*) and Del Mar Manzanita (*Arctostaphylos glandulosa ssp. Crassifolia*) that both grow on Plaintiff's property.

COMPLAINT

163

630.    Trail maintenance also involves disturbing the habitat of threatened and endangered species including the Southwestern willow flycatcher (*Empidonax traillii*), California gnatcatcher (*Polioptila californica californica*), and the Least Bell's vireo (*Vireo bellii pusillus*).

631.    Two federally listed threatened and endangered species have been harmed by the City of Poway on Plaintiff's property: *Arctostaphylos glandulosa ssp. Crassifolia* (Del Mar or Costa Baja manzanita, federally endangered, and pictured below taken on Plaintiff's property) and *Baccharis vanessae* (a California endangered plant), which has been documented to grow in Poway and on Mount Woodson by the federal government at 61 Fed. Reg. 195, 61 FR 52370-52384 (October 7, 1996).



632.    Because the City has violated a state criminal trespass law and other state laws

COMPLAINT

(e.g., cutting a state endangered plant), the City is liable under Section 9(a)(2) of Endangered Species Act, 16 U.S.C. § 1538(a)(2)(B), which makes it unlawful to remove, cut, dig up, or damage or destroy any endangered plant in knowing violation of any state law or regulation or in the course of a violation of a state criminal trespass law. The "violation of any law . . . of any State" language of Section 9(a)(2)(B) federalizes the City's violation of state law.

633.    The City is also in violation of 16 U.S.C. § 1538(a)(1) because Plaintiff's parcels contain critical habitat for the California gnatcatcher and the least bell's vireo, and the City's activities on Plaintiff's parcels have harmed these species and their habitat.

634.    The City of Poway has several volunteers under the authority and direction of Bob Hahn, Poway's Parks Maintenance Supervisor, who help maintain/restore the City's trails, including those on Plaintiff's parcels. Plaintiff has spoken with Mr. Hahn, and he has confirmed that the City maintains/restores the trails on Plaintiff's property on a regular basis through its staff and team of volunteers. Plaintiff observed the City's maintenance activities on Plaintiff's property during the first week of May of 2018. Maintenance activities involve cutting plants on Plaintiff's property.

635.    Although the issuance of an Incidental Take Permit authorizes "take" by any entity under "direct control," Poway's Habitat Conservation Plan is not applicable to Plaintiff's parcels of land unless Plaintiff agrees to be a participant and abide by its terms.

COMPLAINT

636.    According to the City's HCP, if a parcel contiguous to the existing Mitigation Area is found to support high quality habitat or covered species, the property owner may voluntarily request that the property be added to the Mitigation Area.

637.    According to Poway's City Planner Joseph Lim, the California Department of Fish and Wildlife had previously urged the City of Poway to purchase APNs: 278-210-0300, 278-210-0400, 278-210-2900, and 278-210-3000 because of the high habitat values and because of the hiking trails through the properties, but the City of Poway decided to pursue other projects instead of obtaining a legal right to use the trails and to fulfill the requirements of its HCP.

638.    The fire department uses the trails on Plaintiff's property as an auxiliary route in wildfire situations, and City maintenance crews and volunteers use Plaintiff's trails instead of the City's official access point further south for safety reasons.

639.    Citizens park their cars on Plaintiff's property to access the Warren Canyon trail rather than parking on the opposite side of Highway 67 and running through the plethora of speeding cars to get to the side where the trailhead is located.

640.    Even googlemaps has the trailhead for the Warren Canyon trail on Plaintiff's parcel, APN: 278-210-3000, because it is a better maintained (clearly visible from aerial shots because of the City's maintenance activities) and safer trail with easier access than the alternative.

641.    For the most part, the City stopped maintaining its official trailhead and has used Plaintiff's trailhead and properties instead without proper authorizations.

COMPLAINT

642.    The City uses Plaintiff's property because the alternative route is steep and dangerous, especially during the winter and spring months.

643.    The City of Poway, its citizens, and its agents likely will continue to use these trails in the future without authorization.

644.    The City of Poway has included the trails on Plaintiff's property as a "planned trail" on its official public map published on its website, which invites others to use his trails without authorization.

645.    On its maps available to the public, Poway has labeled Plaintiff's parcels as "parks/open spaces" even though Plaintiff's property is zoned residential.

## IX. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Discharges from the City of Poway's MS4s Causing, Contributing to, and Threatening to Cause Pollution in Receiving Waters in Violation of the 2013 MS4 Permit and CWA Sections 301(a) and 402(p), 33 U.S.C. §§ 1311(a) and 1342(p).

646.    Plaintiff incorporates by reference each and every allegation contained above, as though set forth fully herein.

647.    The City's 2013 MS4 Permit prohibits discharges that cause or contribute to or threatened to cause a condition of pollution in receiving waters. A condition of pollution exists when the water quality needed to support designated beneficial uses has become unreasonably affected or impaired or altered by waste, to a degree which unreasonably

COMPLAINT

affects either of the following: 1) The waters for beneficial uses; or 2) Facilities that serve these beneficial uses. 2013 MS4 Permit, C-8, C-11–C-12. Poway's unpermitted stormwater and non-storm water discharges of waste are threatening to dwindle and are reducing the size of the reservoir and are threatening to cause and are causing eutrophication, leading to the City's use of toxic substances in Lake Poway to combat its effects.

648.   The City of Poway's satellite images on March 16, 2017 visually show the discharges of non-storm water containing pollutants from the City's destroyed point-source stream crossing (which was not permitted before it was constructed under the CWA) and third-parties' destroyed, unpermitted point-source stream crossings flowing into the reservoir as it had not rained in Poway in over two weeks when the aerial photographs were taken.

649.   Eyewitness testimony establishes the fact that several unpermitted culvert crossings in the privately owned portion of Warren Canyon failed in the winter of 2017, more specifically on February 26-28, 2017, sending polluted stormwater and non-storm water waste into Lake Poway.

650.   Satellite imagery on the City of Poway's website also establishes the fact that several unpermitted stream crossings in the privately owned portion of Warren Canyon failed in the winter of 2017, sending the unpermitted waste into the mouth of Warren Creek at Lake Poway via stormwater and non-storm water.

COMPLAINT

651.   Photographic evidence established the fact that Fisherman's Footbridge was half buried in waste from washed-out unpermitted earthen roads following the 2017 winter storms.

652.   In the City of Poway, anthropogenic sources of pollutants—namely unpermitted discharges of dredged and fill materials placed around culverts and other conveyances by the City and by private third parties in Warren Canyon– have become mobilized and discharged into the mouth and other portions of Warren Creek and into Lake Poway as an unreasonable amount of waste from and through Poway's point sources in violation of its 2013 MS4 Permit.

653.   The approximate location of the unpermitted point sources originally running perpendicular to the watercourse to allow the passage of vehicles that were washed out as a result of the February 2017 and February 2019 winter storms (February 26-28, 2017 and February 14-16, 2019 more specifically) and the April 5-10, 2020 spring storms in Warren Canyon are as follows:

a. 33.001298, -117.003004 (APN: 278-290-1100);

n. 32.998925, -116.998575 (APN: 278-300-5000);

o. 32.998802, -116.997127 (APN: 278-300-5900);

p. 33.001296, -117.003004 (APN: 278-290-0600);

q. 32.9990, -116.9961 (APN: 278-200-1900);

r. 32.9992, -116.9934 and 32.9993, -116.9927 (APN: 278-200-0700);

s. 32.998671, -116.981069 (APN: 278-200-0200);

COMPLAINT

t.   32.998204, -116.977989 (APN: 278-210-1500);

u.   32.9980, -116.9761 (APN: 278-210-1800);

v.   32.9990, -116.9756 (APN: 278-210-1800);

w.   32.998103, -116.976631 (APN: 278-210-1600);

x.   32.9992, -117.0003 (APN: 278-300-6000); and

y.   33.0030, -117.0057 (APN: 278-280-2300).

654.   The discharges from City staff activities and from third parties activities in Warren Canyon include point-source pollution that is all funneled through a point source MS4 (e.g., Warren Crossing and Fisherman's Footbridge) and into the receiving waters of Warren Creek and Lake Poway.

655.   These unpermitted discharges have caused and are threatening to cause a condition of pollution in Lake Poway. The man-made conveyances in Warren Canyon mentioned above were mostly washed out on (or around) February 26-28, 2017; again on (or around) February 13-16, 2019, and again on (or around) April 5-10, 2020.

656.   Residual waste from these unpermitted point sources flowed into Poway's reservoir after these dates via non-storm water.

657.   The City of Poway has acknowledged in the public record that sediment pollution from the storms of 2017 have lessened the water storage capacity of Lake Poway and have blocked the natural course of the main tributary feeding the reservoir.

COMPLAINT

658.   The City of Poway was rightly concerned about the lost storage capacity of Lake Poway because the State of California considers Poway dam as having a high risk of overtopping and inundation to the Pacific Ocean below.

659.   Lake Poway, the San Dieguito River, and the Pacific Ocean are all navigable waters of the United States affected or threatened to be affected by the City of Poway's MS4 discharges of waste.

660.   The City of Poway is liable for third-party waste discharges into its reservoir from parcels under the City of Poway's jurisdiction and control according to the plain meaning of the 2013 MS4 Permit.

661.   On February 16, 2019, the waste of unpermitted washed-out earthen roads that was deposited underneath Fisherman's Footbridge was moved further into the reservoir (Lake Poway) by stormwater and non-stormwater.

662.   By February 28, 2019, a new layer of waste filled in the area beneath Fisherman's Footbridge at the mouth of Warren Creek at Lake Poway.

663.   Sediment plumes into Lake Poway were visible on March 11, 2019 at the Boulder Bay of Lake Poway where it intersects with the mouth of Warren Creek. Sediment extended the beach further into the reservoir, resulting in a reduction of water capacity of the reservoir.

664.   Photographic evidence from May 15, 2020 at the Boulder Bay of Lake Poway establishes the fact that more waste was further pushed into Lake Poway following the

COMPLAINT

April 2020 storms. On May 15, 2020, there was a bigger gap between the footbridge and the streambed underneath it as compared to years 2017-2019.

665.   The San Diego Water Board Basin Plan prohibits discharges of waste such as unpermitted dredged and/or fill material not authorized by a dredged or fill material permit under Section 404 of the Clean Water Act. 2013 MS4 Permit, A-1 – A-2. The discharges of washed-out, unpermitted stream crossings in Warren Canyon in 2017, 2019, and 2020 through Poway's MS4 are prohibited under this definition.

666.   Poway's discharges through its MS4 (including the discharges of third parties within and under its jurisdiction) that are causing and threatening to cause a condition of pollution in Lake Poway are inherently in violation of the waste discharge prohibitions incorporated in the 2013 MS4 Permit, Provision A.1.c.

667.   Poway's MS4 discharges have caused or contributed to a violation of water quality standards, including those articulated in the Basin Plan, in violation of the 2013 MS Permit, Provision A.2.a.(1).

668.   The City ordered a bathymetric survey of the bottom surface of Lake Poway after it "became apparent with the repair work from the 2017 winter storm events." City of Poway, Agenda Item 1.12, pg. 3, November 7, 2017.

669.   These admissions demonstrate that exceedances of water quality standards in Warren Canyon and Lake Poway have occurred since early 2017.

COMPLAINT

670. Since 1972, over 20,000 tons of dirt and course sediment have buried the Boulder Bay area of Lake Poway and infiltrated the reservoir along the path of the historical stream within the reservoir, according to Poway's bathymetric survey of 2018.

671. In 2017 and again in 2019, enough course sediment entered the Boulder Bay portion of Lake Poway to bury most of its wooden footbridge that only a few years ago was floating above water.

672. City-owned parcels containing the City's point sources that discharge pollutants into Lake Poway include the following: APN: 278-290-1000; APN 278-280-2300; APN 278-281-0100; and APN: 278-210-1100.

673. The City of Poway has also maintained two stream crossings without permits/authorization that discharge waste into Warren Canyon and Lake Poway on APN: 278-210-3000 and APN: 278-210-1100.

674. The City of Poway also contains two springs (Rock Haven Spring and Kelly Spring) that discharge into private, manmade unpermitted point sources and eventually into the City's MS4 in an anthropogenically influenced state because of unpermitted fill materials and mobile pollutants placed in Warren Creek due to the actions of private property owners within Poway as well as the actions of City staff.  The mobile pollutants are picked up by the flowing spring waters, which also contain their own sources of pollutants, before being discharged into Lake Poway.

675. The City of Poway must comply with the discharge prohibitions in its 2013 MS4 Permit, Provision A.1.a at a minimum because the polluted water contained a large

COMPLAINT

amount of non-storm spring water that is traceable to Rock Haven Spring and the seasonal springs on Mount Woodson including Kelly Spring, which flowed into Lake Poway between February 26, 2017 and April 20, 2017; between February 14, 2019 and June 5, 2019; and between March 31, 2020 and June 15, 2020.

676.    In the winter and spring of 2017, the seasonal springs on Mount Woodson continually fed Lake Poway from at least February 26, 2017 through at least April 20, 2017.

677.    In the winter, spring, and summer of 2019, Kelly Spring continually fed Lake Poway from February 5, 2019 through at least July 15, 2019.

678.    In 2019-2020, Kelly Spring continually fed Lake Poway between December 27, 2019 through at least January 20, 2020 and then resumed flowing again in the month of March 2020 and at least through the beginning of August 2020.

679.    As a result of its control of land areas that are generating polluted stormwater and non-stormwater, the City of Poway has caused and contributed to, and is causing, contributing to, and threatening to cause, pollution in the wetlands of Warren Canyon and in Lake Poway, which are all considered waters of the United States.

680.    Between February 26, 2017 and April 20, 2017, each day that the City of Poway has caused, contributed to, threatened to cause, or failed to mitigate polluted stormwater and non-storm water flows through its MS4 is a separate and distinct violation of the 2013 MS4 Permit and 33 U.S.C. §§ 1311(a) and 1342(p).

COMPLAINT

681.    Between February 5, 2019 and June 5, 2019, each day that the City of Poway has caused, contributed to, threatened to cause, or failed to knowingly mitigate polluted stormwater and non-storm water flows through its MS4 is a separate and distinct violation of the 2013 MS4 Permit and 33 U.S.C. §§ 1311(a) and 1342(p).

682.    Between March 31, 2020 and June 15, 2020, each day that the City of Poway has caused, contributed to, threatened to cause, or failed to knowingly mitigate polluted stormwater and non-storm water flows through its MS4 is a separate and distinct violation of the 2013 MS4 Permit and 33 U.S.C. §§ 1311(a) and 1342(p).

683.    The violations of the 2013 MS4 Permit's discharge prohibitions continue to this day because the polluted sediment has not been removed, which has lessened the reservoir's storage capacity.

684.    The polluted sediment and non-storm water containing phosphorous and nitrates is also threatening to cause eutrophication in the Boulder Bay area of Lake Poway. Potential eutrophication conditions exist when excessive amounts of nutrients (commonly nitrogen and phosphorus) are in an aquatic environment. Nutrients have accelerated the growth of algae and phytoplankton in Lake Poway in 2017, 2019 and 2020, which has reduced dissolved oxygen content and harmed aquatic organisms (World Resources Institute, 2013). This condition can unbalance the aquatic system and so harm fish and wildlife.

685.    On May 3-4, 2019, severe algal blooms were visible in the Boulder Bay area of Lake Poway at the mouth of Warren Creek.

COMPLAINT

686.   During major rain events including during the winter and spring months of 2017, 2019, and 2020, stormwater water flows freely over exposed materials of the stream crossings and sediment buildup, becoming contaminated with bacteria, color, manganese, mercury, nitrogen, pH, phosphorus, viruses, turbidity, and nutrients at levels above applicable water quality standards for several of these constituents. The polluted water then flows uncontrolled into Lake Poway.

687.   For weeks and months in a typical year, non-storm spring water flows freely over exposed materials of the stream crossings and sediment buildup, becoming contaminated with bacteria, color, manganese, mercury, nitrogen, pH, phosphorus, viruses, turbidity, and nutrients at levels above applicable water quality standards for several of these constituents. The contaminated non-storm then flows uncontrolled into the City's MS4 and into Lake Poway.

688.   Minimizing non-storm water flows through wetland repair projects would lessen the amount of pollutants in the non-storm water through biological uptake.

689.   These violations are ongoing and continuous in light of the City of Poway's history of failing to abide by the Clean Water Act and its 2013 MS4 Permit in the area above and including Lake Poway.

690.   These violations are ongoing and continuous because the City's Warren Crossing has not been engineered to withstand storm surges and will eventually blow out into Lake Poway and its adjacent wetlands during the next series of 50-year winter storm events.

COMPLAINT

691.    The City has not put into place best management practices and effective controls as required by the San Diego Water Board that will reduce pollutants in storm water discharges from its MS4 above Lake Poway to the maximum extent practicable.

692.    While the 2013 MS4 Permit includes a "Prohibitions and Limitations Compliance Option," such that co-permittees who are willing to pursue significant measures to improve water quality will be deemed in compliance with the permit's discharge prohibitions, receiving water limitations and water-quality-based effluent limitations of Provision A, Co-permittees who choose this optional means of compliance must implement Water Quality Improvements Plans that include certain interim and final numeric goals, water quality improvement strategies, and time schedules. The plans must also include, for each final numeric goal, annual milestones in five-year increments, dates for achievement of the milestones, and public input analyzing these plans. Poway has not submitted a WQIP that follows the rigorous requirements of Provision B.3.c.(1) and (2) with respect to the types of pollutants that are being addressed in this lawsuit such as waste sediment, iron, total phosphorous, total nitrogen, and bacterial pollutants.

693.    Poway submitted its current WQIP in September of 2015, before Provision B.3.c.(1) and (2) was made an effective part of the 2013 MS4 Permit in January of 2016. Poway has not undergone the rigorous process of seeking the "Prohibitions and Limitations Compliance Option" and has not updated its current non-optional WQIP accordingly since 2015 with the optional safe-harbor compliance terms.

COMPLAINT

694.   Poway has not engaged in the iterative process outlined in the 2013 MS4 Permit, Provision A.4 with regard to the discharge prohibitions that occurred in Warren Canyon in 2017, 2019, and 2020. In any event, undergoing the iterative process of Provision A.4 (without also meeting the safe-harbor requirements of Provision B.3.c) with respect to these discharges would not shield Poway from a citizen suit if a threatened condition of pollution remains according to the plain meaning of the 2013 MS4 Permit.

695.   These violations are ongoing and continuous because the City of Poway has not fully enforced the law against private property owners in Warren Canyon who have their own unpermitted discharges of dredge and fill materials in Warren Creek, including tractor-disturbed stream crossings maintained, repaired, and/or built in 2016, 2017, 2018, 2019, and/or 2020.

696.   In 2017, 2018, 2019, and 2020, the City has not properly addressed the non-storm water discharges from its MS4 above Lake Poway containing residual waste which are aggravating a condition of pollution in Lake Poway.

697.   Because the condition of pollution that is occurring and that is threatening to recur in Warren Creek and Lake Poway is aggravated by non-storm water discharges containing pollutants, the MEP standard does not apply to non-storm water discharges into the MS4 and/or receiving waters that are causing and threatening to cause and aggravating the condition of pollution. The standard to be applied to non-storm water discharges is much stricter and requires "effective prohibition."

COMPLAINT

698.   The City of Poway will continue to violate the Clean Water Act in the future unless and until the City is instructed by a federal district judge that the Clean Water Act is applicable to Lake Poway and its watershed area.

699.   The City of Poway will continue to violate the Clean Water Act in the future unless and until the City is instructed by a federal district judge to dredge the Boulder Bay area of Lake Poway, remove the waste pollution deposited there, and restore the damaged stream and wetlands there.

700.   The City of Poway will continue to violate the Clean Water Act in the future unless and until the City is instructed by a federal district judge to dredge the Warren Crossing area, remove the waste pollution deposited there, and restore and re-establish the wetlands there.

701.   The City of Poway will continue to violate the Clean Water Act in the future unless and until the City is instructed by a federal district judge to commence enforcement actions under the Clean Water Act against those in Warren Canyon who have installed/maintained illegal stream crossings over Warren Creek without the proper permits.

702.   Unless the City of Poway desists in its violations of the 2013 MS4 Permit and Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p), Plaintiff will suffer irreparable harm.

703.   From February 26, 2017 to the present, each day that the City has caused, contributed to, or failed to prohibit exceedances of water quality standards by allowing unpermitted

COMPLAINT

waste to remain and accumulate in Warren Canyon and Lake Poway is a separate and distinct violation of the applicable 2013 MS4 Permit and 33 U.S.C. §§ 1311(a) and 1342(p).

704.    These violations are ongoing and continuous. In light of the City's history of violations and the nature of the violations, the City will continue to violate these requirements in the future unless and until enjoined from doing so.

705.    By committing the acts and omissions alleged above, Defendant City is subject to an assessment of civil penalties for each violation of 33 U.S.C. § 1311(a).  See 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4 (February 6, 2019).

706.    An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Defendant must be subject to an injunction ordering them to cease activities in violation of the Clean Water Act and to commence abatement activities.

707.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

708.    An action to seek attorney fees and costs from the City of Poway for the prosecution of this case under the Clean Water Act is authorized under 33 U.S.C. § 1365(d).

709.    An action to apply civil penalties against the City of Poway under 33 U.S.C. § 1319(d) is authorized by the Clean Water Act Section 505(a), 33 U.S.C. § 1365(a).

710.    Allowing the commission of the acts and omissions alleged above to continue will irreparably harm Plaintiff, for which he has an insufficient and inadequate remedy at law.

711.    Plaintiff prays for judgment against Defendant City with remedies as set forth below.

COMPLAINT

**SECOND CAUSE OF ACTION**

**Non-Storm Water Discharges into and/or from the City's MS4 Aggravating a**

**Condition of Pollution in Receiving Waters Without the Use of Effective Controls to**

**Reduce and Minimize the Discharges Containing Pollutants and/or the Lack of a**

**Separate NPDES Permit in Violation of the 2013 MS4 Permit and CWA Sections**

**301(a) and 402(p), 33 U.S.C. §§ 1311(a) and 1342(p).**

712.    Plaintiff incorporates by reference each and every allegation contained above, as though set forth fully herein.

713.    Discharges of non-storm spring water from Rock Haven and from Mount Woodson, which are themselves sources of pollutants to receiving waters, into the City of Poway's MS4 and into Lake Poway have aggravated a condition of pollution and the loss of the beneficial uses of Lake Poway each and every day from February 26, 2017 to April 20, 2017, from February 5, 2019 to June 5, 2019, and from March 31, 2020 to June 15, 2020, which are each separate and distinct violations of the City's 2013 MS4 Permit as stated in the First Cause of Action.

714.    One of the main sources of soluble phosphorous into the City of Poway's MS4 is from Kelly Spring, located at 32.9998 Latitude, -116.9749 Longitude, which is under the City of Poway's jurisdiction and on Plaintiff's property.

715.    Total Phosphorus levels from discharges from Kelly Spring exceeded the non-storm action level (NAL) for inland surface waters (see Poway's JRMP) more than 90% of the time between March 18, 2019 and June 5, 2019.

COMPLAINT

716.    On March 18, 2019, exceedances of the NALs for iron and phosphorous occurred downstream of Warren Crossing.

717.    On March 28, 2019, exceedances of the NAL for phosphorous occurred at Fisherman's Footbridge.

718.    On April 14-15, 2019, exceedances of the NALs for total phosphorous and total nitrogen occurred downstream of Warren Crossing.

719.    On May 4-5, 2019, exceedances of the NALs for total phosphorous and for Enterococcus occurred downstream of Warren Crossing.

720.    On May 30-31, 2019, exceedances of the NALs for phosphorous and for Enterococcus occurred downstream of Warren Crossing.

721.    On June 4, 2019, exceedances of the NALs for phosphorous and for Enterococcus occurred downstream of Warren Crossing.

722.    On May 15, 2020, exceedances of the NALs for iron, phosphorous, and Enterococcus occurred at Warren Crossing.

723.    The location of Rock Haven Spring is part of the public record as it is located in Caltrans's right of way within the City of Poway. The 2013 MS4 Permit mandates that the City of Poway is responsible for discharges from Rock Haven Spring into its MS4 on the City-owned parcel located at APN: 278-210-1100. Provision E.2.b.(6).

724.    By June 13, 2019, volume flows from Kelly Spring dropped below 5 gallons per minute and the reduced volume flows resulted in discharges below the NAL for total phosphorous due to biological uptake.

COMPLAINT

725.    Over the last 50 years, including as recently as 2016, the residents of Warren Canyon have altered the wetland system surrounding Kelly Spring, resulting in the reduction of its phosphorous-retention capacity.

726.    Other wetland systems in Warren Canyon including on the City-owned property surrounding Warren Crossing, located at 33.003 Latitude, -117.006 Longitude, have also lost pollutant-retention capacity as a direct result of anthropogenic activity.

727.    Increased nutrient concentrations – such as nitrogen and phosphorous – in natural water systems, can impact water quality and clarity and contribute to algal blooms that impact native vegetation and interfere with the springs' ecosystems and Lake Poway's ecosystem. Increases in nutrients in Poway's ecosystems and water resources result from a variety of activities, including illegal earth moving activities over the creek, unpermitted dirt-backfilled culverts and/or constructed fords at approximately a dozen locations upstream of Lake Poway, wetlands vegetation removal in the area surrounding Kelly Spring and in the area surrounding Warren Crossing, and wells and failing septic tanks in Warren Canyon.

728.    Biological uptake of pollutants such as nitrogen and phosphorous from the spring water in Warren Canyon has been reduced by wetland destruction at specific locations in Warren Canyon, including at Warren Crossing and on APN: 278-210-1800, the parcel containing Kelly Spring.

729.    Excessive bacterial and nutrient levels of the spring water discharges as measured at Warren Crossing through the months of February, March, April, May, and June

COMPLAINT

2019 and in May 2020 which exceeded NALs listed in Poway's JRMP indicated that leaking septic tanks in Warren Canyon have contributed to some of the pollution in Lake Poway.

730.   On April 15, 2019, the single sample result registered exceedances of the Enterococcus limit (500/100 mL) NAL downstream of Warren Crossing.

731.   On May 5, 2019, the single sample result registered exceedances of the Enterococcus limit (240/100 mL) NAL downstream of Warren Crossing.

732.   On May 5, 2019, the single sample result registered exceedances of the fecal coliform limit (1600/100 mL) NAL downstream of Warren Crossing.

733.   On May 31, 2019, the single sample result registered exceedances of the Enterococcus limit (130/100 mL) NAL downstream of Warren Crossing.

734.   On June 4, 2019, during the dry season, the single sample result registered exceedances of the Enterococcus limit (240/100 mL) NAL downstream of Warren Crossing.

735.   On May 15, 2020, during the dry season, the single sample result registered exceedances of the Enterococcus limit (170/100 mL) NAL at Warren Crossing.

736.   Exceedances of NALs on various dates in the spring of 2019 and 2020 in Warren Canyon demonstrate that the various exceedances are not one-time, isolated occurrences; rather exceedances of NALs will recur on a seasonal basis during the winter and spring months of non-drought years in Warren Canyon.

737.   More than 90% of the time when the stream flow through Warren Crossing

COMPLAINT

consisted of dry-weather, non-storm spring water between the months of April, May and June 2019, the permitted MS4 contribution of phosphorous into Warren Creek and into Lake Poway (0.1 mg/L maximum daily action level (MDAL) non-storm water action level (NAL)) has been exceeded, oftentimes at levels double the amount allowable under the City's MS4 Permit, Poway's Jurisdictional Runoff Management Plan (JRMP), and the San Diego's Basin Plan.

738.    From February 16, 2019 to March 28, 2019, the permitted MS4 contribution of iron into Warren Crossing and into Lake Poway from non-storm water discharges (0.3 mg/L maximum daily action level non-storm action level (NAL)) was exceeded more than 50% of the time.

739.    Total Nitrogen levels of discharges from Warren Crossing into Lake Poway exceeded the NAL as adopted in Poway's JRMP periodically and on at least two occasions between February 5, 2019 and June 5, 2019.

740.    Exceeding a NAL as established in the Basin Plan, the 2013 MS4 Permit, and Poway's JRMP is evidence that non-storm water has been anthropogenically influenced.

741.    The ecosystem surrounding Kelly Spring has been anthropogenically influenced over the past 50 years including as recently as 2016 through the use of culverts and tractors and wetland vegetation removal (not by Plaintiff nor his agents but by previous landowners), which has lessened the phosphorous-retention capacity of the spring ecosystem. There is a trail located immediately above Kelly Spring (the

COMPLAINT

Warren Canyon trail) and to the immediate west of Kelly Spring, and at least three water wells within a 1000-feet radius of Kelly Spring. The location of the wells are as follows: 32.9983 Lat., -116.9756 Long.; 32.9980 Lat, -116.9758 Long., and 32.9983 Lat., -116.9767 Long.

742.    The violations continue on days when the spring water flows through the polluted sediment in the Boulder Bay area of Lake Poway and into the receiving waters of Lake Poway.

743.    The Maximum Extent Practicable (MEP) standard does not apply to non-storm water discharges into the MS4 and/or receiving waters. The standard to be applied to non-storm water discharges is much stricter.

744.    Non-storm water discharges must be addressed by the City of Poway, and Poway's proposals for the minimization of spring water discharges must be approved by the Department of the Army and the San Diego Water Board. The City of Poway has failed to properly address the non-storm spring water discharges into Lake Poway in 2017, 2018, 2019, and 2020 according to discharge Prohibition Provision A.1.b of the 2013 MS4 Permit; see also 33 U.S.C. § 1311(a).

745.    The City of Poway has not "effectively prohibited" the non-stormwater discharges coming from springs into its MS4 and the illicit connections (e.g., the unauthorized stream crossings on private property upstream of Lake Poway) and discharges affecting the water quality and pollutant concentrations of the spring water in the Lake Poway watershed in 2017, 2019, and 2020.

COMPLAINT

746.    Unless the City desists in its violations of the 2013 MS4 Permit, 33 U.S.C. §§ 1311(a) and 1342(p), or obtains a separate NPDES permit for non-storm water discharges of polluted spring water, Plaintiff and the public will suffer irreparable harm.

747.    The City of Poway has not effectively enforced the Clean Water Act, state law, and the 2013 MS4 Permit in the streams feeding Lake Poway with regard to City projects in waters of the state and has not effectively enforced the Clean Water Act, state law, and the 2013 MS4 Permit as to the discharges of fill and dredged materials in Warren Creek on private property upstream of Lake Poway.

748.    The City has been presented with a feasible plan to reduce the non-storm water discharges into its MS4 through wetland repair projects on APN: 278-210-1800 that will reduce non-storm water spring flows into the City's MS4 and into Lake Poway.

749.    The City's 2013 MS4 permit requires that the spring water emanating from Mount Woodson be addressed as a priority concern because of the traceable pollution that has resulted in Lake Poway in 2017, 2019, and 2020 and because Warren Canyon and Lake Poway have been designated as ESAs by the City of Poway.

750.    The City of Poway has the resources to purchase APN: 278-210-1800 for its ecological and water resource values and to construct the rock weirs that will control and reduce storm and non-storm water flows before they enter Lake Poway. For example, the City of Poway is slated to receive over $9 million from the American Rescue Plan Act of 2021 which can be used for city water projects under Section 603.

COMPLAINT

751.    The City of Poway has not come up with an alternative <u>effective</u> and <u>feasible</u> plan approved by the San Diego Water Board, along with compensatory mitigation for the engineered structures, to segregate the non-storm water spring water discharges <u>into</u> its MS4 before they are discharged into Lake Poway.

752.    The City of Poway has no intention of obtaining a separate NPDES permit for the spring water flows from Mount Woodson containing pollutants.

753.    As Poway has not used the "Prohibitions and Limitations Compliance Option" as outlined in Provision B.3.c.(1) and (2) with respect to its stormwater and non-stormwater discharges of polluted sediment and spring water flows containing pollutants such as phosphorous, iron, indicator bacteria, and nitrogen that are aggravating a condition of pollution in receiving waters in the SDR watershed (no numeric goals were set for any of these constituents and there was no public participation process addressing the "option"), Poway is liable under Provision A and must implement Provisions A.4 and E.2 and properly address the flows containing pollutants from Kelly Spring and Rock Haven Spring together with the unpermitted waste deposits from washed-out stream crossings into its MS4.

754.    By committing the acts and omissions alleged above, the City is subject to an assessment of civil penalties for each and every violation of the Clean Water Act occurring from February 26, 2017 to the present. <u>See</u> 33 U.S.C. §§ 1319(d), 1365(a); and 40 C.F.R. § 19.4 (February 6, 2019).

COMPLAINT

755.    An action for injunctive relief is authorized by Clean Water Act Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff.

756.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

757.    An action to seek attorney fees and costs from the City of Poway for the cost of the prosecution of this case under the Clean Water Act is authorized under 33 U.S.C. § 1365(d).

758.    Plaintiff has no adequate remedy at law.

759.    Plaintiff prays for judgment against Defendant City as set forth below.

### THIRD CAUSE OF ACTION

**Failing to Monitor and Report Wet and Dry Weather Discharges and Identify Sources of Non-Storm Water Discharges and Illegal Connections in Violation of the 2013 MS4 Permit and Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p).**

760.    Plaintiff realleges, as set forth fully herein, each and every allegation contained in the preceding paragraphs.

761.    After receiving information of non-storm water flows containing pollutants in Warren Canyon/Lake Poway, the City of Poway is required to conduct wet and dry weather monitoring of the non-storm water flows coming into Lake Poway, but it has failed to do so in 2017, 2018, 2019 and/or 2020.

COMPLAINT

762.    The City of Poway is required to identify the complete storm sewer conveyance immediately upstream of Lake Poway (including third-party connections) and their connections into Lake Poway and to downstream waters below the Warren Canyon dam, but it has failed to do so.

763.    The City of Poway is required to conduct wet and dry weather monitoring of the Warren Canyon area on regular basis. It has failed to do so and to accurately report the constituents in the stormwater and non-stormwater discharges to Lake Poway to the San Diego Water Board.

764.    The City of Poway's parcels containing its point sources that discharge pollutants into and from its MS4 to receiving waters include the following: APN 278-280-2300; APN 278-281-0100; and APN: 278-210-1100.

765.    Cross-draining culverts can be found along the hiking trails above Lake Poway including at the following locations: 33.003, -117.008; 33.004, -117.009; and 33.0047, -117.0110.

766.    Poway's MS4 culverts placed in WOTUS include the following locations: 33.0030, -117.0057 and 33.0062, -117.0052.

767.    Fisherman's Footbridge, located at 33.0039 Latitude, -117.007 Longitude, is part of the City's MS4.

768.    The City of Poway is required to identify non-storm water discharges coming from its MS4. The City of Poway has not properly identified, mapped, and monitored the

COMPLAINT

flows of Rock Haven Spring and Kelly Spring which are sources of non-storm water pollutants in its MS4 and into Lake Poway.

769.    The City of Poway is required to respond to Plaintiff's reports of non-storm water discharges in Warren Canyon with monitoring and reporting of its own to fulfill the 2013 MS4 Permit, Provisions E.2.d, E.2.d.(1), E.2.d.(2), E.2.d.(3), and E.2.d.(4). After receiving Plaintiff's reports as documented in the July 27, 2018, November 5, 2018, May 24, 2019, October 1, 2019, and February 5, 2021 NOVs, the City of Poway has not fully fulfilled the mandated requirements of the 2013 MS4 Permit, Provisions E.2.d., E.2.d.(1), E.2.d.(2), E.2.d.(3), and E.2.d.(4).

770.    The City of Poway is required to monitor the water quality of the non-storm water discharges coming from its MS4 and into Lake Poway. It has failed to do so in a timely and thorough fashion in 2017, 2018, 2019, and 2020.

771.    The City is required to report its illegal discharges and illegal connections, including those of third parties, and update the Water Quality Improvement Plan and identify water quality improvement strategies such as stream rehabilitation projects that will be implemented to reduce or eliminate any pollutants or conditions that are causing or contributing to the exceedance of water quality standards and are resulting in discharge prohibitions. The City has failed to do so in 2017, 2018, 2019, and/or 2020.

COMPLAINT

772.    Poway has not fulfilled the reporting requirements of the 2013 MS4 Permit, Provision E.2.d.(4) with regard to the non-storm water discharges in the Lake Poway area in 2017, 2019 and 2020.

773.    Because waste-contaminated non-storm spring water has been discharged into the City's MS4, the City of Poway is required to report the discharges as illicit discharges/connections to the San Diego Water Board. It has failed to do so in a timely fashion in 2017, 2018, 2019, and/or 2020.

774.    The City has violated and continues to violate the 2013 MS4 Permit, Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p), by failing to update its Water Quality Improvement Plan and identify water quality improvement strategies such as stream rehabilitation projects in the subwatershed area above Lake Poway that will be implemented to reduce or eliminate any pollutants or conditions that are causing or contributing to the exceedance of water quality standards from storm and non-storm water, including those in the Basin Plan.

775.    The City has violated and continues to violate the 2013 MS4 Permit by failing to submit an adequate and accurate Waste Discharge Report, which is required for NPDES Permit renewal, and by failing to submit an adequate Water Quality Improvement Plan Annual Report documenting all discharges from the MS4 that have caused or contributed to exceedances of water quality standards in the subwatershed area containing Lake Poway in 2017, 2018, 2019, and/or 2020.

COMPLAINT

776.    The City of Poway has failed to include the NALs of Provision C.1.a in its current Water Quality Improvement Plan as required by Provision C to identify pollutants in non-storm water that must be addressed by the City according to Provision E.2.

777.    These violations are ongoing and continuous. In light of the City's history of violations and the nature of violations, the City will continue to violate these requirements to monitor and report discharges and implement the 2013 MS4 Permit's action levels in the future unless and until enjoined from doing so.

778.    The City has failed to identify the location and the health of septic tanks to the San Diego Water Board throughout Warren Canyon within City limits in 2017, 2018, 2019, and/or 2020.

779.    Several septic tanks on private property are located in proximity to Warren Creek in Warren Canyon. At least one of these septic tanks was failing in 2019 and 2020 and contributed some of the nutrient and bacterial pollutants at Warren Crossing and into Lake Poway.

780.    Each Copermittee is responsible for prioritizing its efforts to eliminate non-storm water and illicit discharges or connections to its MS4 based on field screening and monitoring data including satellite imagery, the non-storm water action levels (NALs) of Provision C to support the detection and elimination of non-storm water and illicit discharges to the MS4, required pursuant to Provision E.2, and illicit discharge investigation records collected from septic tank monitoring and reporting of unpermitted

COMPLAINT

structures such as stream crossings to the San Diego Water Board; however, Poway has failed to undertake these responsibilities in 2017, 2018, 2019, and/or in 2020.

781.    Poway has not reduced sources of non-storm water in Warren Canyon as required by Provision E.2.a. and Poway's JRMP by eliminating illicit discharges or connections and by enforcing its legal authority pursuant to Provision E.1 in years 2017, 2018, 2019, and 2020 against the private parties in Warren Canyon who have unauthorized stream crossings over Warren Creek.

782.    Each Copermittee must implement practices and procedures to prevent and limit infiltration of seepage from sanitary sewers (including private laterals and failing septic systems) to the MS4, 2013 MS4 Permit, Provision E.2.b.(5), but Poway continues to refuse to protect its watershed feeding its reservoir by failing to implement Provision E.2.b.(5) with regard to Warren Canyon and the several septic tanks installed throughout the canyon.

783.    The City's legal authority must also include monitoring and reporting spills, dumping, or disposal of materials and other unpermitted fills and mobile pollutants into its MS4 in the interconnected privately owned storm water conveyance system within its jurisdiction and parts controlled by other entities such as Caltrans, 2013 MS4 Permit, Provisions E.1.a.(1-10) and E.2.d.(3)(c), but Poway fails to fulfill these requirements and protect its own watershed into Lake Poway.

784.    In its proposed 2021 WQIP update, the City of Poway erroneously noted that "Lake Poway is not part of the MS4, with no discharges to MS4 infrastructure or into the

COMPLAINT

watershed. Therefore, the City did not identify Lake Poway on the maps in Appendix B." San Dieguito WMA WQIP Updated 2021, Appendix D, D-38. The city of Poway has incorrectly labeled Lake Poway as not part of its MS4; rather, it must release water from its dam to the watershed below via an outlet pipe when there is stream flow in Warren Canyon between June 1 and October 31 of any given year as was the case in 2019 and in 2020. As such, Lake Poway is part of the City's MS4.

785.    Unless the City desists in its violations of the 2013 MS4 Permit, 33 U.S.C. §§ 1311(a) and 1342(p), Plaintiff and the public will suffer irreparable harm.

786.    Plaintiff requests that the City of Poway be assessed civil penalties for each reporting and monitoring violation of the 2013 MS4 Permit in years 2017, 2018, 2019, and 2020.

787.    Plaintiff has an inadequate remedy at law.

788.    Plaintiff requests an injunction to force the City of Poway to adequately monitor and report on non-storm water discharges in the Lake Poway watershed, including third-party illicit discharges, according to the requirements of the 2013 MS4 Permit.

789.    Plaintiff prays for judgment against Defendant City as set forth below in the Remedies section.

///

///

///

///

COMPLAINT

**FOURTH CAUSE OF ACTION**

**Failing to Reduce Pollutants in Storm Water Discharges from the City's MS4 to the MEP in Violation of the 2013 MS4 Permit and Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p)**

790. Plaintiff incorporates by reference each and every allegation contained above, as though set forth fully herein.

791. The City of Poway's parcels containing its point sources that discharge pollutants into and from its MS4 to receiving waters include the following: APN 278-280-2300; APN 278-281-0100; and APN: 278-210-1100.

792. Cross-draining culverts can be found along the hiking trails above Lake Poway including at the following locations: 33.003, -117.008; 33.004, -117.009; 33.0047, -117.0110, and 33.0046, -117.0100.

793. MS4 culverts placed in WOTUS include the following locations: 33.0030, -117.0057 and 33.0062, -117.0052.

794. Although the City controls land areas that are generating polluted stormwater, the City of Poway has failed to reduce pollutants in storm water to its MS4 and from its MS4 to the maximum extent practicable in violation of 2013 MS4 Permit, Provision A.3.a. by failing to enforce and implement BMPs as listed in its 2013 MS4 Permit, its JRMP, and its BMP Manuel as approved by the San Diego Water Board for projects on City land as well as projects on private land within the City of Poway's jurisdiction in 2017, 2018, 2019, and 2020.

COMPLAINT

795. The City of Poway has failed to effectively enforce the 2013 MS4 Permit and its terms as incorporated in its JRMP against the third parties in Warren Canyon who have unauthorized stream crossings in Warren Canyon and who have reconstructed stream crossings upstream of Lake Poway in 2017, 2018, 2019, and/or 2020 without obtaining authorization and/or without installing required controls/BMPs to reduce pollutants in stormwater to the MEP.

796. Poway failed to engage in best management practices by failing to install and maintain BMPs in its MS4 to limit the amount of stormwater pollution from entering Lake Poway on February 26-28, 2017, on February 14-16, 2019, and on April 5-10, 2020.

797. The City of Poway has failed to clean out its culverts within streams above Lake Poway and its cross-draining culverts along its hiking trails above Lake Poway before the 2017, 2018, 2019, and/or 2020 storm seasons to lessen pollution from its MS4 and into Lake Poway during the rainy season as required by Poway's JRMP, which was approved by the San Diego Water Board.

798. Discharges of storm water were not reduced to the MEP from its cross-drainage culverts in the Lake Poway area on February 26-28, 2017 and February 14-16, 2019.

799. The City of Poway failed to prescribe effective onsite, source control, and/or structural best management practices (BMPs) to its development projects completed in 2017 in Warren Canyon to reduce pollutants in storm water discharges from the City's MS4 to the maximum extent practicable.

COMPLAINT

800.    The City of Poway failed to implement the maintenance and restoration of the natural storage reservoir and drainage corridors downstream of the Piperin Crossing project, located at Latitude 33.0046, Longitude -117.0100 and constructed in 2017.

801.    The Piperin Crossing project was constructed without the proper BMPs/source controls/ and/or LID BMPs to reduce pollutants in storm water from the City's MS4 during the 2018, 2019, and 2020 seasons to the maximum extent practicable. The City of Poway's 2013 MS4 Permit and its JRMP required the City to implement an effective low impact development (LID) BMP downstream of the Piperin Crossing, including filtering rocks and meshes within the culvert, as a feasible way to reduce pollutants in storm water to the MEP.

802.    The City of Poway's failure to document the reasons why certain BMPs were not implemented/required at the Piperin Crossing project, even though it is a development project of the City permitted by the City Council, is evidence that the 2013 MS4 Permit and its MEP standard has been violated.

803.    Discharges from the Piperin Crossing culvert were not reduced to the MEP on February 14-16, 2019 or on April 5-10, 2020.

804.    According to 2013 MS4 Permit, Finding 16, "[w]aste and pollutants which are deposited and accumulate in MS4 drainage structures will be discharged from these structures to waters of the U.S. unless they are removed; these discharges may cause or contribute to, or threaten to cause or contribute to, a condition of pollution in receiving waters;" yet, even though the polluted waste sediment deposited in the

COMPLAINT

City's MS4 in 2017, 2019, and 2020 contains excess phosphorous and other constituents, the City refuses to reduce the polluted discharges of storm water from Warren Creek and the Boulder Bay area of Lake Poway and into the drinking water reservoir to the MEP by dredging out the excess waste sediment coming from unpermitted stream crossings in Warren Canyon that have been deposited in Warren Creek at Warren Crossing and in its mouth at Boulder Bay as required by its JRMP.

805.    The City of Poway has failed to prescribe BMPs to its development project at the Lake Poway boat dock replacement during the planning and construction process or to provide documentation as to why these BMPs were not needed.

806.    Provision E.3.a.(3) requires the maintenance or restoration of the storage reservoir at the site of the boat dock and its replacement in 2017 where applicable and feasible or documentation as to why the BMPs are not needed.

807.    The City of Poway failed to implement the restoration of the natural storage reservoir and drainage corridors downstream of the Warren Creek Crossing project in 2017. The natural flow of the main tributary into Lake Poway is still blocked by excess sediment, preventing the free flow of clean water into the reservoir. The City of Poway's 2013 MS4 Permit and its JRMP required the City to implement BMPs downstream of the Warren Creek Crossing as it is a feasible way to reduce pollutants in storm water to the MEP.

808.    Had the City obtained the proper local permits (i.e. 401 certification and/or waste discharge requirements from the San Diego Water Board) the City would had been

COMPLAINT

required by the San Diego Water Board to implement the aforementioned source control, onsite, and/or other required BMPs at the Warren Creek Crossing, at the Piperin Corp. Crossing, and at the boat dock in Lake Poway where feasible and applicable.

809.    The Warren Crossing installed by the City of Poway using dirt backfill would not reduce pollutants from its MS4 and into Lake Poway to the maximum extent practicable.

810.    Discharges from the Warren Crossing culvert were not reduced to the MEP on February 26-28, 2017, on February 14-16, 2019, and on April 5-10, 2020.

811.    To reduce pollutants in storm water discharges at the location of the Warren Crossing to the maximum extent practicable, the City of Poway should have installed a bridge with abutments instead of a culvert which will not withstand storm surges of an expected 50-year storm event.

812.    Had the City of Poway not given false information to the San Diego Water Board concerning the type and nature of the stream flowing in Warren Canyon and into Lake Poway, the San Diego Water Board would have required something other than a dirt-backfilled culvert system at Warren Crossing to meet the MEP standard and/or additional BMPs/rehabilitation of the stream channel.

813.    The City of Poway has not installed sufficient BMPs/controls as required by its JRMP in the vicinity of Warren Crossing in the Lake Poway area in 2017, 2018, 2019, and 2020 to fully protect its downstream water supply to the maximum extent practicable.

COMPLAINT

814.    The Warren Crossing Project, the Piperin Crossing Project, and the Lake Poway boat dock replacement project are all considered "development projects" as that term is used in the 2013 MS4 Permit, Provision E.3.a.

815.    The City of Poway has not documented the reasons why the BMPs as described in Provision E.3.a and its JRMP were not needed for its Warren Crossing Project, the Lake Poway boat dock, and/or its Piperin Crossing project in 2017 even though all of these projects were permitted by Poway's City Council.

816.    The BMPs, if any, that the City of Poway did prescribe for its development projects in Warren Canyon in 2017 do not completely fulfill the requirements of its 2013 MS4 Permit, Provision E.3.a. and its JRMP.

817.    Because the City of Poway has not obtained an individualized DA permit or water quality certification from the San Diego Water Board for Warren Crossing, it has not reduced pollutants in stormwater to the MEP on February 14-16, 2019 and April 5-10, 2020 in violation of Provision A.3.a. of the 2013 MS4 Permit.

818.    Because the city of Poway has not obtained a waste discharge requirements for Piperin Crossing from the San Diego Water Board, it has not reduced pollutants in stormwater to the MEP on February 14-16, 2019 and April 5-10, 2020 in violation of Provision A.3.a. of the 2013 MS4 Permit.

819.    Because the City of Poway has not obtained a DA permit, a water quality certification, and/or waste discharge requirements for its new boat dock built in 2017,

COMPLAINT

it has not reduced pollutants in stormwater to the MEP on February 14-16, 2019 and April 5-10, 2020 in violation of Provision A.3.a. of the 2013 MS4 Permit.

820.    These violations are ongoing and continuous. The City of Poway will continue to violate the Clean Water Act in the future unless and until it is enjoined from doing so.

821.    Unless the City of Poway desists in its violations of the 2013 MS4 Permit and Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p), Plaintiff and the public will suffer irreparable harm.

822.    Plaintiff requests that the City of Poway be assessed civil penalties under the Clean Water Act for failing to reduce pollutants in stormwater to the MEP on February 27-28, 2017, on February 14-16, 2019, and on April 5-10, 2020.

823.    Plaintiff has an inadequate remedy at law.

824.    Plaintiff prays for judgment against Defendant City as set forth below.

**FIFTH CAUSE OF ACTION**

**Dredging and Filling Waters of the United States in Violation of Section 301, 401, and 404 of the Clean Water Act, 33 U.S.C. §§ 1311, 1341, 1344.**

825.    Plaintiff re-alleges and incorporates herein by this reference the preceding paragraphs of this Complaint.

826.    Warren Creek is Waters of the United States under Justice Kennedy's (and the Ninth Circuit's) case law describing the significant nexus test (the EPA's Rapanos Rule of 2008), under pre-2015 EPA regulations promulgated in the 1980s (because it is a

COMPLAINT

seasonal intermittent stream), and under the Trump Administration's  WOTUS rules

(because it is an intermittent stream connected to navigable waters used in interstate

commerce).

827.   Lake Poway is Waters of the United States under Justice Scalia's <u>Rapanos</u> decision,

under pre-2015 EPA regulations promulgated in the 1980s, under the Trump

Administration's Navigable Waters Protection Rule, and under case law developed over

the last 50 years by the federal courts because Lake Poway is navigable-in-fact waters

used for commercial navigation.

828.   Lake Poway and Warren Creek are WOTUS under the Trump Administration's

Navigable Waters Protection Rule because of the natural seasonal springs and elevated

groundwater table feeding Warren Creek and flooding Lake Poway on an intermittent,

seasonal basis for weeks and/or months of a typical non-drought year.

829.   Lake Poway, which is a fishable reservoir open to the general public including out-of-

state and foreign tourists and is used for commercial navigation (rental boats), is a water

used in interstate commerce.

830.   In rebuilding its earthen stream crossings beginning in the spring of 2017, the City of

Poway dredged vegetation and sediment from Warren Creek and placed fill materials in

Warren Creek without seeking or obtaining individualized Section 404 permits from the

Army Corp of Engineers or individualized Section 401 certifications from the San Diego

Water Board for dredging and filling activities in an intermittent stream.

COMPLAINT

831.    The City's activity on April 17-20, 2017 at Warren Crossing caused unauthorized discharges of dredged and fill materials into waters of the United States in violation of the Clean Water Act Sections 301, 401, and 404.

832.    The City of Poway has undertaken unauthorized work in Waters of the United States as defined by the Clean Water Act and the permitting authorities.

833.    The City of Poway does not have, has never had, and has never applied for an *individualized* Section 401 certification for any of its stream crossings or other structures in Waters of the United States located in the watershed area above Lake Poway.

834.    The City of Poway does not have, has never had, and has never applied for an *individualized* Section 404 permit for any of its stream crossings or other structures in Waters of the United States located in the watershed area above Lake Poway.

835.    The generalized emergency permit/certification that the City of Poway obtained in 2017 for Warren Crossing cannot be used in non-emergency situations and cannot be used for dredging and filling activities above a public water supply intake area.

836.    The City of Poway's unauthorized work in 2017 occurred in a non-emergency situation and involved dredging and filling activities immediately above a public water supply intake area.

837.    The generalized permit that the City of Poway tried to obtain did not contain a full description of all the work done in Waters of the United States including the dredging and filling activities involved in constructing a concrete platform and conduit installed

COMPLAINT

between August 30, 2017 and September 25, 2017 that still remain within jurisdictional waters at Warren Crossing to this day.

838.   The City of Poway has undertaken unauthorized work in Waters of the United States as defined by the Clean Water Act and the permitting authorities because the City of Poway misled the Army Corps and the San Diego Water Board in 2017 by describing the work at Warren Crossing as done in an ephemeral tributary and in non-wetland waters. In actuality, the work done in 2017 to construct Warren Crossing took place in an intermittent stream fed by seasonal springs and an elevated groundwater table that flow into a navigable body of water used in interstate commerce.

839.   The Army Corp has asserted jurisdiction over all portions of the Warren Creek Crossing including the part of the stream that is more than ephemeral, the wetland waters, adjacent wetlands, and Lake Poway.

840.   The DA permit and Section 401 water quality certification that the City of Poway did obtain for constructing Warren Crossing in 2017 permitted discharges to an "ephemeral tributary to Lake Poway;" however, this permit and certification did not authorize work in intermittent waters.

841.   The discharge that occurred on April 17-20, 2017 when the construction work occurred to construct Warren Crossing was not a discharge into ephemeral, wet-weather storm water but rather an unpermitted discharge into intermittent, non-storm, dry-weather spring waters and rising groundwaters, which were flowing those very days in Warren Creek and into Lake Poway during that time frame.

COMPLAINT

842.   All of the dredging and filling activities that occurred in 2017 at Warren Crossing was not fully described in the DA permit or water quality certification, including additional construction work of a concrete platform and conduit for a water-flow meter subsequently installed at the Warren Crossing area between August 30, 2017 and September 25, 2017, also resulting in additional unauthorized discharges of dredged and fill material to WOTUS.

843.   The dredging and filling activities installed in Warren Creek at Warren Crossing between August 30, 2017 and September 25, 2017 were discharged to WOTUS at Lake Poway between February 5, 2019 and June 5, 2019 and between March 31, 2020 and May 15, 2020 via stormwater and non-storm water.

844.   In the replacing its boat dock at Lake Poway in 2017, the City of Poway dredged the lake bottom, filled wetlands with new concrete, and/or anchored the new dock in WOTUS without seeking or obtaining a Section 404 permit from the Army Corp of Engineers or a Section 401 certifications from the San Diego Water Board. This activity caused unauthorized discharges of dredged and fill materials into waters of the United States in violation of the Clean Water Act Sections 301, 401, and 404.

845.   The City of Poway does not have, has never had, and has never applied for a Section 401 certification for its boat dock or other structures in Waters of the United States located in Lake Poway over the past 45 years, including in 2017 or thereafter.

COMPLAINT

206

846.    The City of Poway does not have, has never had, and has never applied for a Section 404 permit for its boat dock in Waters of the United States located in Lake Poway over the last 45 years, including in 2017 or thereafter.

847.    The City of Poway failed to undertake Endangered Species Act § 7 consultation with the wildlife agencies to ensure that its work in Waters of the United States conforms to its Habitat Conservation Plan, which is required by the Clean Water Act and regulations promulgated under it.

848.    The City of Poway, through its work in Lake Poway in 2017 at the location of its new boat dock, has undertaken unauthorized work in Waters of the United States as defined by the Clean Water Act and the permitting authorities.

849.    In 2019, the City of Poway, through the San Diego County Water Authority, undertook a jurisdictional delineation study of Lake Poway in response to this lawsuit.

850.    The City of Poway's ongoing and threatened future discharges of dredge and fill material and other pollutants from its activities in the Lake Poway area and upstream watershed constitute violations of the Clean Water Act Section 301, 401, and 404, 33 U.S.C. § 1311, 1341, and 1344.

851.    The City of Poway has violated and continues to violate Sections 404 and 401 of the CWA. There is a reasonable likelihood that the City of Poway will conduct future dredge and fill operations in the Lake Poway area and upstream watershed without obtaining individualized Section 404 permits from the Army Corps of Engineers or Section 401 certifications from the San Diego Water Board. There is also a reasonable likelihood that

COMPLAINT

207

the City of Poway will fail to obtain an after-the-fact Section 404 Permit and a Section 401 water quality certification for its boat dock and/or Warren Crossing.

852.    Plaintiff has provided the City of Poway and other state and federal officials with a sixty-day notice of the Clean Water Act violations alleged in this action, pursuant to the Clean Water Act's requirements and all applicable law. Clean Water Act § 505(b)(1)(A), 33 U.S.C. § 1365(b)(1)(A). More than 60 days have elapsed since Plaintiff provided notice to Defendant of the Clean Water Act violations alleged in this Complaint, and the violations remain unabated.

853.    Upon information and belief, neither the EPA nor the State has commenced and is diligently prosecuting an action for the Clean Water Act violations asserted in this Complaint.

854.    Unless the City of Poway desists in its violations of the CWA and engages in abatement activities, Plaintiff will suffer irreparable harm.

855.    Plaintiff requests that the City of Poway be assessed civil penalties for each violation of the Clean Water Act and each day of violation of the Clean Water Act in 2017, 2018, 2019, and 2020 for unpermitted dredged and fill work remaining in WOTUS at Warren Crossing and in Lake Poway.

856.    Plaintiff has an inadequate remedy at law and also requests injunctive relief including an order for the City of Poway to obtain after-the-fact Clean Water Act permits.

COMPLAINT

857.    Plaintiff requests that the City of Poway be ordered to undertake supplemental environmental projects as defined by the EPA such as those proposed on APN: 278-210-1800 to mitigate its harms to the environment.

858.    Plaintiff prays for judgment against Defendant City as set forth below.

**SIXTH CAUSE OF ACTION**

**Failing to obtain Waste Discharge Requirements for dredging and filling activities in Waters of the State in violation of the 2013 MS4 Permit and Section 402 of the Clean Water Act, 33 U.S.C. §§ 1311, 1342, and 1365(a)(1).**

859.    Plaintiff incorporates by reference each and every allegation contained above, as though set forth fully herein.

860.    The City of Poway has failed to obtain Waste Discharge Requirements for its dredging and filling activities in waters of the state for the Piperin Crossing project in violation of Provision E.3.a.(3)(a) n.25 of the 2013 MS4 Permit, Poway's JRMP, and Poway's BMP Manuel, Section 2.1.1.3.

861.    The City of Poway has failed to obtain Waste Discharge Requirements for its dredging and filling activities in waters of the state for Warren Crossing in violation of Provision E.3.a.(3)(a) n.25 of the 2013 MS4 Permit, Poway's JRMP, and Poway's BMP Manuel, Section 2.1.1.3.

862.    The City of Poway has failed to obtain Waste Discharge Requirements for its dredging and filling activities in waters of the state for the Lake Poway boat dock project

COMPLAINT

of 2017 in violation of Provision E.3.a.(3)(a) n.25 of the 2013 MS4 Permit, Poway's

JRMP, and Poway's BMP Manuel, Section 2.1.1.3.

863.   The City of Poway's failure to obtain waste discharge requirements continues to this

day. Every day that the City of Poway fails to actively obtain these permits from the San

Diego Water Board for its work at Warren Crossing and/or at Piperin Crossing and/or in

Lake Poway is a separate and distinct violation of the CWA subject to civil penalties.

864.   Plaintiff requests that the City of Poway be assessed civil penalties for each day of

violation of the 2013 MS4 Permit's requirement to obtain waste discharge requirements

from the San Diego Water Board from 2017 to the present for the structures remaining in

waters of the state in Warren Canyon.

865.   The City of Poway's failure to obtain waste discharge requirements is ongoing.

866.   Unless the City of Poway desists in its violations of the CWA, Plaintiff will suffer

irreparable harm.

867.   Plaintiff requests that the City of Poway be ordered to obtain after-the-fact waste

discharge requirements for its projects in Warren Canyon in 2017.

868.   Plaintiff requests that the City of Poway be ordered to undertake supplemental

environmental projects such as those proposed on APN: 278-210-1800 to mitigate its

harms to the environment.

869.   Plaintiff has an inadequate remedy at law and seeks remedies as set forth below.

///

COMPLAINT

210

## SEVENTH CAUSE OF ACTION

## <u>Taking of Endangered and Threatened Species Protected by the Endangered Species Act on Private Property (Section 9, 16 U.S.C. § 1538).</u>

870.    Plaintiff incorporates the allegations set forth above as though fully set forth herein, and alleges as follows:

871.    The City of Poway has violated the Endangered Species Act § 9 and its implementing regulations by causing a direct and/or indirect "take" of protected species by substantially modifying, degrading and/or destroying critical habitat of endangered and threatened species and/or by killing and/or harming endangered and threatened species when conducting trail construction and maintenance activities on Plaintiff's private property, APNs: 278-210-2900 and 278-210-3000.

872.    The City of Poway has cut endangered and threatened plants, including Del Mar Manzanita, without the private property owners' permission.

873.    The City has harmed endangered and threatened animal species and their critical habitat, including the California gnatcatcher and the least bell's vireo. The City is also in violation of 16 U.S.C. § 1538(a)(1) because Plaintiff's parcels contain critical habitat for the California gnatcatcher and the least bell's vireo, and the City's activities on Plaintiff's parcels have harmed these species and their habitat.

874.    The City of Poway has violated California state laws in the process of its trail construction and maintenance activities on Plaintiff's property including state trespassing laws.

COMPLAINT

875.    Poway and its agents have violated California Penal Code Section 384a(2) by its trail maintenance activities on Plaintiff's parcels. Poway has willfully and/or negligently cut plant material on APN: 278-210-2900 and APN: 278-210-3000 without written permission from the owners.

876.    Under Cal. Penal Code § 602, it is unlawful to cut down, destroy, or injure any kind of wood growing upon the lands of another. Poway and its agents have willfully cut down and injured wood on Plaintiff's parcels, APN: 278-210-2900 and APN: 278-210-3000.

877.    Article I, Section 19 of the California Constitution provides: "Private property may be taken or damaged for public use only when just compensation . . . has first been paid to, or into the court for, the owner."

878.    It is unlawful to commit, to attempt to commit, to cause to be committed or to solicit another to commit the following: Remove, cut, dig up, damage, or destroy a federally listed endangered plant on private property in violation of any law or regulation of any state including a state criminal trespass law. 16 U.S.C. § 1538(a)(2)(B).

879.    The City of Poway has solicited others to use Plaintiff's property, which has caused damage to federally listed endangered plants.

880.    Through its construction and maintenance activities on Plaintiff's private property, the City has violated various state laws as the unpermitted trails cross a blue-line stream feeding Lake Poway and contain federally endangered plant and animal species along the trails and in the vicinity.

COMPLAINT

212

881.    Due to the failure to mitigate the "take," as well as the City of Poway's continued management practices and the public's use of the trail system on private property, Plaintiff alleges that the City of Poway's violations of the Endangered Species Act as set forth in this Complaint are ongoing and will continue after the filing of this lawsuit.

882.    Plaintiff is informed and believes, and on such information and belief alleges, that without the imposition of the appropriate equitable relief, the City of Poway will continue to violate the Endangered Species Act with respect to the endangered and threatened species. Plaintiff is further informed and believes, and on such information and belief alleges, that the relief requested in this Complaint will redress the injury to Plaintiff including the endangered and threatened species, prevent future injury without just compensation and protect the interests of Plaintiff, the public at large, and preserve additional acreage containing endangered and threatened species to account for the Defendant's "take" in violation of the Endangered Species Act as set forth in this Complaint.

883.    Plaintiff has provided adequate 60-day notice to the City and the United States Department of the Interior.

884.    Upon information and belief, neither the federal government nor the state has commenced or is diligently prosecuting an action for the Endangered Species Act violations asserted in this Complaint.

885.    Plaintiff requests that the City of Poway be ordered to cease illegal activities on Plaintiff's properties.

COMPLAINT

213

886.   Plaintiff prays for judgment and relief against Defendant City as set forth below.

## EIGHTH CAUSE OF ACTION

**Lake Poway Watershed: Causing and Contributing to Exceedances of Water Quality Standards in Violation of the 2013 MS4 Permit and CWA Sections 301(a) and 402(p), 33 U.S.C §§ 1311(a) and 1342(p).**

887.   Plaintiffs reallege, as set forth fully herein, each and every allegation contained in the preceding paragraphs.

888.   The San Diego Basin Plan and other applicable regulatory documents establish a number of water quality standards for inland and coastal waters in the San Diego region, all incorporated by reference into the 2013 MS4 Permit. The Permit prohibits discharges that cause or contribute to exceedances of these water quality standards.

889.   This lawsuit, including information presented to the San Diego Water Board and other regulatory agencies, has documented exceedances of water quality standards in Warren Canyon since 2017.

890.   In violation of the 2013 MS4 Permit and the CWA, 33 U.S.C. §§ 1311(a) and 1342(p), as owner and/or operator of the MS4, the City of Poway has caused or contributed to, and is causing and contributing to, exceedances of water quality standards in the Lake Poway subwatershed, which is a portion of the San Dieguito Watershed, including tributaries and drainages to the Pacific Ocean.

891.   In violation of the 2013 MS4 Permit and the CWA, 33 U.S.C. §§ 1311(a) and 1342(p), as a result of its control of land areas that are generating polluted stormwater

COMPLAINT

and non-stormwater, the City of Poway has caused and contributed to, and is causing and contributing to, exceedances of water quality standards in the Lake Poway subwatershed, which is a portion of the San Dieguito Watershed, including tributaries and drainages to the Pacific Ocean.

892.   From February 26, 2017 to the present, each day that the City of Poway has caused or contributed to exceedances of water quality standards is a separate and distinct violation of the 2013 MS4 Permit and 33 U.S.C. §§ 1311(a) and 1342(p).

893.   Poway's discharges (including the discharges of third parties within and under its jurisdiction) that are causing a condition of pollution in Lake Poway are inherently in violation of the waste discharge prohibitions incorporated in the San Diego Water Board's Basin Plan in violation of Provision A.1.c. These MS4 discharges have contributed to a violation of water quality standards, including those in the Basin Plan. 2013 Permit, Provision A.2.a.; Id. at A.2.a.(1).

894.   These violations are ongoing and continuous. In light of the City of Poway's history of violations and the nature of the violations, the City of Poway will continue to violate these requirements in the future unless and until enjoined from doing so.

895.   Unless the City of Poway desists in its violations of the 2013 MS4 Permit and Sections 301(a) and 402(p) of the CWA, 33 U.S.C. § 1311(a) and § 1342(p), Plaintiff will suffer irreparable harm.

COMPLAINT

896.    Plaintiff requests that the City of Poway be assessed civil penalties for each

violation of the 2013 MS4 Permit's water quality standards in Lake Poway in 2017,

2019, and 2020.

897.    Plaintiff has an inadequate remedy at law and requests equitable and injunctive

relief as set forth below, including removal of the waste deposits.

## NINTH CAUSE OF ACTION

## SDR Watershed: Discharges from Poway's MS4 Containing Prohibited Waste in Violation of the 2013 MS4 Permit and CWA Sections 301(a) and 402(p), 33 U.S.C §§ 1311(a) and 1342(p).

898.    Plaintiffs reallege, as set forth fully herein, each and every allegation contained in

the preceding paragraphs.

899.    The City of Poway has also violated NPDES Permit No. CAS0109266, Provision

A.1.c: "Discharges from MS4s are subject to all waste discharge prohibitions in the

Basin Plan."

900.    The City of Poway's MS4 includes Warren Crossing, Fisherman's Footbridge, and

Lake Poway including its spillway and/or outlet pipe discharging to areas below Poway

dam.

901.    On February 26-28, 2017, February 14-16, 2019, and on April 5-10, 2020, the

unpermitted stream crossings in Warren Canyon that have become mobilized by storm

surges and that have entered into the City's MS4 further downstream are by definition

COMPLAINT

waste discharges prohibited by the Basin Plan and by the 2013 MS4 Permit, Provision A.1.c.

902.    The City of Poway is liable for these discharges from the City's MS4 and must remove the accumulation of waste at Warren Crossing, at the mouth of Warren Creek in Lake Poway, and in the Boulder Bay area of Lake Poway.

903.    Not only is the City liable for the unpermitted washed-out crossings owned by the City, the City is also liable for the unpermitted washed-out crossings owned by third parties within its jurisdiction and under its control that it has failed to prevent from entering into its MS4 and that it has failed to abate.

904.    As the City of Poway has not used the optional pathway to compliance under Provision B.3.c. of the 2013 MS4 Permit, the City cannot be deemed in compliance with Provision A.1.c. of the 2013 MS4 Permit despite the waste accumulating in its MS4 that is prohibited by the Basin Plan.

905.     Lake Poway has been deemed as having a high downstream hazard risk of flooding according to the state of California because of the seasonal streams feeding the reservoir. For example, water flooded over the dam in 1997, which was naturally funneled into the Pacific Ocean below the dam.

906.    The City of Poway has a license to use a fixed amount of the water from Warren Creek, which is a tributary to the San Dieguito River and thence the Pacific Ocean. The amount cannot exceed 858 acre-feet per season, and it can only be collected by the reservoir between November 1 of each year to May 31 of the succeeding year. The City

COMPLAINT

217

of Poway must maintain an outlet pipe of adequate capacity in the dam as near as practicable to the bottom of the natural stream channel in order that water entering the reservoir which is not authorized for appropriation under its license may be released downstream of the dam.

907.   In 2019 and again in 2020, the City of Poway was mandated under its 1987 water rights license agreement with the State Water Resources Control Board to release water from Lake Poway dam to the natural stream below the dam and to the San Dieguito River and hence to the Pacific Ocean everyday between June 1, 2019 to at least August 10, 2019 and between June 1, 2020 and August 3, 2020 because there was persistent stream flow in the Boulder Bay area of Lake Poway from Warren Creek during those time periods. This evidence shows that Lake Poway is not a terminal reservoir.

908.   On February 1, 2018, the City of Poway entered into a contract with Foth-CLE Engineering Inc., a Wisconsin company, to perform a bathymetric survey of Lake Poway in order to characterize the thickness of the terrestrial sediment that has deposited in the reservoir from its MS4 system following the Winter Storm Events of 2017.

909.   The City of Poway has stated in the public record that the need for this survey "became apparent" after the winter storms of 2017. City staff acknowledged that the course sediment pollution has buried most of its wooden bridge that only a few years ago was suspended over the waters of Lake Poway and that sediment buildup has blocked the natural flow of the tributary.

COMPLAINT

910.   To supply City engineers with options for the removal of terrestrial sediment from Boulder Bay and other identified areas of Lake Poway, CLE compiled a dredge report. The stated goal of the project was to assess the siltation and storage capacity of Lake Poway and to evaluate the removal of silt from Boulder Bay and adjacent areas.

911.   The 2018 report found that over 20,000 tons of sediment has accumulated in Boulder Bay since 1972.

912.   The maps complied by CLE show that sediment has built up over the years (i.e. shoaling) along the route of the historical stream (Warren Creek) within Lake Poway all the way to its spillway.

913.   The violations of the 2013 MS4 Permit's discharge prohibitions continue to this day because the polluted sediment has not been removed, which has lessened the reservoir's storage capacity and flood control capacity.

914.   These violations are ongoing and continuous. In light of the City of Poway's history of violations and the nature of the violations, the City of Poway will continue to violate the prohibitions of Provision A.1.c. of the 2013 MS4 Permit in the future unless and until enjoined from doing so.

915.   Unless the City of Poway desists in its violations of the 2013 MS4 Permit and Sections 301(a) and 402(p) of the CWA, 33 U.S.C. § 1311(a) and § 1342(p), Plaintiff will suffer irreparable harm.

916.   Plaintiff requests that the City of Poway be assessed civil penalties for each day that it has violated the waste discharge prohibitions of the 2013 MS4 Permit.

COMPLAINT

917.    Plaintiff has no adequate remedy at law and requests equitable relief as further described in the Remedies section, including removal of the waste deposits.

## TENTH CAUSE OF ACTION

### Poway's Takings Clause Violations under the Fourteenth Amendment of the U.S. Constitution, via 42 U.S.C. § 1983.

918.    Plaintiffs reallege, as set forth fully herein, each and every allegation contained in the preceding paragraphs.

919.    The City of Poway, acting under color of state law, has maintained unauthorized hiking trails on Plaintiff's private property in the watershed area above Lake Poway.

920.    Through its construction and maintenance activities on Plaintiff's private property, the City has violated various state laws as the unpermitted trails cross a blue-line stream feeding Lake Poway and contain federally endangered plant and animal species along the trails and in the vicinity.

921.    The City has designated Plaintiff's property as park/open space with hiking trails to the public in its maps available on its website even though Plaintiff's property is private property that is zoned residential.

922.    The City of Poway does not have an easement to use Plaintiff's property.

923.    The City of Poway has several volunteers under the authority and direction of Bob Hahn, Poway's Parks Maintenance Supervisor, who help maintain/restore the City's trails, including those on Plaintiff's parcels. Plaintiff has spoken with Mr. Hahn, and he has confirmed that the City maintains/restores the trails on Plaintiff's property on a

COMPLAINT

regular basis. Plaintiff observed the City's maintenance activities on Plaintiff's property during the first week of May of 2018.

924.   The City of Poway and its staff and agents have acted under the color of state law in operating its open space/trails system in Warren Canyon including on Plaintiff's property.

925.   The fire department uses the trails on Plaintiff's property as an auxiliary route in wildfire situations.

926.   City maintenance crews and volunteers use Plaintiff's trails instead of the City's official access point further south for safety reasons.

927.   Several people park their cars on Plaintiff's property to access the Warren Canyon trail rather than parking on the opposite side of Highway 67 and running through the plethora of speeding cars to get to the side where the trailhead is located.

928.   Even googlemaps has the trailhead for the Warren Canyon trail on Plaintiff's parcel, APN: 278-210-3000, because it is better maintained by City staff and its agents and is a safer trail with easier access than the alternative.

929.   For the most part, the City had stopped maintaining its official trailhead and has used Plaintiff's trailhead and properties instead without proper authorizations.

930.   The City uses Plaintiff's property because the alternative route is steep and dangerous, especially during the winter and spring months.

931.   The City of Poway, its citizens, and its agents likely will continue to use these trails in the future without authorization.

COMPLAINT

932.    The City of Poway has included the trails on Plaintiff's property as a planned trail on its official public map published on its website, which has invited others to use his trails without authorization.

933.    The City of Poway has taken and continues to take Plaintiff's property rights without just compensation.

934.    Plaintiff is entitled to reasonably attorneys' fees and costs under 42 U.S.C. § 1988 for the successful prosecution of this action.

935.    Plaintiff is entitled to just compensation relief as described in the Remedies section of this Complaint.

**ELEVENTH CAUSE OF ACTION**

**Poway's Substantive Due Process Violations under the Fourteenth Amendment of the U.S. Constitution, via 42 U.S.C. § 1983.**

936.    Plaintiffs reallege, as set forth fully herein, each and every allegation contained in the preceding paragraphs.

937.    The City of Poway's environmental policies affecting Plaintiff's property has deprived Plaintiff of his substantive due process/property rights protected under the Fourteenth Amendment.

938.    The City of Poway's policy of wrongly labeling Warren Creek as an "ephemeral stream" has deprived Plaintiff of his substantive due process/property rights protected by the Fourteenth Amendment to the U.S. Constitution because the City's illegal policy adversely affects Plaintiff and Plaintiff's land as a mitigation bank.

COMPLAINT

939.   The City of Poway's official and illegal policy regarding Warren Canyon has been affirmed by Poway's City Attorney and by Poway's City Council as documented by City Council minutes and by the documents the City has filed in this lawsuit.

940.   The City of Poway's policy of trying to remove the WOTUS designation for Warren Canyon has deprived Plaintiff of his substantive due process/property rights protected by the Fourteenth Amendment to the U.S. Constitution because the City's illegal policy adversely affects Plaintiff and Plaintiff's land as a mitigation bank.

941.    The City of Poway's policy of not fully treating City-owned structures and facilities in Warren Canyon as part of its regulated MS4 under the jurisdiction of the 2013 MS4 Permit has deprived Plaintiff of his substantive due process/property rights protected by the Fourteenth Amendment to the U.S. Constitution because the City's illegal policy adversely affects Plaintiff and Plaintiff's land as a mitigation bank.

942.   The City of Poway's policy of not adhering to the discharge prohibitions and land-use requirements of the 2013 MS4 Permit as set forth in this Complaint has deprived Plaintiff of his substantive due process/property rights protected by the Fourteenth Amendment to the U.S. Constitution because the City's illegal policy adversely affects Plaintiff and Plaintiff's land as a mitigation bank.

943.   The City of Poway's policy of not adhering to the requirements of the Clean Water Act in Warren Canyon as set forth in this Complaint has deprived Plaintiff of his substantive due process/property rights protected by the Fourteenth Amendment to the U.S. Constitution because the City's illegal policy adversely affects Plaintiff and

COMPLAINT

Plaintiff's land as a mitigation bank.

944.    The City of Poway's policy of not obtaining sufficient mitigation land at the required mitigation ratio to fulfill its regulatory permit requirements has deprived Plaintiff of his substantive due process/property rights protected by the Fourteenth Amendment to the U.S. Constitution because the City's illegal policy adversely affects Plaintiff and Plaintiff's land as a mitigation bank.

945.    The City of Poway through its staff and agents has acted under color of state law when setting its environmental policies in Warren Canyon described herein including those affecting Plaintiff and Plaintiff's property.

946.    Plaintiff is entitled to injunctive, other equitable, and declaratory relief under 42 U.S.C. § 1983 to address Defendant's violations of Plaintiff's civil rights as set forth below.

947.    Plaintiff is entitled to damages for Defendant's violations of Plaintiff's civil rights, including compensatory and/or nominal damages.

948.    Plaintiff is entitled to reasonably attorneys' fees and costs under 42 U.S.C. § 1988 for the successfully prosecution of this action.

**X. REMEDIES**

WHEREFORE, Plaintiff requests this Court to enter a judgment:

COMPLAINT

949.    Declaring Lake Poway as Waters of the United States under 28 U.S.C. § 2201 because it was built over an intermittent jurisdictional stream and is currently used for commercial navigation.

950.    Declaring Warren Creek as Waters of the United States at the location of the Warren Creek Crossing because it is an intermittent stream fed by seasonal springs and an elevated groundwater table that in its natural state drains into the Pacific Ocean.

951.    Declaring that the Clean Water Act is enforceable as to Lake Poway and the subwatershed area above Lake Poway.

952.    Declaring that the 2013 MS4 Permit is enforceable throughout Warren Canyon in the City of Poway.

953.    Declaring that Lake Poway is not a terminal reservoir but a component of the City's MS4 system.

954.    Declaring the City of Poway to have violated and to be in violation of the 2013 MS4 Permit and Sections 301(a) and 402(p) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1342(p), for discharges causing and contributing to or threatening to cause a condition of pollution in the receiving waters of the state and for exceedances of water quality standards at Warren Crossing and at Lake Poway in 2017, 2019, and 2020.

955.    Declaring the City of Poway to have violated the 2013 MS4 Permit for not reducing pollutants in its MS4 to the maximum extent practicable through best management practices and other water quality improvement projects in 2017, 2019, and 2020.

COMPLAINT

956.    Declaring the City of Poway to have violated the 2013 MS4 Permit for not fully addressing the non-storm water spring water discharges into its MS4 and into Lake Poway in 2017, 2019, and 2020.

957.    Declaring the City of Poway to have violated the 2013 MS4 Permit for not reducing/minimizing the non-storm spring water discharges containing pollutants into its MS4 and into Lake Poway in 2017, 2019, and 2020.

958.    Declaring the City to have violated, and to be in violation of, its 2013 MS4 Permit and Sections 301(a) and 402(p) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1342(p), for discharging non-storm water uncontrolled.

959.    Declaring the City to have violated, and to be in violation of, its 2013 MS4 Permit and Sections 301(a) and 402(p) of the Clean Water Act, 33 U.S.C. § 1311(a) and 1342(p), for passively receiving discharges causing and contributing to exceedances of water quality standards that it failed to prohibit or effectively control.

960.    Declaring the City of Poway to have violated and to be in violation of the 2013 MS4 Permit, Provision A.1.c., and Sections 301(a) and 402(p) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1342(p), for not removing waste discharges from its MS4 in Warren Canyon that are prohibited by the Basin Plan.

961.    Declaring the City of Poway to have violated the 2013 MS4 Permit for failing to obtain the proper state and/or federal permits for its construction activities in 2017 in the Lake Poway subwatershed area, including the boat dock replacement project and the Warren Crossing project.

COMPLAINT

226

962.    Declaring the City of Poway to have violated the 2013 MS4 Permit for not installing/maintaining controls and other Best Management Practices when constructing its trail/road repairs in and near the various tributaries above Lake Poway including at Warren Crossing and at Piperin Crossing.

963.    Declaring the City of Poway to have violated and to be in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), for engaging in dredge and fill activities without a valid Department of the Army permit upstream of Lake Poway and in Lake Poway.

964.     Declaring the City of Poway to have violated and to be in violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), for engaging in dredge and fill activities without a proper 401 Certification pursuant to the Act in various locations above Lake Poway and in Lake Poway.

965.    Declaring the City of Poway to have violated and to be in violation of Section 402 of the Clean Water Act and the 2013 MS4 Permit for failing to obtain Waste Discharge Requirements from the San Diego Water Board for its work in the Lake Poway area in 2017 and thereafter.

966.    Enjoining the City of Poway from discharging or causing the discharge of dredged or fill materials or other pollutants into any waters of the United States or waters of the state except in compliance with a Department of the Army permit, a San Diego Water Board permit, and/or the 2013 MS4 Permit.

967.    Declaring the City of Poway to have violated and to be in violation of its 2013 MS4 Permit and Sections 301(a) and 402(p) of the CWA for discharging non-storm water

COMPLAINT

227

containing waste sediment and other pollutants exceeding NALs for multiple

constituents without a separate NPDES permit or without effective controls installed or

to be installed.

968.   Declaring that the City of Poway to have violated and to be in violation of the

Endangered Species Act for its activities on private land, APN: 278-210-2900 and APN:

278-210-3000.

969.   Ordering Lake Poway to be added to the section 303(d) of the CWA list of impaired

water bodies.

970.   Ordering the City of Poway to submit an updated Waste Discharge Report and Water

Quality Improvement Plan Annual Report to the San Diego Water Board containing its

water quality exceedances and polluted non-storm water flows into Lake Poway in 2017,

2019, and 2020.

971.   Ordering the City of Poway to replace Warren Crossing with a properly engineered

bridge and/or obtain a proper individualized after-the-fact CWA permit, Water Quality

Certification, and/or waste discharge requirements for Warren Crossing.

972.   Ordering the City of Poway to remove the porta potties next to Warren Creek in

proximity to Lake Poway.

973.   Ordering the City of Poway to remove its unpermitted boat dock or obtain a proper

individualized after-the-fact CWA permit, Water Quality Certification, and/or waste

discharge requirements for the boat dock at Lake Poway.

COMPLAINT

974.    Directing the City of Poway to undertake measures, at the City's own expense and at the direction of the San Diego Water Board and/or Army Corps, to effect complete restoration of waters of the United States within Warren Creek and its tributaries, to restore the capacity of Lake Poway through sediment removal, to remove the waste sediment in Boulder Bay to allow improved flow of waters from Warren Creek into Lake Poway, to remove waste sediment and restore the wetlands surrounding the boat dock, and/or to conduct on-site and off-site mitigation for unauthorized and/or unavoidable impacts to Waters of the United States, as appropriate.

975.    Ordering Defendant to dredge out the waste from its unpermitted stream crossing that was washed out and deposited in the Boulder Bay area of Lake Poway in February 2017, in February 2019, and again in April 2020.

976.    Ordering Defendant to dredge out the waste from the unpermitted stream crossings from third parties in Warren Canyon under the City of Poway's jurisdiction that were washed out and deposited in the Warren Crossing area and the Boulder Bay area of Lake Poway in 2017, 2019, and 2020.

977.    Directing Defendant to undertake measures, at Defendant's own expense and at the direction of the San Diego Water Board and Army Corps, to effect restoration of waters of the United States at Warren Canyon and Lake Poway and to conduct on-site and off-site mitigation for unauthorized impacts to waters of the United States as a penalty, as appropriate.

COMPLAINT

978.   Ordering Defendant to install the proper BMPs/controls at Warren Crossing and Piperin Crossing that will reduce pollutants in storm water to the MEP.

979.   Ordering Defendant to unclog the cross-drainage culverts and improve the drainage of the unpaved trails surrounding Lake Poway.

980.   Ordering Defendant to submit and re-submit accurate reports including the Water Quality Improvement Plan annual report and the Report of Waste Discharge to the San Diego Water Board for past unreported discharges including in 2017, 2018, 2019, and 2020 for the Lake Poway subwatershed area of the SDR watershed.

981.   Ordering Defendant to submit an accurate map detailing the location of the various point sources, springs, stream road crossings, septic tanks, dam drainage pipe, wells, and MS4 structures within the Warren Canyon subwatershed area to the San Diego Water Board as required by the 2013 MS4 Permit.

982.   Ordering the City to undertake a Supplemental Environmental Project as defined by the EPA. Purchasing land that protects sources of drinking water and enhancing that land to capture more stormwater and non-storm water as groundwater are the types of projects that this Court can order the City of Poway to undertake according to EPA guidelines.

983.   Ordering the City to undertake wetland repairs on APN: 278-210-1800 in the two separate streams on this parcel to slow down storm water flows and to capture non-storm spring water flows before they enter the City's MS4.

984.   Directing the City of Poway to cease illegal activities on Plaintiff's parcels and to justly compensate him for the taking of private property, which is part of a proposed

COMPLAINT

mitigation bank containing streams and springs that has been evaluated by the California Department of Fish and Wildlife.

985. Ordering the City of Poway to purchase Plaintiff's five parcels in the subwatershed area above Lake Poway for their ecological/water resource values so that Poway can properly regulate these properties as public utilities.

986. Ordering the City of Poway to purchase Plaintiff's five parcels in the subwatershed area above Lake Poway as relief for the City's trespassing and illegal takings of endangered species on Plaintiff's property.

987. Ordering the City of Poway to remove the polluted sediment from the Boulder Bay area of Lake Poway. Currently, the polluted sediment is causing waste blockage and is causing and threatening to cause eutrophication in the stream and in the reservoir. According to the 2013 MS4 Permit, Finding 16, "[w]aste and pollutants which are deposited and accumulate in MS4 drainage structures will be discharged from these structures to waters of the U.S. unless they are removed.  These discharges may cause or contribute to, or threaten to cause or contribute to, a condition of pollution in receiving waters." As the polluted sediment threatens to cause eutrophication and requires toxic controls which harm fish and other aquatic life, the polluted sediment must be dredged out to stop the cycle of ongoing pollution in Lake Poway. Also, because the waste sediment also reduces the storage and flood control capacity of Lake Poway, the City must dredge out the waste at Boulder Bay as well as the area surrounding Warren

COMPLAINT

Crossing to stop the cycle of ongoing pollution in Lake Poway through storm surges reducing its beneficial uses.

988.   Ordering the City of Poway to obtain a separate NPDES permit for non-storm water discharges in Warren Canyon to Lake Poway.

989.   Assessing the appropriate amount of civil monetary penalties for <u>each</u> violation of the CWA and the 2013 MS4 Permit as described herein on each and every day that violations of the Act and the 2013 MS4 Permit have occurred. The maximum civil penalty for noncompliance with the CWA is currently $54,833 per day per violation for all violations since 2017.

990.   Awarding Plaintiff's reasonable costs of suit, including attorney, witness, expert and consultant fees, as permitted by Section 505(d) of the CWA, 33 U.S.C. § 1365(d); Section 11(g)(4) of the Endangered Species Act, 16 U.S.C. § 1540(g)(4); and the Civil Rights Act, 42 U.S.C. § 1988.

991.   Awarding Section 1983 damages, including compensatory and/or nominal damages.

992.   Awarding prejudgment interest.

993.   All other relief deemed appropriate by this Court.

///

///

///

///

COMPLAINT

232

## XI. JURY DEMAND

994.         Plaintiff requests a jury trial on the issue of liability and any other issue

cognizable by a jury.

DATED: April 8, 2021         Respectfully submitted,


WILLIAMS & SINGH, LLP

By:    s/ *Raj P. Singh*

_____

RAJ P. SINGH

Attorneys for Plaintiff
KEVIN T. KELLY

raj@williamsandsingh.com

COMPLAINT